Solicitation Version

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **INDEPENDENCE CONTRACT DRILLING,** | § | **Case No.  24-[●] (●)** |
| **INC.**[1] | § | |
| | § | **(Joint Administration Requested)** |
| **Debtors.** | § | |
| | § | |

**DEBTORS' DISCLOSURE STATEMENT
FOR THE JOINT PREPACKAGED PLAN OF REORGANIZATION
PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**SIDLEY AUSTIN LLP**

Duston McFaul (24003309)
Maegan Quejada (24105999)
1000 Louisiana Street, Suite 5900
Houston, Texas 77002
Telephone:  (713) 495-4500
Facsimile:  (713) 495-7799

**SIDLEY AUSTIN LLP**

Michael Sabino (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 839-5300
Facsimile:  (212) 839-5599

*Proposed Counsel for the Debtors and Debtors in Possession*
**Dated:  December 2, 2024**

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are:  Independence Contract Drilling, Inc. (3648) and Sidewinder Drilling LLC (1024).  The Debtors' service address is 20475 SH 249, Suite 300, Houston, Texas 77070.

<u>**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**</u>

**SOLICITATION OF VOTES ON THE DEBTORS' JOINT PREPACKAGED PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE FROM THE HOLDERS OF OUTSTANDING:**

| VOTING CLASS | NAME OF CLASS UNDER THE PLAN |
|:---:|:---:|
| **CLASS 4** | **Notes Claims** |

**IF YOU ARE IN CLASS 4 YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING MATERIALS BECAUSE YOU ARE ENTITLED TO VOTE ON THE PLAN**

The deadline for the Holders of Claims in Class 4 to accept or reject the Plan is *12:00 p.m. (prevailing Central Time) on December 4, 2024* (the "<u>Voting Deadline</u>") unless the Debtors, in consultation with the Noteholder Group, extend the Voting Deadline.  To be counted, a ballot to accept or reject the Plan (a "<u>Ballot</u>") indicating such acceptance or rejection must be received by Kroll Restructuring Administration LLC ("<u>Kroll</u>"), the Debtors' notice, claims, and solicitation agent (the "<u>Voting Agent</u>"), no later than the Voting Deadline.  To be counted, a Ballot must be actually received by the Voting Agent before the Voting Deadline as described herein.  Holders of Claims in the Voting Class should refer to the enclosed Ballots for further instructions on how to vote on the Plan.  Votes received via facsimile transmission will not be counted.

Please note that the description of the Plan provided throughout this Disclosure Statement is only a summary provided for convenience.  For a complete understanding of the Plan, you should read the Plan, and the Exhibits thereto in their entirety.  The Plan is attached as hereto as <u>Exhibit A</u>.  In the case of any inconsistency between the summary of the Plan in this Disclosure Statement and the Plan, the Plan will govern.  The Debtors cannot assure you that the version of the Disclosure Statement, including any Exhibits thereto, that is ultimately approved by the Bankruptcy Court in the Chapter 11 Cases will not contain different, additional, or material terms that do not appear in this Disclosure Statement.

This Disclosure Statement has been prepared in accordance with Section 1125 of the Bankruptcy Code and Rule 3016(b) of the Federal Rules of Bankruptcy Procedure and not necessarily in accordance with federal or state securities laws or other nonbankruptcy law.  This Disclosure Statement has been neither reviewed nor approved by the U.S. Securities and Exchange Commission ("<u>SEC</u>") or by any state securities commission or similar public, governmental, or regulatory authority, and neither the SEC nor any other such state authority has passed upon the accuracy or adequacy of the statements contained herein.  Any representations to the contrary is a criminal offense.

The Debtors recommend that each Holder of Claims in the Voting Class (i) read and consider carefully this entire Disclosure Statement (including the Plan and the matters described under "Risk Factors" below) and (ii) consult with its own advisors with respect to reviewing this Disclosure Statement, the Plan and each of the proposed transactions contemplated thereby prior to deciding whether to accept or reject the Plan.  You should not rely on this Disclosure Statement for any purpose other than to determine whether to vote to accept or reject the Plan.

If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all Holders of Claims against, and Holders of Interests in, the Debtors (including, without limitation, those Holders of Claims or Interests who do not submit Ballots to accept or reject the Plan or who are not entitled to vote on the Plan) will be bound by the terms of the Plan and the transactions contemplated thereby.

Independence Contract Drilling, Inc. ("ICD") and Sidewinder Drilling LLC ("Sidewinder") (each a "Debtor" and, collectively, the "Debtors" or the "Company"), are sending you this document and the accompanying materials (the "Disclosure Statement") because you may be a creditor entitled to vote on the *Debtors' Joint Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, supplemented, or otherwise modified from time to time, the "Plan").[2]  A copy of the Plan is attached hereto as Exhibit A and is incorporated herein by reference.  The Debtors are providing the information in this Disclosure Statement to certain Holders of Claims for purposes of soliciting votes to accept or reject the Plan.

The Debtors will file voluntary reorganization cases under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases") to implement the Plan.  This Disclosure Statement has not yet been approved by the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") as containing "adequate information" within the meaning of Section 1125(a) of the Bankruptcy Code.  The Debtors are seeking an order of the Bankruptcy Court (a) approving this Disclosure Statement as having contained "adequate information," (b) approving the solicitation of votes as having been in compliance with Section 1126(b) of the Bankruptcy Code, and (c) confirming the Plan.  The Bankruptcy Court may order additional disclosures.

The consummation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article IX of the Plan.  There is no assurance that the Bankruptcy Court will confirm the Plan or, if the Bankruptcy Court does confirm the Plan, that the conditions necessary for the Plan to become effective will be satisfied or, in the alternative, waived.

The Debtors recommend that each Holder of a Claim or Interest consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and each proposed transaction contemplated by the Plan.

The Debtors strongly encourage Holders of Claims in Class 4 to read this Disclosure Statement (including the Risk Factors described in Section XII of this Disclosure Statement) and the Plan in their entirety before voting to accept or reject the Plan.  Assuming the requisite acceptances to the Plan are obtained, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Combined Hearing (as defined herein).

---

[2] Unless otherwise defined in this Disclosure Statement, all capitalized terms used, but not otherwise defined, in this Disclosure Statement will have the meanings ascribed to them in the Plan.  **The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.**

## SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

The Bankruptcy Court has not reviewed this Disclosure Statement or the Plan, and the securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the SEC under the United States Securities Act of 1933, as amended (the "Securities Act"), or any securities regulatory authority of any state under any state securities laws ("Blue Sky Laws").

The Debtors are relying on Section 4(a)(2) of the Securities Act and similar Blue Sky Laws, of the Bankruptcy Code to exempt from registration under the Securities Act and Blue Sky Laws the issuance of shares of New Common Stock to Holders of Notes Claims prior to the Petition Date ("Section 4(a)(2) Securities"), including in connection with the solicitation of votes to accept or reject the Plan (the "Solicitation").

After the Petition Date, the Debtors will rely on section 1145(a) of the Bankruptcy Code to exempt from registration under the Securities Act and Blue-Sky Laws the offer, issuance, and distribution, if applicable, of New Common Stock to Holders of Notes Claims under the Plan, and to the extent such exemption is not available, then such New Common Stock shares will be offered, issued, and distributed under the Plan pursuant to other applicable exemptions from registration under the Securities Act and any other applicable securities laws, including Section 3(a)(9) and Section 18(b)(4)(c) of the Securities Act. The Plan has not been approved or disapproved by the SEC or any state securities commission and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of the information contained herein. Any representation to the contrary is a criminal offense. Neither the Solicitation nor this Disclosure Statement constitutes an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized or is unlawful.

Except to the extent publicly available, this Disclosure Statement, the Plan, and the information set forth herein and therein are confidential. This Disclosure Statement and the Plan contain material non-public information concerning the Debtors, their subsidiaries, and their respective Securities. Each recipient hereby acknowledges that it (a) is aware that the federal securities laws of the United States prohibit any person who has material non-public information about a company, which is obtained from the company or its representatives, from purchasing or selling securities of such company or from communicating the information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities and (b) is familiar with the United States Securities Exchange Act of 1934, as amended (the "Exchange Act"), including the rules and regulations promulgated thereunder, and agrees that it will not use or communicate to any Person or Entity, under circumstances where it is reasonably likely that such Person or Entity is likely to use or cause any Person or Entity to use, any confidential information in contravention of the Exchange Act or any of its rules and regulations, including Rule 10b-5.

See the Risk Factors in Section XII of this Disclosure Statement for certain risks that you should carefully consider.

## <u>IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT</u>

This Disclosure Statement provides information regarding the Plan.  The Debtors believe that the Plan is in the best interests of all creditors and parties in interest and recommend that all Holders of Claims in the Voting Class vote in favor of the Plan.

Unless the context requires otherwise, references to "*we*," "*our*" and "*us*" are to the Debtors.

Confirmation of the Plan and effectiveness of the Plan are subject to certain material conditions precedent described herein and in the Plan.  The Debtors give no assurance that the Plan will be confirmed, or if confirmed, that the conditions precedent to the occurrence of the Effective Date will be satisfied (or waived).

***The Debtors encourage you to read this Disclosure Statement in its entirety, including without limitation the Plan and <u>Section XII</u> of this Disclosure Statement, entitled "Risk Factors," (and all Exhibits) before submitting a Ballot to vote on the Plan.***

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan and the Plan Supplement, as applicable, and the summaries of the financial information and the documents annexed to this Disclosure Statement or otherwise incorporated herein by reference are qualified in their entireties by reference to those documents.  The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and the Debtors give no assurance that the statements contained herein will be correct at any time after such date.  Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and Confirmation of, the Plan and may not be relied on for any other purpose.  The Debtors believe that the summaries of certain provisions of the Plan and certain other documents and financial information contained or referenced in this Disclosure Statement are fair and accurate.  The summaries of the financial information and the documents annexed to this Disclosure Statement, including, but not limited to, the Plan, or otherwise incorporated herein by reference, are qualified in their entireties by reference to those documents.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement, but the financial information contained in, or incorporated by reference into, this Disclosure Statement has not been, and will not be, audited or reviewed by the Debtors' independent auditors unless explicitly stated herein. The financial projections, attached hereto as **<u>Exhibit C</u>** and described in this Disclosure Statement (the "**<u>Financial Projections</u>**"), have been prepared by the Debtors' management in consultation with their advisors.  The Financial Projections, while presented with numerical specificity, necessarily were based on a variety of estimates and assumptions that are inherently uncertain and may be beyond the control of the Debtors or Debtors' management. Important factors that may affect actual results and cause the management forecasts to not be achieved include, but are not limited to, risks and uncertainties relating to the Debtors' (including its ability to achieve strategic and operational goals, objectives and targets over applicable periods), industry environment, the regulatory environment, general business and economic conditions and other factors.  The Debtors caution that no representations can be made as to the accuracy of these projections or to the ultimate performance of the Reorganized Debtors and any subsidiaries of the foregoing compared to the information contained in the forecasts or that the forecasted results will be achieved. Therefore, the Financial Projections may not be relied upon as a guarantee or other assurance that these projected results will occur.

Regarding contested matters, adversary proceedings, and other pending, threatened, or potential litigations or other actions, this Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver by the Debtors or any other party, but rather as a statement made in the context of settlement negotiations in accordance with Rule 408 of the Federal Rules of Evidence.  As such, this Disclosure Statement shall not be admissible in any non-bankruptcy proceeding involving the Debtors or any other party in interest, nor shall it be construed to be conclusive advice on the tax, securities, financial, or other effects of the Plan to Holders of Claims or Interests or any other party in interest.

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under federal securities laws.  Statements concerning these and other matters are not guarantees of the Debtors' future performance.  Such forward-looking statements represent the Debtors' estimates and assumptions only as of the date such statements were made and involve known and unknown risks, uncertainties, and other unknown factors that could impact the Debtors' restructuring plans or cause the actual results of the Debtors to be materially different from the historical results or from any future results expressed or implied by such forward-looking statements.  In addition to statements that explicitly describe such risks and uncertainties, readers are urged to consider statements labeled with the terms "believes," "belief," "expects," "intends," "anticipates," "plans," or similar terms to be uncertain and forward-looking.  There can be no assurance that the Restructuring described herein will be consummated.  Creditors and other interested parties should see **Section XII** of this Disclosure Statement, entitled "Risk Factors," for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

*[Remainder of page intentionally left blank.]*

**TABLE OF CONTENTS**

I.      **INTRODUCTION** ...............................................................................................................1

II.    **EXECUTIVE SUMMARY** ...............................................................................................1

    A.    Preliminary Statement.............................................................................................1
    B.    Overview of the Plan..............................................................................................2

        1.    Debt-For-Equity and Debt Exchange....................................................2

        2.    Payment in Full of Allowed Administrative Expense, Other Secured, Priority, and General Unsecured Claims.................................................2

        3.    General Settlement of Claims and Interests...........................................2

        4.    Exit Facilities........................................................................................2

        5.    Releases and Injunctions.......................................................................2

    C.    Entitlement to Vote................................................................................................3
    D.    Plan Distributions..................................................................................................3

III.   **VOTING INSTRUCTIONS AND PROCEDURES** ........................................................8

    A.    Holders of Claims Entitled to Vote.......................................................................8
    B.    Combined Hearing..................................................................................................9
    C.    Solicitation Package...............................................................................................9
    D.    Voting Instructions.................................................................................................9
    E.    Voting Tabulation.................................................................................................10
    F.    Agreements upon Furnishing Ballots...................................................................10

IV.   **GENERAL INFORMATION ABOUT THE DEBTORS** ..............................................11

    A.    Overview..............................................................................................................11
    B.    Corporate History................................................................................................11
    C.    Operations............................................................................................................12

        1.    Permian Basin and Haynesville Shale Operations..............................13

    D.    The Debtors' Prepetition Capital Structure..........................................................14

        1.    2026 Convertible Notes........................................................................15

        2.    Revolving ABL Credit Facility...........................................................15

        3.    Intercreditor Agreement.......................................................................16

        4.    Trade and Related Debt.......................................................................16

        5.    Equity Interests....................................................................................16

    E.    Executive Officers and Board of Directors..........................................................17

V.    **CIRCUMSTANCES LEADING TO THE COMMENCEMENT OF THESE CHAPTER 11 CASES** ...............................................................................................................17

    A.    Market Conditions................................................................................................17
    B.    Exploration of Strategic Alternatives..................................................................18
    C.    Strategic Alternatives...........................................................................................18

        1.    Board Hires Advisors...........................................................................18

        2.    Restructuring Terms.............................................................................19

        3.    Post Petition Financing.........................................................................19

VI.   **CHAPTER 11 CASES**...................................................................................................20

    A.    Overview of Chapter 11.......................................................................................20

|  |  |  |  |
|---|---|---|---|
| B. | | Administration of these Chapter 11 Cases | 20 |
| | 1. | First Day Motions | 20 |
| | 2. | Proposed Confirmation Schedule | 20 |
| | 3. | Debtor-in-Possession Financing | 21 |
| C. | | Preference and Other Potential Avoidance Actions | 22 |
| D. | | Other Litigation Matters | 22 |
| E. | | Assumption and Rejection of Executory Contracts and Unexpired Leases | 22 |
| F. | | Exclusivity | 23 |
| **VII.** | | **PLAN OF REORGANIZATION** | **23** |
| A. | | Administrative Expense Claims and Priority Claims | 23 |
| | 1. | General Administrative Expense Claims | 23 |
| | 2. | DIP Claims | 23 |
| | 3. | Professional Claims | 23 |
| | 4. | Payment of Restructuring Expenses | 24 |
| | 5. | Priority Tax Claims | 24 |
| | 6. | Statutory Fees | 24 |
| B. | | Classification and Treatment of Claims and Interests | 25 |
| | 1. | Classification of Claims and Interests | 25 |
| | 2. | Treatment of Claims and Interests | 25 |
| | 3. | Special Provision Governing Unimpaired Claims | 28 |
| | 4. | Elimination of Vacant Classes | 29 |
| | 5. | Controversy Concerning Impairment | 29 |
| | 6. | Subordinated Claims | 29 |
| | 7. | Discharge of Claims | 29 |
| C. | | Acceptance or Rejection of the Plan | 29 |
| | 1. | Presumed Acceptance by Non-Voting Classes | 29 |
| | 2. | Voting Class | 29 |
| | 3. | Acceptance by Impaired Class | 29 |
| | 4. | Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code | 30 |
| D. | | Means for Implementation of the Plan | 30 |
| | 1. | No Substantive Consolidation | 30 |
| | 2. | General Settlement of Claims and Interests | 30 |
| | 3. | Restructuring Transactions | 30 |
| | 4. | Reorganized Debtors | 31 |
| | 5. | Sources for Plan Distributions | 31 |
| | 6. | New Common Stock | 32 |
| | 7. | Corporate Existence | 32 |
| | 8. | Vesting of Assets in the Reorganized Debtors | 32 |
| | 9. | Cancellation of Existing Securities and Agreements | 33 |
| | 10. | Corporate Action | 33 |

11. New Organizational Documents .................................................................................. 34

12. Indemnification Provisions in Organizational Documents ........................................ 34

13. Directors and Officers of the Reorganized Debtors .................................................. 34

14. Effectuating Documents; Further Transactions ......................................................... 34

15. Section 1146 Exemption ............................................................................................ 34

16. Director and Officer Liability Insurance ................................................................... 35

17. Management Incentive Program ................................................................................ 35

18. Employee and Retiree Benefits .................................................................................. 35

19. Preservation of Causes of Action .............................................................................. 35

E. Treatment of Executory Contracts and Unexpired Leases .................................................. 36

1. Assumption and Rejection of Executory Contracts and Unexpired Leases ..................... 36

2. Indemnification Obligations ...................................................................................... 37

3. Claims Based on Rejection of Executory Contracts or Unexpired Leases ...................... 37

4. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.................... 37

5. Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases ........................................................................................................................... 38

6. Insurance Policies ...................................................................................................... 38

7. Reservation of Rights ................................................................................................ 39

8. Nonoccurrence of Effective Date............................................................................... 39

9. Employee Compensation and Benefits ...................................................................... 39

10. Contracts and Leases Entered Into after the Petition Date........................................ 40

F. Provisions Governing Distributions ................................................................................... 40

1. Distributions on Account of Claims Allowed as of the Effective Date ........................... 40

2. Disbursing Agent ....................................................................................................... 40

3. Rights and Powers of Disbursing Agent .................................................................... 40

4. Delivery of Distributions and Undeliverable or Unclaimed Distributions....................... 41

5. Manner of Payment.................................................................................................... 42

6. Exemption from Registration Requirements.............................................................. 42

7. Compliance with Tax Requirements.......................................................................... 42

8. Allocations................................................................................................................. 42

9. No Postpetition Interest on Claims ........................................................................... 43

10. Foreign Currency Exchange Rate .............................................................................. 43

11. Setoffs and Recoupment ............................................................................................ 43

12. Claims Paid or Payable by Third Parties ................................................................... 43

G. Procedures for Resolving Contingent, Unliquidated, and Disputed Claims ...................... 44

1. Disputed Claims Process ........................................................................................... 44

2. Allowance of Claims .................................................................................................. 44

3. Claims Administration Responsibilities .................................................................... 44

4. Adjustment to Claims without Objection................................................................... 45

|  | 5. | Disallowance of Claims or Interests | 45 |
|  | 6. | No Distributions Pending Allowance | 45 |
|  | 7. | Distributions after Allowance | 45 |
| H. | | Settlement, Release, Injunction, and Related Provisions | 46 |
|  | 1. | Discharge of Claims and Termination of Interests | 46 |
|  | 2. | Release of Liens | 46 |
|  | 3. | Releases by the Debtors | 47 |
|  | 4. | Releases by the Releasing Parties (the "Third-Party Release") | 47 |
|  | 5. | Exculpation | 48 |
|  | 6. | Injunction | 49 |
|  | 7. | Gatekeeping Provision | 49 |
|  | 8. | Protections against Discriminatory Treatment | 50 |
|  | 9. | Waiver of Statutory Limitation on Releases | 50 |
|  | 10. | Reimbursement or Contribution | 50 |
|  | 11. | Integral Part of Plan | 50 |
| I. | | Conditions Precedent to Confirmation and Consummation of the Plan | 50 |
|  | 1. | Condition Precedent to Confirmation | 50 |
|  | 2. | Conditions Precedent to the Effective Date | 51 |
|  | 3. | Waiver of Conditions | 52 |
|  | 4. | Effect of Failure of Conditions | 52 |
|  | 5. | Substantial Consummation | 52 |
| J. | | Modification, Revocation, or Withdrawal of Plan | 52 |
|  | 1. | Modification and Amendments | 52 |
|  | 2. | Effect of Confirmation on Modifications | 53 |
|  | 3. | Revocation or Withdrawal of Plan | 53 |
| K. | | Retention of Jurisdiction | 53 |
| L. | | Miscellaneous Provisions | 55 |
|  | 1. | Immediate Binding Effect | 55 |
|  | 2. | Additional Documents | 55 |
|  | 3. | Dissolution of Committee and Cessation of Fee and Expense Payment | 55 |
|  | 4. | Reservation of Rights | 55 |
|  | 5. | Successors and Assigns | 55 |
|  | 6. | Notices | 55 |
|  | 7. | Term of Injunctions or Stays | 56 |
|  | 8. | Entire Agreement | 56 |
|  | 9. | Exhibits and Annexes | 56 |
|  | 10. | Nonseverability of Plan Provisions | 57 |
|  | 11. | Votes Solicited in Good Faith | 57 |
|  | 12. | Governing Law | 57 |

|        | 13. | Closing of Chapter 11 Cases ........................................................................ | 57 |
|        | 14. | Waiver or Estoppel ....................................................................................... | 57 |
| **VIII.** | **LIQUIDATION ANALYSIS, VALUATION, AND FINANCIAL PROJECTIONS** | | **58** |
| A. | | Liquidation Analysis ............................................................................................. | 58 |
| B. | | Valuation Analysis ................................................................................................ | 58 |
| C. | | Financial Projections ............................................................................................. | 58 |
| D. | | Other Available Information .................................................................................. | 60 |
| **IX.** | **CORPORATE GOVERNANCE** ....................................................................................... | | **60** |
| A. | | New Organizational Documents ............................................................................ | 60 |
| B. | | Directors and Officers of the Reorganized Debtors ............................................. | 60 |
| **X.** | **FEASIBILITY AND BEST INTEREST OF THE CREDITORS** ............................................ | | **60** |
| A. | | Feasibility of the Plan .......................................................................................... | 60 |
| B. | | Best Interests of Creditors Test ............................................................................ | 61 |
| **XI.** | **CONFIRMATION PROCEDURES** ................................................................................... | | **61** |
| A. | | Combined Hearing ................................................................................................. | 61 |
| B. | | Statutory Requirements for Confirmation of the Plan .......................................... | 61 |
|        | 1. | Acceptance by Impaired Classes ................................................................ | 61 |
|        | 2. | Confirmation Without Acceptance by All Impaired Classes ....................... | 62 |
| **XII.** | **RISK FACTORS** ........................................................................................................ | | **62** |
| A. | | Bankruptcy-Specific Considerations ..................................................................... | 63 |
|        | 1. | General ........................................................................................................ | 63 |
|        | 2. | Objections to the Plan's Classification of Claims and Interests ................. | 63 |
|        | 3. | Non-Confirmation or Delay of Confirmation of the Plan ........................... | 63 |
|        | 4. | Non-Consensual Confirmation .................................................................... | 64 |
|        | 5. | Non-Occurrence of the Effective Date ....................................................... | 64 |
|        | 6. | Conversion to Chapter 7 ............................................................................. | 64 |
|        | 7. | Impact of Chapter 11 Cases on the Debtors ............................................... | 64 |
|        | 8. | Inability to Assume Executory Contracts ................................................... | 65 |
|        | 9. | Adverse Effect on Debtors' Tax Attributes ................................................ | 65 |
|        | 10. | Votes and Recoveries Subject to Contingencies ......................................... | 65 |
|        | 11. | Ability to Discharge or Satisfy Prepetition Claims .................................... | 65 |
|        | 12. | Failure to Obtain Approval of Releases, Injunctions, and Exculpation ...... | 66 |
|        | 13. | Plan Based on Assumptions ........................................................................ | 66 |
| B. | | Risks Related to the Debtors' Business Operations and Financial Condition ...... | 66 |
|        | 1. | Volatility of Oil and Natural Gas Prices .................................................... | 66 |
|        | 2. | Operating Hazards ...................................................................................... | 67 |
|        | 3. | Substantial Leverage; Ability to Service Debt ........................................... | 68 |
|        | 4. | Restrictive Covenants in Exit Facilities Documents .................................. | 68 |
|        | 5. | Effect of Uncertainty on Employees and Contract Counterparties ............. | 69 |
|        | 6. | Loss of ICD Executive Officers .................................................................. | 69 |

7. Adverse Impact of Prepetition and Postpetition Litigation ........................ 69

8. Inability to Obtain Capital ................................................................. 69

9. Shortages of Equipment or Supplies ................................................... 69

10. Uncertainty Related to Customers ..................................................... 70

11. Inability to Compete Effectively ....................................................... 70

12. Financial Projections ...................................................................... 71

13. Variance between Historical Performance and Future Performance of Reorganized Debtors ........................................................................ 71

C. Risks Related to the New Common Stock ................................................. 71

1. Significant Holders ......................................................................... 71

2. Lack of Public Market or Valuation Analysis for Plan Securities ............... 71

3. Restrictions on Transfer .................................................................. 71

4. Potential for Dilution ..................................................................... 72

5. Adverse Effects on Value of New Common Stock .................................. 72

D. Additional Risks, Uncertainties, and Other Factors .................................... 72

**XIII.   CERTAIN SECURITIES LAW MATTERS** ............................................. **73**

A. Plan Securities .................................................................................. 73

B. Issuance and Resale of Plan Securities under the Plan ................................ 73

1. Exemptions from Registration Requirements of the Securities Act and State Blue Sky Laws ..................................................................... 73

2. Resales of Plan Securities; Definition of Underwriter ............................ 74

3. Resale of Other Securities Exempt from Registration Requirements Pursuant to Section 4(a)(2) of the Securities Act ................................... 75

**XIV.   CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** ....... **75**

A. Introduction ..................................................................................... 75

B. Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors ....... 76

1. Cancellation of Debt and Reduction of Tax Attributes ........................... 76

2. Limitation of Tax Attributes ............................................................ 76

C. Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Claims ...... 78

1. General ....................................................................................... 78

2. Market Discount ............................................................................ 79

3. Definition of "Security" .................................................................. 79

4. Consequences to Holders of Notes Claims ........................................... 79

5. Bad Debt and/or Worthless Securities Deduction .................................. 81

6. Consequences to Holders that are Non-United States Persons ................... 81

7. Consequences to U.S. Holders of Ownership and Dispositions of Exit Facility Term Loans ......................................................................... 82

8. Consequences to Non-U.S. Holders of Ownership and Dispositions of Exit Facility Term Loans ......................................................................... 82

9. Consequences to U.S. Holders of Ownership and Dispositions of New Common Stock . 83

      10.      Consequences to Non-U.S. Holders of Ownership and Dispositions of New Common Stock ...............................................................................................................84

      11.      Withholding and Reporting ...............................................................................85

      12.      FATCA .................................................................................................................85

   D.      Reservation of Rights.........................................................................................................86

**XV.     CONCLUSION AND RECOMMENDATION .........................................................................87**

**EXHIBITS**

EXHIBIT A        Plan of Reorganization

EXHIBIT B        Liquidation Analysis

EXHIBIT C        Financial Projections

EXHIBIT D        Valuation Analysis

---

**THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT ATTACHED TO THIS DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN**

## I.  INTRODUCTION

ICD and Sidewinder submit this Disclosure Statement pursuant to Section 1125 of the Bankruptcy Code to Holders of Claims against the Debtors in connection with the solicitation of votes for acceptance of the Plan.  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code.  The Debtors seek to consummate the restructuring outlined in the Plan on the proposed Effective Date of the Plan.  Each Debtor is a proponent of the Plan within the meaning of Section 1129 of the Bankruptcy Code.  Unless otherwise indicated in a particular Class, the classification of Claims and Interests set forth in **Article III** of the Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable.  The Plan does not contemplate substantive consolidation of any of the Debtors.

**THE DEBTORS BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST AVAILABLE RECOVERY TO ALL CREDITORS.  AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.  EXECUTIVE SUMMARY

The Debtors will file petitions for relief under the Bankruptcy Code and their proposed Plan.  The Plan sets forth the manner in which Claims against and Interests in the Debtors will be treated following confirmation of the Plan.  This Disclosure Statement, submitted pursuant to Section 1125 of the Bankruptcy Code for the purpose of soliciting votes to accept or reject the Plan, describes certain aspects of the Plan, the Debtors' business operations and financial projections, significant events occurring in the Debtors' Chapter 11 Cases, and related matters.  This Executive Summary is intended solely as a summary.  **FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN, AND THE EXHIBITS HERETO AND THERETO IN THEIR ENTIRETY**.

### A.  Preliminary Statement

ICD is a publicly-traded, land-based contract drilling services company for a broad array of oil and natural gas producers in the United States.  The Debtors utilize their specialized rig fleet, including superspec AC Powered rigs, to target unconventional oil and natural gas exploration and resources in geographic regions that can be leveraged by the Debtors' primary Houston, Texas, Midland, Texas, Odessa, Texas and Coushatta, Louisiana facilities.  The Debtors customers include major oil and natural gas companies, independent oil and natural gas companies, as well as numerous small to mid-sized publicly-traded and privately held oil and natural gas companies.  The Debtors' drilling services offer cost-effective drilling models that assist customers in increasing flexibility in field development, reaching higher production capacity and reaching unconventional wells through horizontal drilling systems.  The Debtors employ approximately 387 full-time employees in the United States.  In addition, the Debtors lease or own approximately 50.7 acres in connection with their field operations and their corporate headquarters in northwest Houston, Texas.

The Company operates in a highly competitive industry.  The Company's success depends on capital spending levels by oil and natural gas companies for their exploration, development, and production activities, which could be materially impacted by the price of oil and natural gas.  Customers for contract drilling services in the United States include major oil and natural gas companies, independent oil and natural gas companies, and numerous small to mid-sized publicly-traded and privately held oil and natural gas companies.

The Plan reflects the agreement reached among the Debtors and Noteholders.  For the reasons detailed in this Disclosure Statement, the Debtors believe that the Plan provides for a comprehensive restructuring of the Debtors' capital structure, provides for fair and reasonable treatment of Holders of Claims and Interests, and is in the best interests of the Debtors, their Estates, and their creditors.  Accordingly, the Debtors  recommend that Holders of Claims in the Voting Class vote to accept the Plan.

### B.       Overview of the Plan

The Plan contemplates the implementation of a debt-to-equity conversion of a substantial portion of the Debtors' prepetition funded indebtedness, the payment in full of all Allowed General Unsecured Claims, exit financing facilities, which collectively will result in a significantly deleveraged balance sheet and necessary liquidity for the Reorganized Debtors upon emergence.  The compromises and settlements embodied in the Plan preserve value by enabling the Debtors to avoid costly and time-consuming litigation that would delay the Debtors' emergence from chapter 11.  The key components of the Plan are described below.

#### 1.       Debt-For-Equity and Debt Exchange

The key element of the Plan is the conversion of substantially all of certain of the Notes Claims into equity in the Reorganized Debtors.  Specifically, if the Plan is confirmed, the Noteholders under the 2026 Convertible Notes will receive their Pro Rata share of (a) 100% of the New Common Stock, subject to dilution on account of any equity issued pursuant to the Management Incentive Plan and (b) on account of the Additional Notes, solely $7.5 million, plus the amount of accrued and unpaid interest on the Additional Notes, in principal amount of the loans under the Exit Term Loan Facility (the "**Exit Facility Term Loans**").

#### 2.       Payment in Full of Allowed Administrative Expense, Other Secured, Priority, and General Unsecured Claims

As set forth in more detail below and in the Plan, the Plan provides for the full satisfaction of Allowed Administrative Expense Claims, Priority Tax Claims, Other Secured Claims, Other Priority Claims, and General Unsecured Claims or such other treatment that renders such claims Unimpaired (with the consent of the Noteholder Group).

#### 3.       General Settlement of Claims and Interests

As described more fully in the Plan, pursuant to Section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan will constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the Debtors.

#### 4.       Exit Facilities

On the Effective Date, the Reorganized Debtors shall enter into the Exit Facilities, the terms of which will be set forth in the Exit Facilities Documents and acceptable to the Noteholder Group.

In accordance with the terms and conditions set forth in the Exit Facilities Documents, and to the extent applicable, Confirmation of the Plan shall be deemed (a) an approval of the Exit Term Loan Facility and Exit ABL Facility (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid (at any time) by the Debtors or the Reorganized Debtors, as applicable, in connection therewith and subject to all conditions set forth therein), to the extent not approved by the Bankruptcy Court previously, and (b) an authorization for the Debtors or the Reorganized Debtors, as applicable, to, without further notice to or order of the Bankruptcy Court, (i) execute and deliver those documents necessary or appropriate to obtain the Exit Facilities, including the Exit Term Loan Facility Documents and Exit ABL Facility Documents and (ii) act or take action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or the Reorganized Debtors, as applicable, may deem to be necessary to consummate the Exit Facilities.

#### 5.       Releases and Injunctions

The Plan contains certain releases and injunctions (as described more fully in **Article VIII** of the Plan), including releases between the Debtors and Reorganized Debtors, on the one hand, and certain Released Parties on the other hand.  The Released Parties under the Plan include the Debtors, Reorganized Debtors, DIP Lenders, the

Noteholders, the Indenture Trustee, the Revolving ABL Agent, the Revolving ABL Lenders, the Exit Facility Agents, the lenders under the Exit Facilities, any statutory committee appointed in these Chapter 11 Cases and its members, and their representatives, advisors, Affiliates, and agents, including the Debtors current and former directors and officers. The Plan also provides that each Holder of a Claim or an Interest that does not make the opt-out election on its Ballot or form included with the notice of non-voting status, as applicable, and return such Ballot or form pursuant to the instructions set forth therein, will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all claims and causes of action against the Released Parties. The applicable Ballot or election form included with a notice of non-voting status provide the instructions by which Holders of Claims or Interests as of the Voting Record Date may opt-out of granting the Third Party Release in the Plan. The release, exculpation, and injunction provisions in **Article VIII** of the Plan are integral to the Plan and the Debtors' restructuring efforts.

### C.     Entitlement to Vote

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim you hold and whether you held that Claim as of the Voting Record Date (as defined below). Each category of Holders of Claims or Interests, as set forth in **Article III** of the Plan pursuant to Section 1122(a) of the Bankruptcy Code, is referred to as a "**Class**." Each Class's respective voting status is set forth below:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | Revolving ABL Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 4 | Notes Claims | Impaired | Entitled to Vote |
| Class 5 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 6 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 7 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 8 | Existing ICD Subsidiary Equity Interest | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

### D.     Plan Distributions

The following chart summarizes the projected distributions to Holders of Allowed Claims and Allowed Interests. Although every reasonable effort was made to be accurate, the projections of estimated recoveries are only an estimate. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts Allowed by the Bankruptcy Court. As a result of the foregoing and other uncertainties which are inherent in the estimates, the estimated recoveries in this Disclosure Statement may vary from the actual recoveries received. In addition, the ability to receive distributions under the Plan depends on the ability of the Debtors to obtain Confirmation of the Plan and meet the conditions to confirmation and effectiveness of the Plan, as discussed in this Disclosure Statement. Reference should be made to the entire Disclosure Statement, including without limitation **Section VII.A** of this Disclosure Statement, and the Plan for a complete description of the classification and treatment of Allowed Claims and Allowed Interests.

| SUMMARY OF EXPECTED RECOVERIES[3] | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims (approx.) | Projected Recovery Under the Plan |
| N/A | General Administrative Expense Claims | Unless otherwise agreed to by the Holder of an Allowed General Administrative Expense Claim and, with the reasonable consent of the Noteholder Group, the Debtors or the Reorganized Debtors, as applicable, each Holder of an Allowed General Administrative Expense Claim will receive in full and final satisfaction of its General Administrative Expense Claim, at the option of the Debtors (with the consent of the Noteholder Group), (A) an amount of Cash equal to the unpaid amount of such Allowed Administrative Expense Claim in accordance with the following: (1) if an General Administrative Expense Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed General Administrative Expense Claim is due or as soon as reasonably practicable thereafter); (2) if such General Administrative Expense Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such General Administrative Expense Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed General Administrative Expense Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Administrative Expense Claim without any further action by the Holders of such Allowed General Administrative Expense Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable (with the reasonable consent of the Required Consenting Lenders); or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court or (B) such other treatment | Undetermined | 100% |

---

[3] The projected Plan recoveries set forth in this chart related to the receipt of New Common Stock under the terms of the Plan were projected using the estimated range of Equity Value (as defined in the Valuation Analysis) of $100 to $130, as provided in the Valuation Analysis attached as **Exhibit D** hereto.

| SUMMARY OF EXPECTED RECOVERIES[3] | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims (approx.) | Projected Recovery Under the Plan |
| | | consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | | |
| N/A | DIP Claims | In full satisfaction of each Allowed DIP Claim, each Holder thereof shall receive, in full satisfaction of its Claims, distribution of Cash and/or commitments under the Exit Term Loan Facility in the manner set forth in the Exit Facility Term Loan Documents. | $32.5 million | 100% |
| N/A | Professional Claims | All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be Filed no later than the Administrative Expense Claims Bar Date. The Reorganized Debtors shall pay Professional Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Claim Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Claim Reserve Amount on the Effective Date. | Undetermined | 100% |
| N/A | Priority Tax Claims | Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtors (with the consent of the Noteholder Group) agree to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. | Undetermined | 100% |
| Class 1 | Other Secured Claims | Subject to **Article VIII** of the Plan, except to the extent that a Holder of an Allowed Other Secured Claim against any of the Debtors has agreed to less favorable treatment of such Claim, on, or as soon as reasonably practicable after, the later of (i) the Effective Date if such Other Secured Claim is an Allowed Other Secured Claim as of the Effective Date or (ii) the date on which such Other Secured Claim becomes an Allowed Other Secured | Undetermined | 100% |

| | | SUMMARY OF EXPECTED RECOVERIES[3] | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims (approx.) | Projected Recovery Under the Plan |
| | | Claim, each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor, in each case, with the consent of the Noteholder Group: (i) payment in full in Cash of its Allowed Other Secured Claim; (ii) Reinstatement of its Allowed Other Secured Claim; or (iii) such other treatment that renders its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code; *provided*, *however*, that Other Secured Claims arising out of obligations incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with the terms and conditions of any agreements relating thereto without further notice to or order of the Bankruptcy Court. | | |
| Class 2 | Other Priority Claims | Subject to **Article VIII** of the Plan, except to the extent that a Holder of an Allowed Other Priority Claim against any of the Debtors has agreed to less favorable treatment of such Claim, on, or as soon as reasonably practicable after, the later of (i) the Effective Date if such Other Priority Claim is an Allowed Other Priority Claim as of the Effective Date or (ii) the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive, at the option of the applicable Debtor,  in each case, with the consent of the Noteholder Group: (i) payment in full in Cash of its Allowed Other Priority Claim; (ii) Reinstatement of its Allowed Other Priority Claim; or (iii) such other treatment that renders its Allowed Other Priority Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code; *provided*, *however*, that Other Priority Claims arising out of obligations incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with the terms and conditions of any agreements relating thereto without further notice to or order of the Bankruptcy Court. | Undetermined | 100% |
| Class 3 | Revolving ABL Claims | Upon the closing of the DIP Facility pursuant to the terms of the DIP Documents, each Holder of an Allowed Revolving ABL Claim | $0-$14.3 million | 100% |

| | | SUMMARY OF EXPECTED RECOVERIES[3] | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims (approx.) | Projected Recovery Under the Plan |
| | | shall have received, in full and final satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Revolving ABL Claim, payment in full in Cash or such other treatment that renders its Revolving ABL Claim Unimpaired in accordance with Section 1124 of the Bankruptcy Code. | | |
| Class 4 | Notes Claims | On the Effective Date, each Holder of an Allowed Notes Claim shall receive its Pro Rata share of (a) 100% of the New Common Stock, subject to dilution on account of any equity issued pursuant to the Management Incentive Plan and (b) on account of the Additional Notes, solely $7.5 million, plus the amount of accrued and unpaid interest on the Additional Notes, in principal amount of the Exit Facility Term Loans. | $216 million | 50%-64% |
| Class 5 | General Unsecured Claims | The legal, equitable, and contractual rights of the Holders of General Unsecured Claims are unaltered by the Plan.  On or as soon as practicable after the earliest to occur of the Effective Date and the date such Claim becomes due in the ordinary course of business, each Holder of an Allowed General Unsecured Claim shall receive payment in full in Cash on account of its Allowed General Unsecured Claim or such other treatment as would render such Claim Unimpaired (in each case except to the extent that a holder of a General Unsecured Claim agrees to less favorable treatment with the prior written consent of the Noteholder Group). | Undetermined | 100% |
| Class 6 | Intercompany Claims | All Intercompany Claims shall be, at the option of the applicable Debtor with the prior written consent of the Noteholder Group, either: (i) Reinstated on the Effective Date; or (ii) canceled, released, and extinguished, and will be of no further force or effect without any distribution. | N/A | 100%/0% |
| Class 7 | Existing Equity Interests | All Existing Equity Interests shall be canceled, released, and extinguished, and will be of no further force or effect. | N/A | 0% |
| Class 8 | Existing ICD Subsidiary Equity Interest | All Existing ICD Subsidiary Equity Interests shall be Reinstated. | N/A | 100% |

### III.     VOTING INSTRUCTIONS AND PROCEDURES

On the Petition Date, the Debtors will file a motion seeking the Bankruptcy Court to schedule a hearing to, among other things, (i) approve this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtors' creditors and interest holders to make an informed judgment whether to accept or reject the Plan, (ii)  consider Confirmation of the Plan, and (iii) ratify the procedures for soliciting votes to accept or reject the Plan (the "**Solicitation Procedures Order**") (the "**Combined Hearing**").  **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

The Solicitation Procedures Order will ratify the deadlines, procedures, and instructions for voting to accept or reject the Plan and for filing objections to Confirmation of the Plan, the record date for voting purposes and the applicable standards for tabulating ballots.  In addition, detailed voting instructions accompanied each Ballot.  Each Holder of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Plan, and the instructions accompanying the Ballot in their entirety before voting on the Plan.  These documents contain important information concerning the classification of Claims and Interests for voting purposes and the tabulation of votes.  No solicitation of votes to accept the Plan may be made except pursuant to Section 1125 of the Bankruptcy Code.

#### A.        Holders of Claims Entitled to Vote

> **THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 12:00 P.M. PREVAILING CENTRAL TIME ON DECEMBER 4, 2014.  TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT BY THIS DATE.**

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or equity interests which (i) are "impaired" by a chapter 11 plan and (ii) are entitled to receive a distribution under such plan are entitled to vote to accept or reject a proposed plan.  Classes of claims or equity interests which (a) are "impaired" by a chapter 11 plan and (b) are not entitled to receive a distribution under such a plan are not entitled to vote and are deemed to have rejected the Plan.  Classes of Claims or Interests in which the Holders of Claims or Interests are unimpaired are deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

Classes 4 (Notes Claims) and 7 (Existing Equity Interests) are impaired under the Plan.  Holders of Claims in Class 4 are entitled to vote to accept or reject the Plan (the "**Voting Class**").  Holders of Existing Equity Interests in Class 7 will not receive any distribution and Class 7 is therefore deemed to reject the Plan.  Classes 1 (Other Secured Claims), 2 (Other Priority Claims), 3 (Revolving ABL Claims), 5 (General Unsecured Claims), and 8 (Existing ICD Subsidiary Equity Interest) are unimpaired by the Plan and the Holders thereof are conclusively presumed to have accepted the Plan.  Class 6 (Intercompany Claims) will either be Unimpaired and deemed to accept the Plan, or Impaired and deemed to reject the Plan, and is not entitled to vote on the Plan.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan.  Thus, acceptance of the Plan by Class 4 will occur only if at least two-thirds in dollar amount and a majority in number of the Holders of Claims in each Class that cast their ballots vote in favor of acceptance.  A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

If one or more Classes of Claims entitled to vote on the Plan reject the Plan, the Debtors reserve the right to amend the Plan or request Confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code or both.  Section 1129(b) permits confirmation of a plan of reorganization notwithstanding the non-acceptance of a plan by one or more impaired classes of claims or equity interests if the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class.

**B.      Combined Hearing**

Pursuant to Section 1128 of the Bankruptcy Code, the Debtors will request that the Bankruptcy Court hold the Combined Hearing to consider Confirmation of the Plan on January 9, 2025. The Debtors will request that the Bankruptcy Court direct that objections, if any, to confirmation of the Plan be served and filed so that they are received on or before **January 3, 2025 at 4:00 p.m.** (prevailing Central Time) (the "**Objection Deadline**").  The Combined Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Combined Hearing or at any subsequent adjourned Combined Hearing.

**C.      Solicitation Package**

Accompanying this Disclosure Statement for the purpose Solicitation are copies of (i) the Plan, (ii) the notice of, among other things, the time for submitting Ballots to accept or reject the Plan, the date, time, and place of the Combined Hearing and related matters, and the Objection Deadline; (iii) as applicable, a Ballot or Ballots (and return envelope(s)) that you may use in voting to accept or to reject the Plan; (iv) a cover letter from the Debtors; and (vi) any other such materials that the Bankruptcy Court may direct (the "**Solicitation Package**").  Only Holders eligible to vote to accept or reject the Plan will receive a Solicitation Package.

Holders of Claims or Interests not entitled to vote to accept or reject the Plan will receive a notice of non-voting status, which notice will provide such Holder with information regarding (i) how to obtain copies of this Disclosure Statement, the Plan, and other documents, (ii) the Combined Hearing, (iii) the Objection Deadline, and (iv) the releases and injunctions provided for in **Article VIII** of the Plan, and the procedures by which such Holders may elect to opt-out of granting certain releases.

If you did not receive a Solicitation Package and believe that you should have, please contact the Debtors' Voting Agent at the address or telephone number set forth in **Section III.D** of this Disclosure Statement.  You may also contact Debtors' counsel.

**D.      Voting Instructions**

If you are entitled to vote to accept or reject the Plan, a Ballot is included in your Solicitation Package for the purpose of voting on the Plan.

Each Ballot has been coded to reflect the Class of Claims it represents.  Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you in your Solicitation Package.

After carefully reviewing the Plan and this Disclosure Statement, and the Exhibits thereto, and the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan on the enclosed Ballot. After indicating your acceptance or rejection of the Plan, please complete any other applicable items on your Ballot, sign your Ballot and return your Ballot in accordance with the instructions accompanying your Ballot on or before the Voting Deadline. In order for your vote to be counted, you must complete and return your Ballot in accordance with the instructions accompanying your Ballot so that your Ballot is *actually received* by the Voting Agent on or before the Voting Deadline.

Any party that has previously submitted a valid Ballot to the Voting Agent before the Voting Deadline may revoke such Ballot and change its vote by submitting to the Voting Agent a subsequent, valid Ballot for acceptance or rejection of the Plan before the Voting Deadline.

If you are a Holder of an Allowed Class 4 Notes Claim and are not an Accredited Investor, you should make the certification that you are a Non-Accredited Noteholder on the enclosed Ballot.

If you have any questions about the procedure for voting your eligible Claim or with respect to the Solicitation Package that you have received, please contact the Voting Agent:

Independence Contract Drilling, Inc. Ballot Processing Center
c/o Kroll Restructuring Administration
850 Third Avenue, Suite 412
Brooklyn, NY 11232
Email: ICDBallots@ra.kroll.com
Case Website: https://cases.ra.kroll.com/ICD

**IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT ON OR BEFORE 12:00 P.M. (PREVAILING CENTRAL TIME) ON DECEMBER 4, 2024, AT THE ABOVE ADDRESS.  EXCEPT TO THE EXTENT ALLOWED BY THE BANKRUPTCY COURT OR DETERMINED OTHERWISE BY THE DEBTORS, BALLOTS RECEIVED AFTER THE PLAN VOTING DEADLINE WILL NOT BE ACCEPTED OR USED IN CONNECTION WITH THE DEBTORS' REQUEST FOR CONFIRMATION OF THE PLAN OR ANY MODIFICATION THEREOF.  THE RECORD DATE FOR DETERMINING WHICH CREDITORS MAY VOTE ON THE PLAN IS NOVEMBER 27, 2024.**

**DO NOT RETURN ANY SECURITIES WITH YOUR BALLOT.**

If you are a Holder of a Claim entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot, or lost your Ballot, or if you have any questions concerning this Disclosure Statement, the Plan or the procedures for voting on the Plan, please contact Kroll at ICDBallots@ra.kroll.com.

| |
|---|
| **RECOMMENDATION**: THE DEBTORS RECOMMEND THAT CREDITORS IN THE VOTING CLASS VOTE TO ACCEPT THE PLAN. |

### E.      Voting Tabulation

Under the Bankruptcy Code, for purposes of determining whether the requisite acceptances have been received, only Holders who actually vote will be counted.  The failure of a Holder to deliver a duly executed Ballot will be deemed to constitute an abstention by such Holder with respect to voting on the Plan and such abstentions will not be counted as votes for or against the Plan.

Unless otherwise ordered by the Bankruptcy Court, Ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted.  The Debtors may request that the Voting Agent attempt to contact such voters to cure any such defects in the Ballots, however, the Debtors and the Voting Agent are not required to contact voters to cure defects associated with their submitted Ballot(s).

A vote may be disregarded if the Bankruptcy Court determines, pursuant to Bankruptcy Code Section 1126(e), that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another Party acting in a fiduciary or representative capacity, such Person should indicate such capacity when signing and, unless otherwise determined by the Debtors, must submit proper evidence satisfactory to the Debtors of authority to so act.

### F.      Agreements upon Furnishing Ballots

The delivery of an accepting Ballot by a Holder pursuant to one of the procedures set forth above will constitute the agreement of such Holder to accept (i) all of the terms of, and conditions to, the solicitation and voting procedures and (ii) the terms of the Plan, but subject to rights of such Holder under Section 1128 of the Bankruptcy Code.

## IV.    GENERAL INFORMATION ABOUT THE DEBTORS

### A.    Overview

ICD, incorporated in 2011, provides land-based contract drilling services for oil and natural gas producers in the United States, focusing operations in geographic regions that the Company can efficiently support from its facilities.  The Company targets unconventional oil and natural gas exploration and development projects using its fleet of technologically advanced drilling rigs, which it markets under its ShaleDriller® brand.  The Company provides the drilling rig and required crews to drill and case its customers' oil and gas wells.  During the three months ending September 30, 2024, the Company operated an average of 13.1 rigs and expects to operate an average of 10.7 rigs during the three months ended December 31, 2024.  This is substantially below the 17.3 and 15.7 average rigs operated during the twelve (12) months ended December 31, 2022 and December 31, 2023, respectively.

The Company operates in a highly competitive industry which includes much larger competitors as well as competitors of equal or smaller size.  The Company's success depends on capital spending levels by oil and natural gas companies for their exploration, development, and production activities and their need to employ drilling rigs to maintain or increase oil and natural gas production—which can be materially impacted by not only the price of oil and natural gas but also increases in drilling and production efficiencies, customers' access to capital to fund their E&P programs, and capital return expectations of their investors.  Customers for contract drilling services in the United States include major oil and natural gas companies, independent oil and natural gas companies, and numerous small to mid-sized publicly-traded and privately held oil and natural gas companies.  More recently, accelerating consolidation of the industry's E&P customer base has been an important contributing factor to overall U.S. land rig count stagnation and declines as the post-merger E&P customer has typically operated fewer combined rigs than the pre-merger stand-alone companies.  Such consolidation has also increased the competitive environment for smaller drilling contractors such as the Company as larger E&P operators place a higher value on fleet size and operating scale when selecting drilling contractors for their exploration and development programs.

As detailed below, the Company has experienced significant peaks and valleys as it sought to navigate the challenging oil and gas drilling industry.  The proposed restructuring transaction described herein and the related chapter 11 process will prove transformative—and is expected to allow the Company to go forward with the ability to compete successfully in the current economic environment.

### B.    Corporate History

A total of two (2) Debtors, ICD and Sidewinder, a wholly-owned direct subsidiary of ICD, will file voluntary petitions on the Petition Date.  An illustrative chart of the Company's corporate structure as of the Petition Date is below:



The Company operates in an industry driven by volatile commodity prices and significant swings in drilling activity.  For example, at the time the Company completed its initial public offering ("**IPO**") and listing of its common stock on the New York Stock Exchange in August 2014, the U.S. land rig count as reported by Baker Hughes Company ("**Baker Hughes**") was approximately 1,841 rigs.  However, following completion of the Company's IPO, oil prices began to substantially decline and continued to decline during 2015 and into 2016 due to the removal of production constraints by the Organization of Petroleum Exporting Countries, which created an oversupply of oil.  The effects were devastating.  For example, the closing price of oil was as high as $105.34 per barrel during the third quarter of 2014, was $37.04 per barrel on December 31, 2015, and fell to as low as $26.55 during January 2016.  During this

period of time, the U.S. land rig count fell from a high of 1,864 rigs in November 2014 to a low of 374 rigs in May 2016 before beginning to recover from this historic industry downturn.

In July 2018, as market conditions began to improve and in pursuit of greater operating scale, ICD entered into an Agreement and Plan of Merger (the "**Merger Agreement**") with Patriot Saratoga Merger Sub, LLC ("**Merger Sub**") and Sidewinder.   On October 1, 2018, pursuant to the Merger Agreement, the Company merged with Sidewinder in a transaction in which Merger Sub merged with and into Sidewinder, with Sidewinder surviving as a wholly-owned subsidiary of the Company.   In connection with the closing of the Sidewinder merger, the Company entered into a term loan credit agreement for an initial term loan in an aggregate principal amount of $130 million and a delayed draw term loan facility in an aggregate principal amount of up to $15.0 million (the "**2018 Term Loan**") with affiliates of MSD Partners, L.P. ("**MSD**") to fund the cash portion of the merger transaction and refinance outstanding debt.   At the time, the merger increased the Company's drilling fleet from 15 to 34 rigs.   As of December 31, 2018, the Company was marketing a combined 32 rigs and operated an average of 30.6 during the three months ended December 31, 2018.   At that time, the overall U.S. land rig count had increased to approximately 1,083 rigs.

The industry and the Company experienced a slight slowdown in 2019 due to commodity price volatility.   The COVID downturn in 2020 had further material negative implications for the industry and the Company's active rig count, which declined to a low of five average operating rigs during the three months ended September 30, 2020.   During this period of time, the overall U.S. land rig count fell to an all-time low of 230 rigs in August 2020.   As the industry emerged from the COVID pandemic, the Company steadily increased its rig count and began investing capital to increase the operating capabilities of its drilling rigs by adding third pumps and fourth engines to all of its operating rigs and increasing racking capacity to 25,000 feet or more, which was rapidly becoming the industry standard for super-spec rigs in the post-pandemic U.S. land market.

In order to gain greater access to capital resources required to reactivate drilling rigs post-pandemic and complete necessary capital expenditures, and in light of the impending maturity of the 2018 Term Loan, on March 18, 2022, the Company refinanced the 2018 Term Loan with the issuance of the 2026 Convertible Notes.   The issuance of the 2026 Convertible Notes added immediate liquidity to the Company.   In addition, the 2026 Convertible Notes permitted payment of interest in-kind throughout the term of the 2026 Convertible Notes, which the Company intended to utilize to enhance liquidity to fund rig reactivations and make capital expenditures.

By December 2022, the U.S. rig count as reported by Baker Hughes had recovered to approximately 762 drilling rigs which was well below the rig count highs reported in 2014 and 2018.   The reason this post-pandemic rig count high was substantially less than previous rig count highs experienced in 2014 and 2018 was not driven by lower commodity prices.   In fact, natural gas prices had reached a high of $9.85 during 2022 and oil prices had risen to as high as $123.64 per barrel during 2022 as well, which historically would have driven much higher rig counts during prior industry cycles.   Rather, the rig count was driven by the changing landscape of the U.S. land contract drilling industry.   The acceleration of drilling and production efficiencies has meant that E&P customers can produce more oil and natural gas while using fewer rigs.   In addition, fiscal discipline on behalf of the industry's E&P customer base, driven by lessons learned from overproduction during prior cycles as well as reduced access to capital markets and investor requirements for return of capital, has caused these customers to favor cash flow generation over investments in production growth through the drill bit.   Significantly, at the end of 2022, the acceleration of the industry's E&P customer base was only at its beginning and had not yet impacted the overall U.S. land rig count.

Following the issuance of the 2026 Convertible Notes, the Company was successful in reactivating rigs and securing favorable contracts in this improving environment that existed during 2022.   During the three months ended March 31, 2023, the Company averaged 19.4 average working rigs and ended the quarter with 21 contracted rigs.   Of these rigs, 11 were located in the Permian Basin and ten were located in the Haynesville Shale.   As a result of these efforts, during the first quarter of 2023, the Company reported record quarterly earnings before interest, taxes, and depreciation ("**EBITDA**") of $19.5 million.

C.     **Operations**

The Company is headquartered in Houston, Texas, and employs approximately 387 full-time employees.   The Company operates facilities in Houston, Texas, Midland, Texas, Odessa, Texas, and Coushatta, Louisiana, and,

as of the Petition Date, rigs in the Permian Basin and the Haynesville Shale.  Previously, the Company has operated rigs in Oklahoma, the Eagle Ford Shale, Mid-Continent, Bakken, Utica, Marcellus, and Eaglebine regions.  The Debtors lease or own approximately 50.7 acres in connection with their field operations and their corporate headquarters in northwest Houston, Texas.

The Company's rig designs offer safe and efficient drilling operations for large, multi-well drilling locations. All of the Company's marketed drilling fleet is comprised of super-spec, pad optimal rigs, which means the rigs: (a) are AC programmable, which allows for precise computer control of motor speed during operations and therefore more precise drilling; (b) include pad optimized, omni-directional walking systems, which allow for the drilling of multiple wells from a single location, resulting in cost savings and accelerated cash flows for exploration and production ("**E&P**") companies; (c) can be efficiently mobilized between drilling sites, reducing cycle times so E&P companies can drill more wells in the same period; (d) include drawworks rated to at least 1500-HP, which means the rigs have a superior capability to handle extended drill string lengths required to drill long horizontal wells; and (e) are equipped with high-pressure mud pumps and piping systems to effectively pump fluids through significantly longer wellbores.  Over time, the characteristics of a super-spec rig have evolved.  For example, over the past ten (10) years, third pumps, fourth engines, high-torque top drives and iron roughnecks, and enhanced racking capacity greater than 25,000 feet have become standardized features of a super-spec rig, while additional features such as drilling optimization software, larger rig floors, high-torque drill strings, enhanced walking capabilities, 2000-HP drawworks and one million pound or greater hookloads are becoming more desirable features.  This continued evolution of super-spec rig expectations has required the Company to continue to invest material cash flows into capital expenditures to maintain and increase the competitiveness of its rig fleet.

The Company's rigs operate under separate drilling contracts or in some cases under drilling orders subject to a master drilling contract, and the Company performs drilling services on a "daywork" contract basis, charging a specified rate per day.  The dayrates charged are market-driven and determined by customer requirements, and location, depth and complexity of the wells to be drilled, operating conditions, the duration of the contract, and overall supply and demand dynamics.

        1.        **Permian Basin and Haynesville Shale Operations**

The Permian Basin, one of the largest and most prolific oil and natural gas producing basins in the United States, was discovered in 1921 and extends over 100,000 square miles in west Texas and southeast New Mexico.  It is characterized by oil and natural gas fields with long production histories and multiple producing formations.  These stacked formations have been further drilled and produced following the advent and refinement of horizontal drilling.  Currently, the majority of the rigs running in the Permian Basin are drilling horizontal wells.

During the fourth quarter of 2022, natural gas prices began to rapidly decline driven by warm winter conditions in the Northern Hemisphere and delays in forecasted Liquefied Natural Gas ("**LNG**") projects, which created an oversupplied natural gas market that materially impacted demand for drilling rigs in the natural-gas-driven Haynesville Shale beginning in the first quarter of 2023.  Consequentially, the overall land rig count in the Haynesville Shale fell from a high of 72 rigs in December 2022 to 37 rigs in October 2023.  As approximately half of the Company's rigs were operating in the Haynesville Shale at this time, this market backdrop materially negatively impacted the Company's operating rig count.  For example, the Company's largest customer in the Haynesville Shale (a private-equity owned E&P operating five (5) of the Company's Haynesville Shale rigs) completely shut down its entire drilling program by the end of May 2023, thereby releasing all five (5) of the Company's rigs.  As a result, by June 30, 2023, the Company's Haynesville Shale rig count had fallen from ten (10) contracted rigs to four (4) contracted rigs.  Demand for rigs in the Haynesville Shale continues to remain depressed as natural gas prices remain low and LNG projects continue to confront a variety of project delays.

In response to the rapid and material decline in Haynesville Shale activity in early 2023, the Company began relocating rigs into the Permian Basin where drilling activities are directed more toward oil reserves.  Rigs in the Permian Basin were not materially impacted by the rapid decline in natural gas prices that occurred beginning in late 2022.  As a result, the Company was able to increase its Permian Basin average operating rig count during the second and third quarters of 2023 compared to first quarter 2023 levels and was optimistic about increases in the overall Permian rig count as it approached 2024.  However, driven by a combination of customer consolidation, moderating and fluctuating oil prices, increased associated-gas takeaway constraints, continued fiscal discipline by E&P

customers, and increasing operating efficiencies, demand for drilling rigs in the Permian Basin did not increase as anticipated but rather moderated and began to decline.

Customer consolidation also impacted the competitive landscape of the post-pandemic U.S. land contract drilling industry, in particular during the last 18 months. For example, at the beginning of 2023, the 15 largest E&P customers measured by operating rig count in the Company's primary target markets of Texas, New Mexico, and Louisiana controlled approximately 43% of the total operating rig count in such target markets.[4] As a result of E&P industry consolidation, the percentage of rigs controlled by the top 15 E&P customers increased to approximately 62% as of November 2024. Additionally, larger E&P customers prefer to minimize their vendor community size and therefore place a greater value on scale and fleet uniformity favoring the largest contract drilling competitors. As of January 2023, the five largest contract drillers competing against the Company in the Company's target markets had approximately 80% market share of rigs operating for the 15 largest E&P customers. Following increased industry consolidation impacts in 2024, these five largest contract drillers increased their market share to approximately 84%. Thus, as overall rig counts fell in 2024, competition became more intense, in particular for smaller drilling contractors such as the Company who do not have the competitive advantage of scale when competing for drilling opportunities with the largest E&P customers who were utilizing an increasing share of the drilling rigs in the overall market.

The Company's operations were materially impacted in 2024 due to this accelerating industry consolidation. During 2024, the Company received six rig release notices from customers engaged in consolidation activities, including three release notices in late September 2024 following the merger of two of the Company's Permian Basin customers, including its largest customer.

As a result of the factors described above, the Company's average rig count fell from a post-pandemic high of 19.4 average rigs during the first quarter of 2023 to 14.9 average rigs during the fourth quarter of 2023 and to 13.1 rigs during the third quarter of 2024 and is expected to average 10.7 rigs during the fourth quarter of 2024. In addition to an overall decrease in rig operating levels, market forces also negatively impacted the Company's gross margin per operating rig. For example, the Company's margin per day fell from $15,665 during the first quarter of 2023 to $12,313 during the fourth quarter of 2023 and to $7,726 during the third quarter of 2024, and is expected to fall sequentially during the fourth quarter of 2024.

### D.  The Debtors' Prepetition Capital Structure

As of the Petition Date, the Debtors have approximately $221.1 million in total funded secured debt obligations. The approximate outstanding principal amounts and collateral of the existing secured debt obligations are as follows:

| Funded Secured Debt | Maturity | Outstanding Principal Amount | Collateral |
|---|---|---|---|
| Convertible Notes | March 18, 2026 | Approx. $206.8 million | First priority lien on substantially all assets other than ABL Priority Collateral (as defined below) (the "**Notes Priority Collateral**") and a second priority lien on the ABL Priority Collateral |
| Revolving ABL Credit Facility | September 30, 2025 | Approx. $14.3 million | First priority lien on accounts receivable, deposit accounts, and other related collateral (the "**ABL Priority Collateral**") and a second priority lien on the Notes Priority Collateral |
| **Total Funded Secured Debt** | | $221.1 million | |

---

[4] Market share data excludes mechanical rigs.

1.       **2026 Convertible Notes**

In order to refinance the 2018 Term Loan and add additional liquidity, on March 18, 2022, the Company entered into that certain Convertible Note Subscription Agreement with affiliates of MSD Partners, L.P. and an affiliate of Glendon Capital Management L.P. ("**Glendon**") for the placement of $157.5 million aggregate principal amount of the 2026 Convertible Notes (and the holders thereof including their successors and assigns, the "**Noteholders**"). The 2026 Convertible Notes are governed pursuant to that certain Indenture, dated as of March 18, 2022, as amended by the First Supplemental Indenture, dated July 21, 2022, Second Supplemental Indenture dated February 24, 2023, and Third Supplemental Indenture, dated February 27, 2024 (as so amended, the "**Indenture**"), by and among ICD as issuer, Sidewinder, as guarantor, and U.S. Bank Trust Company, National Association ("**U.S. Bank**") as trustee (the "**Notes Trustee**") and collateral agent.

The Convertible Notes will mature on March 18, 2026. Obligations arising under the Indenture are secured by a first priority lien on substantially all of the Company's and Sidewinders' assets other than ABL Priority Collateral (defined below) (the "**Notes Priority Collateral**"). The Convertible Notes have a second priority lien on ABL Priority Collateral under the Revolving ABL Credit Facility (defined below). The Convertible Notes have a cash interest rate of the Secured Overnight Financing Rate (the "**SOFR**") (with a floor of 1% plus a 0.10% credit spread adjustments (collectively, the "**Notes SOFR**") plus 12.5%. The Convertible Notes have a PIK interest rate of Notes SOFR plus 9.5%. Each Noteholder has a right to convert the Convertible Notes into shares of ICD common stock at any time after issuance through maturity. The conversion price is $4.51 per share. As of close of trading on November 26, 2024, the Company's stock price was $0.08 (OTC as "ICDI" following New York Stock Exchange ("**NYSE**") delisting earlier this year).

The Indenture includes a mandatory redemption offer requirement. On September 13, 2024, the Company entered into a Limited Waiver Agreement (the "**Waiver Agreement**"), by and among ICD, Sidewinder, as guarantor, U.S. Bank as trustee and collateral agent, and the holders signatory thereto (the "**Holders**"). Pursuant to the Waiver Agreement, among other things, the Holders agreed to defer until December 31, 2024 the Company's requirement to repurchase $3.5 million of the 2026 Convertible Notes pursuant to its mandatory offer to repurchase the 2026 Convertible Notes on September 30, 2024 subject to the terms of the Indenture and confirmation request given by the Company. The Waiver Agreement also temporarily waives interest and/or liquidated damages under the registration rights provision of the Indenture that could be due and owing as a result of the Company's delisting from the NYSE, which is further discussed herein.

The Indenture includes an uncommitted accordion (the "**Accordion**") for the issuance of an additional $7.5 million aggregate principal amount of the Convertible Notes (the "**Additional Notes**") to the Noteholders, which are issuable at the request of the Company due to its severely constrained liquidity and option to purchase by the Noteholders. Pursuant to the Accordion, and at the request of the Company, the Noteholders agreed to purchase additional Convertible Notes pursuant to the Accordion, and on November 25, 2024, the Company issued all $7.5 million aggregate principal amount of Additional Notes to the Noteholders. The Additional Notes have the same terms and rights as the Convertible Notes issued in March 2022.

As of the Petition Date, the amount outstanding under the Convertible Notes is approximately $206.8 million in unpaid aggregate principal amount, plus accrued and unpaid interest.

2.       **Revolving ABL Credit Facility**

On October 1, 2018, ICD, ICD Operating, LLC,[5] and Merger Sub, entered into that certain Credit Agreement, which was subsequently amended by that certain Amendment No. 1, dated as of April 27, 2020, Amendment No. 2, dated as of January 21, 2022, Amendment No. 3, dated as of March 18, 2022, Amendment No. 4, dated as of July 31, 2022, Amendment No. 5, dated as of September 22, 2022, and Amendment No. 6, dated as of April 18, 2024 and as

---

[5] ICD Operating, LLC is the former name of Sidewinder. As noted above, Sidewinder was merged with the Merger Sub pursuant to the terms of the merger, with Sidewinder as the surviving entity (the "**Surviving Entity**"). The Surviving Entity changed its name to ICD Operating, LLC, but this entity name was subsequently changed to Sidewinder—a Debtor in the Chapter 11 Cases.

may be further amended, supplemented or otherwise modified from time to time (as so amended, the "**Revolving ABL Credit Agreement**"), with the lenders party thereto from time to time, and Wells Fargo Bank, National Association ("**Wells Fargo**"), as administrative agent (in such capacity, the "**Revolving ABL Agent**"). The Revolving ABL Credit Agreement provides for a revolving ABL credit facility of $40.0 million, including a sublimit for letters of credit in an aggregate amount at any time outstanding not to exceed $7.5 million (the "**Revolving ABL Credit Facility**"). Availability under the Revolving ABL Credit Facility is subject to a borrowing base calculated based on 85% of the net amount of the Company's eligible accounts receivable, minus reserves.

The Revolving ABL Credit Facility will mature on September 30, 2025. Obligations arising under the Revolving ABL Credit Facility are secured by a first priority lien on ABL Priority Collateral and a second priority lien on the Notes Priority Collateral, and are unconditionally guaranteed by all the Company's current and future direct and indirect domestic subsidiaries other than Excluded Subsidiaries (as defined in the Revolving ABL Credit Agreement).

Interest under the Revolving ABL Credit Facility is determined by reference to either (a) a "base rate" equal to the higher of (i) the federal funds effective rate plus 0.05%, (ii) term SOFR for a one month tenor (subject to a 0.0% floor) plus 1.0%, and (iii) the prime rate of Wells Fargo, plus in each case, an applicable base rate margin ranging from 1.5% to 2.0% based on average quarterly availability, or (b) term SOFR for the applicable interest period plus an applicable SOFR margin ranging from 2.36% to 2.86% based on average quarterly availability.

As of the Petition Date, the amount outstanding under the Revolving ABL Credit Facility is approximately $14.3 million in outstanding principal amount of loans and approximately $0.4 million of issued but undrawn letters of credit and reserves. As of the Petition Date, the borrowing base under the Revolving ABL Credit Facility was approximately $19.9 million, and the Company had approximately $5.3 million of availability remaining of the $40.0 million commitment.

3.    **Intercreditor Agreement**

The Notes Trustee and the Revolving ABL Agent, together with ICD and Sidewinder, are parties to that certain Intercreditor Agreement, dated as of March 18, 2022, pursuant to which the parties thereto agree to the relative priority of liens in respect of the Convertible Notes and the Revolving ABL Credit Facility on collateral and certain other rights, priorities, and interests as provided therein.

4.    **Trade and Related Debt**

As of the Petition Date, the Debtors estimate that they have approximately between $9-12 million in obligations to trade and other general unsecured creditors. These amounts consist primarily of accounts payable and accrued obligations to various trade creditors, utility providers, and other third-party service providers.

5.    **Equity Interests**

As of November 15, 2024, ICD has approximately 15,186,780 shares of common stock outstanding and approximately 189,593 shares held as treasury stock. ICD is publicly traded on the OTCQX Best Market. ICD previously traded on the NYSE. On August 28, 2024, the NYSE notified the Company that it was no longer compliant with the NYSE's minimum market capitalization rule, which requires the Company to maintain an average market capitalization of $15 million over a consecutive 30-day trading period. As there is no cure period permitted by the NYSE with respect to its minimum market capitalization rule, the NYSE immediately suspended trading of ICD's common stock and delisted ICD from the NYSE. ICD's common stock began trading on the OTCOX Best Market on August 29, 2024. As discussed above, in order to avoid potential additional interest and liquidated damages under the registration rights agreement provision of the Indenture as a result of the delisting, the Company requested, and the Noteholders granted, a temporary waiver from the application of these provisions pursuant to the terms of the Waiver Agreement.

16

### E.    Executive Officers and Board of Directors

In connection with the Indenture, each Noteholder entered into an investor's rights agreement with the Company, pursuant to which, among other things, each Noteholder was entitled to appoint a member to the Company's board of directors.  In connection with such rights, MSD and Glendon appointed, respectively Christopher G. Gleysteen and Brian D. Berman to the Company's board of directors.  On September 5, 2024, each of Christopher G. Gleysteen and Brian D. Berman resigned from the Company's board of directors.  Four independent directors continued to comprise the Company's board of directors, along with Anthony Gallegos, Jr., the Debtors' President and CEO.

As of the date of this Disclosure Statement, ICD' executive officers include:

| Name | Position |
|------|----------|
| J. Anthony Gallegos, Jr. | President and Chief Executive Officer |
| Philip A. Choyce | Executive Vice President and Chief Financial Officer |
| Philip A. Dalrymple | Senior Vice President of Operations |
| Scott A. Keller | Senior Vice President – Business Development |
| Katherine Kokenes | Vice President and Chief Accounting Officer |

On the Effective Date, the existing executive officers of ICD are expected to continue to service in their current capacities for the Reorganized ICD.

The members of ICD's Board of Directors will be deemed to have resigned as directors as of the Effective Date.  The members of the New Board shall be appointed in accordance with the terms of the Plan, and from and after the Effective Date, each director, officer, or manager of the Reorganized Debtors shall serve pursuant to the terms of their respective charters and by-laws or other formation and constituent documents, and applicable laws of the respective Reorganized Debtor's jurisdiction of formation.  For more information regarding the selection of the New Board, see **Section VII.D.4** of this Disclosure Statement.

Director and officer insurance will continue in place for the directors and officers of each of the Debtors during these Chapter 11 Cases on existing or comparable terms.  Any obligations of the Debtors pursuant to their organizational documents to indemnify current and former officers, directors, agents, and/or employees shall not be discharged or impaired by confirmation of the Plan.

The Debtors have obtained a tail policy covering any director and officer for a six (6)-year period following the termination of the Debtors' current directors and officers' insurance policies.  The New Board will be covered by a new insurance policy that will become effective on the Effective Date.

## V.    CIRCUMSTANCES LEADING TO THE COMMENCEMENT OF THESE CHAPTER 11 CASES

### A.    Market Conditions

As more fully described in Section IV hereof, the overall U.S. land rig count is volatile and is impacted by a multitude of factors, including the volatility of oil and natural gas prices, increased production and drilling efficiencies, customer fiscal discipline, and customer consolidation.

All of these factors have caused the current U.S. land rig count to steadily decline from the previous rig count highs experienced in 2014 and 2018 and the post-pandemic rig count high that existed in 2022 and limit the overall opportunities for material increases in overall rig counts.

All of these market trends have manifested themselves in significant declines in the Company's average quarterly operating rig count and operating profits and cash flows.  The Company's average quarterly operating rig count has fallen from a high of 19.4 rigs during the first quarter of 2023 to 13.1 rigs in the third quarter of 2024 and is expected to average 10.7 rigs during the fourth quarter of 2024.  Similarly, the Company's gross margin per rig operating day has declined from an all-time high during the first quarter of 2023 of $15,665 to $12,313 during the

fourth quarter of 2023 and to a post-pandemic quarterly low of $7,726 during the third quarter of 2024.  As a result, the Company's quarterly EBITDA has declined from an all-time high during the first quarter of 2023 of $19.5 million to $8.6 million during the fourth quarter of 2023 and to a post-pandemic quarterly low of $5.4 million during the third quarter of 2024.

As the Company's operating rigs counts and cash flows have declined, the Company has continued to pay interest in-kind under the Convertible Notes in order to maintain liquidity, which has resulted in a continued increase in the Company's debt levels.  Overall the Company's debt levels have increased from $200.6 million as of March 31, 2023 to approximately $221.1 million as of the Petition Date.

Overall, as previously noted, since the time of the Sidewinder merger in October 2018 through the Petition Date, the overall U.S. land rig count has fallen from a high of 1,018 rigs at December 31, 2018 to a post pandemic high of 762 rigs in 2022 to its current level of approximately 570 rigs.  Significantly, while the Company is optimistic about improvement in demand for drilling rigs in its Haynesville market once LNG takeaway capacity issues are alleviated, the Company is not aware of any third-party research groups today that predict the overall U.S. land rig count will return to post-pandemic highs as the market forces discussed in this Declaration, including E&P operator fiscal discipline, increasing drilling and production efficiencies, and industry consolidation, continue to limit the need for material rig count increases.

More importantly, while the Company expects to increase its operating rig count and margins in 2025 above current levels, due to the most recent declines in its operating rig count and cash flows it currently does not have the liquidity (and is not forecasting to have the liquidity needed) to meet its obligations and comply with its financial covenants contained in its borrowing arrangements or to make investments in its rigs it believes are necessary in order to compete in a consolidating E&P customer environment.

**B.      Exploration of Strategic Alternatives**

As the Convertible Notes mature in March 2026, and in light of other liquidity concerns and market headwinds—in particular that the optimism for 2024 market improvements that existed during the fourth quarter of 2023 was becoming more subdued—the Company sought to be proactive in the process to review potential refinancing and other strategic opportunities.  On February 28, 2024, the board of directors of the Company appointed a special committee of independent directors (the "**Strategic Alternatives Committee**") to evaluate such process and all strategic opportunities.

**C.      Strategic Alternatives**

**1.      Board Hires Advisors**

As part of its formal review process of strategic alternatives, the Strategic Alternatives Committee of ICD engaged Piper Sandler & Co. ("**Piper Sandler**") in March 2024 as investment banker and financial advisor to the Strategic Alternatives Committee to assist in the evaluation process.  At the direction of the Strategic Alternatives Committee, Piper Sandler reviewed alternatives to refinance the Convertible Notes with third-party debt or equity financing, but such refinancing or equity financing alternatives were not considered viable by Piper Sandler due to the level of the Company's debt and its declining cash flow profile.  In addition, Piper Sandler was instructed by the Strategic Alternatives Committee to perform a broad outreach to a variety of industry participants to assess interest in a potential purchase of the Company or a strategic combination.  As a result of this process, no offer or indication of interest was received that did not require the Noteholders to accept less than their secured claim.  One indication of interest, which required the Noteholders to accept less than their secured claim, was explored further by the Strategic Alternatives Committee in consultation with the Noteholders.  However, in June 2024 this interested party withdrew its interest, referencing the decline in market conditions and uncertainty around the Company's future contract status and declining financial performance.  No other actionable offer or indication of interest was identified by Piper Sandler.

Following this evaluation process, the Company began discussions with the Noteholders regarding their willingness to address the Company's leverage and liquidity challenges.  At the same time, the Company's liquidity profile and cash flow prospects continued to decline, which impacted the Company's ability and prospects to comply

18

with mandatory offer requirements and minimum liquidity and other covenants contained in the Convertible Notes Indenture and ABL Credit Facility documents. Ultimately, this manifested in the Company including a going concern disclosure in its Form 10Q for the three months ended September 30, 2024. The scope of engagement with Piper Sandler was thus expanded in October 2024 to include an evaluation of a restructuring of the Company's capital structure. In October 2024, the Strategic Alternatives Committee also directed Piper Sandler to reach out again to potential third parties to analyze a sale or business combination transaction that would address the Company's financial issues, including parties who had been previously contacted by Piper Sandler and had executed a non-disclosure agreement or who were otherwise identified as potential consolidators in the U.S. land drilling sector. This outreach has remained ongoing, however, no actionable offer or indication of interest has been identified by Piper Sandler. The Company also hired Riveron Consulting, LLC ("**Riveron**") in October 2024 to serve as financial advisor and assist with liquidity management and other related financial advisory services. Sidley Austin LLP's ("**Sidley**") existing engagement also was expanded to include assisting the Company in its contingency planning efforts.

### 2. Restructuring Terms

Acting on behalf of the Company, Sidley engaged with Latham & Watkins LLP ("**Latham**"), counsel to the Noteholders, providing them (after execution of confidentiality and non-disclosure agreements with each of the Noteholders) with certain diligence materials and otherwise negotiating with the Noteholders to create a path forward for a reorganization.

Following extensive, arms'-length and good-faith negotiations, the Debtors and the Noteholders agreed to the terms of a restructuring. The Debtors formulated their Plan, which provides, among other things, that the Noteholders will exchange certain of their Noteholder claims for equity securities of the reorganized company. The equity of the reorganized Debtors will not be listed for public trading on any national securities exchange. The Noteholders agreed with the Company to treat all unsecured claims as unimpaired under the Bankruptcy Code and for the Company to maintain a robust fiduciary out until approval of the Plan. The Debtors are soliciting votes on the Plan prior to the filing of these Chapter 11 Cases.

The Reorganized Debtors will be funded by cash on hand and proceeds from the Exit Facilities.

The Debtors are seeking confirmation of the Plan with the goal of emerging from Chapter 11 by January 2025.

### 3. Post Petition Financing

The current cash balance is insufficient to operate the Debtors' enterprises in the immediate term. As such, the Noteholders agreed to provide a postpetition DIP Facility. The DIP Facility consists of $32.5 million super-priority term loans. The Debtors intend to pay the outstanding amount under the Revolving ABL Credit Facility with the proceeds of the DIP Facility. The Debtors will be permitted to continue using prepetition collateral and cash collateral subject to the terms of the Bankruptcy Court's order approving the DIP Facility and use of cash collateral, which shall be in form and substance acceptable to the Noteholders and Wells Fargo, as Revolving ABL Agent. As stated in the DIP Declaration,[6] the Debtors worked with the Noteholders on financing terms designed to minimize any disruption, both in the lead up to these Chapter 11 Cases and with respect to the Debtors' postpetition operations. Under the Plan, the DIP Facility will be refinanced with the Exit Term Loan Facility. The Noteholders will also receive a distribution of loans under the Exit Term Loan Facility equal to the amount that is the sum of $7.5 million (which is the same amount as the amount of principal new money funding pursuant to the recent Accordion transaction) plus the amount of accrued and unpaid interest on the Accordion.

In the days leading up to the Petition Date, the Debtors and their advisors engaged in negotiations with the Noteholders around the terms of the DIP Facility. The parties engaged in serious arms'-length and good faith negotiations to reach the best available terms under the circumstances. Piper Sandler solicited other market

---

[6] "**DIP Declaration**" shall mean the *Declaration of Joseph Denham in Support of the Debtors' Motion to Obtain Postpetition Financing*.

participants for post-petition financing and reported that the DIP Facility represents the best option available to address the Debtors' near-term liquidity needs and provide near-term runway for the Debtors' reorganization.

## VI.    CHAPTER 11 CASES

### A.    Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  Chapter 11 authorizes a debtor to reorganize its business for the benefit of its creditors, equity interest holders, and other parties in interest. Commencing a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the filing date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The principal objective of a chapter 11 case is to consummate a plan of reorganization.  A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a plan of reorganization by a bankruptcy court binds a debtor, any issuer of securities thereunder, any person acquiring property under the plan, any creditor or equity interest holder of a debtor, and any other person or entity the bankruptcy court may find to be bound by such plan.  Chapter 11 requires that a plan treat similarly situated creditors and similarly situated equity interest holders equally, subject to the priority provisions of the Bankruptcy Code.

Subject to certain limited exceptions, the bankruptcy court order confirming a plan of reorganization discharges a debtor from any debt that arose prior to the date of confirmation of the plan and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

Prior to soliciting acceptances of a proposed plan of reorganization, Bankruptcy Code Section 1125 requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the plan of reorganization. This Disclosure Statement is submitted in accordance with Bankruptcy Code Section 1125.

### B.    Administration of these Chapter 11 Cases

#### 1.    First Day Motions

On the Petition Date, or soon thereafter, the Debtors will file numerous first-day motions (the "**First Day Motions**"), the object of which is to streamline the transition to operating under chapter 11, to stabilize operations, and to preserve their relationships with vendors, customers, royalty interest owners and employees.  The First Day Motions will request, among other things, authority to:

(i)      jointly administer the Chapter 11 Cases for procedural purposes only;

(ii)     continue to operate the Debtors' existing cash management system and continue the use of existing bank accounts and business forms;

(iii)    pay prepetition compensation, wages, salaries, and other reimbursable employee expenses;

(iv)     pay certain taxes that the Debtors are required to collect and remit to appropriate taxing authorities;

(v)      continue prepetition insurance coverage, surety bond program, and related practices;

(vi)     establish procedures that impose restrictions on certain transfers of and claims of worthlessness with respect to ICD's stock and that require certain shareholders to provide advance notice of certain actions that could adversely impact ICD's net operating losses and other tax attributes; and

(vii)    continue to pay for utility services.

#### 2.    Proposed Confirmation Schedule

It is imperative that the Debtors proceed swiftly to confirmation of the Plan and emergence from these Chapter 11 Cases to mitigate uncertainty among employees, customers, and vendors, minimize disruptions to the Company's business, and curtail professional fees and administrative costs. Expeditious confirmation of the Plan and

consummation of the Restructuring Transactions is in the best interests of the Debtors, their Estates, and their stakeholders. The Debtors have proposed the following key case dates, subject to Court approval and availability:

| Event | Date |
|---|---|
| Voting Record Date | November 27, 2024 |
| Solicitation Commencement Date | December 2, 2024 |
| Petition Date | On or around December 2, 2024 |
| Voting Deadline | December 4, 2024 at 12:00 p.m. (Prevailing Central Time) |
| Plan Supplement Deadline | December 29, 2024 |
| Opt-Out Deadline | January 3, 2025 at 4:00 p.m. (Prevailing Central Time) |
| Objection Deadline | January 3, 2025 at 4:00 p.m. (Prevailing Central Time) |
| Deadline to File Confirmation Brief and Reply | January 6, 2025 |
| Combined Hearing | January 9, 2025, subject to the Bankruptcy Court's availability |

### 3.    Debtor-in-Possession Financing

The Company was able to secure commitments for a $32.5 million DIP Facility from the Noteholder Group. The DIP Facility allows the Company to access up to $32.5 million of new capital. The Debtors and their advisors believe the DIP Facility is the best and only presently available postpetition financing option for the Debtors and is in the best interest of the Debtors and their estates.

On the Petition Date, the Debtors will file their *Emergency Motion For Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Obtain Senior Secured Superpriority Postpetition Financing, and (II) Use Cash Collateral; (B) Granting Liens and Providing Claims with Superpriority Administrative Expense Status; (C) Modifying the Automatic Stay; (D) Scheduling a Final Hearing; and (E) Granting Related Relief* requesting authority to enter into the DIP Facility.

As noted above, the DIP Facility contains certain milestones ("**Milestones**") requiring an expedited exit from chapter 11.[7] If any of the Milestones are not met, or certain other events specified in the DIP Term Sheet occur (any such event, an "**Event of Default**"), the DIP Lenders, may by notice to the Borrower take all or any of the following actions without further order of or application to the Bankruptcy Court:

(i)     declare all DIP Obligations (including principal of, and accrued interest on, any outstanding DIP Loans) to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are waived by each Debtor pursuant to the DIP Term Sheet;

(ii)    terminate any further DIP Commitments to lend to the Borrower; and/or

(iii)   exercise rights and remedies subject to the terms of the DIP Orders, or applicable law (including, without limitation, direct any or all of the Debtors (or file a motion in the name of the Debtors)), (i) to enforce the terms and provisions of this DIP Term Sheet, (ii) to collect accounts receivable, without setoff by any account debtor, including direct the Debtors to collect such account receivables, (iii) to sell or otherwise dispose of any all of the DIP Collateral on terms and conditions reasonably acceptable to the DIP Lenders pursuant to Sections 363, 365 and other applicable provisions of the Bankruptcy Code (and without limiting the foregoing, direct the Debtors (or file a motion in the name of the Debtors) to assume and assign any lease or executory contract included in the DIP Collateral to the DIP Lenders' designees in accordance with and subject to Section 365 of the Bankruptcy Code), (iv) credit bid any or all of the DIP Obligations, (v) enter into the premises of any Debtor in connection with the orderly sale or disposition of the DIP Collateral (including, without limitation, complete any work in process), (vi) exercise such other rights and remedies to

---

[7] Capitalized terms used, but not otherwise defined, in this section will have the meanings ascribed to them in the DIP Term Sheet.

realize upon the DIP Collateral, and (vii) take such action as is reasonably related to or is in furtherance of the foregoing; *provided* that, subject to the DIP Orders, the Debtors shall take all action that is reasonably necessary to cooperate with the DIP Lenders in the exercise of their rights and remedies and facilitate the realization upon the DIP Collateral by the DIP Lenders.

### C.    Preference and Other Potential Avoidance Actions

The Bankruptcy Code preserves the Debtors' rights to prosecute claims and Causes of Action which exist outside of bankruptcy, and also empowers the Debtors to prosecute certain claims that are established by the Bankruptcy Code, including claims to avoid and recover preferential transfers and fraudulent conveyances. The Plan provides that on the Effective Date, the Debtors will release all preference claims under section 547(b) of the Bankruptcy Code; however the Debtors will retain all other Causes of Action that are not released under Section VIII of the Plan.

### D.    Other Litigation Matters

In the ordinary course of business, the Debtors are parties to a number of lawsuits, legal proceedings, and collection proceedings arising out of their business operations. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and collection proceedings.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. In addition, although a debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, here the following currently stayed matters are expected to ride through the Chapter 11 Cases and continue on against the Reorganized Debtors after the Effective Date.

<u>Active Litigation Matters</u>

- *Kristina Martinez, Personal Representative of the Estate of Adrian Avitia, Deceased, and Manuel Avitia v. Jocelin Perez, Personal Representative of the Estate of Ivan Mingura, Deceased, Sabatha Auto Sales, LLC, and Independence Contract Drilling, Inc.*, CV2023-001144, First Judicial District Court, Santa Fe County – Negligence

- *Joshua Bowman v. Independence Contract Drilling, Inc. and Southwestern Energy Company,* Case 71954, 11th Judicial District Court, Sabine Parish, Louisiana  – Negligence and Strict Liability

- *Michael Blake Meier v. Lightning Oilfield Services Inc (d/b/a Lightning Oilfield Services), Independence Contract Drilling, Inc., and William Allen Cartwright, Jr.*, Cause 202432825, 28th Judicial District Court, Harris County – Class Action - Negligence

### E.    Assumption and Rejection of Executory Contracts and Unexpired Leases

Prior to the Petition Date and in the ordinary course of business, the Debtors entered into over 1,000 Executory Contracts and Unexpired Leases. The Debtors, with the assistance of their advisors, are in the process of reviewing the Executory Contracts and Unexpired Leases to identify the contracts and leases to either assume or reject (with the consent of the Noteholders) pursuant to Sections 365 and 1123 of the Bankruptcy Code. If any Executory Contracts or Unexpired Leases are rejected, any resulting Allowed rejection damages Claims will be treated as Allowed General Unsecured Claims.

The Plan provides that any Executory Contracts and Unexpired Leases that are not rejected during the Chapter 11 Cases or as part of the Plan will be assumed by the Reorganized Debtors. The Debtors may elect to file additional discrete motions seeking to assume or reject various of the Debtors' Executory Contracts and Unexpired Leases.

### F.        Exclusivity

The Debtors have the exclusive right to file a plan in these Chapter 11 Cases until April 1, 2025, and the exclusive right to solicit acceptances of such plan until May 31, 2025.  The Debtors will file the Plan on or around the Petition Date.  As there is always a possibility that Confirmation of the Plan will not occur, the Debtors reserve their rights to seek extension of the exclusivity periods.

## VII.     PLAN OF REORGANIZATION

### A.        Administrative Expense Claims and Priority Claims

In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, DIP Claims, Professional Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in **Article III** of the Plan.

#### 1.        General Administrative Expense Claims

Unless otherwise agreed to by the Holder of an Allowed General Administrative Expense Claim and, with the reasonable consent of the Noteholder Group, the Debtors or the Reorganized Debtors, as applicable, each Holder of an Allowed General Administrative Expense Claim will receive in full and final satisfaction of its General Administrative Expense Claim, at the option of the Debtors (with the consent of the Noteholder Group), (A) an amount of Cash equal to the unpaid amount of such Allowed Administrative Expense Claim in accordance with the following: (1) if an General Administrative Expense Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed General Administrative Expense Claim is due or as soon as reasonably practicable thereafter); (2) if such General Administrative Expense Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such General Administrative Expense Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed General Administrative Expense Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Administrative Expense Claim without any further action by the Holders of such Allowed General Administrative Expense Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable (with the reasonable consent of the Required Consenting Lenders); or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court or (B) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

#### 2.        DIP Claims

On the Effective Date, in full satisfaction of each Allowed DIP Claim, each Holder thereof shall receive, in full satisfaction of its Allowed DIP Claims, distribution of Cash and/or commitments under the Exit Term Loan Facility in the manner set forth in the Exit Term Loan Facility Documents.

#### 3.        Professional Claims

##### (a)        Final Fee Applications and Payment of Professional Claims

All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be Filed no later than the Administrative Expense Claims Bar Date.  The Reorganized Debtors shall pay Professional Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Claim Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Claim Reserve Amount on the Effective Date.

##### (b)        Professional Claim Escrow Account

On the Effective Date, the Reorganized Debtors shall fund the Professional Claim Escrow Account with Cash equal to the aggregate Professional Claim Reserve Amount for all Professionals.  The Professional Claim Escrow

Account shall be maintained in trust for the Professionals.  Such funds in the Professional Claim Escrow Account shall not constitute property of the Debtors' Estates or property of the Reorganized Debtors, except as otherwise expressly set forth in the last sentence of this paragraph.  The amount of Professional Claims owing to the Professionals on and after the Effective Date shall be paid in Cash to such Professionals from funds held in the Professional Claim Escrow Account, without interest or other earnings therefrom, as soon as reasonably practicable after such Claims are Allowed by a Bankruptcy Court order.  When all Allowed Professional Claims have been paid in full, amounts remaining in the Professional Claim Escrow Account, if any, shall revert to the Reorganized Debtors.

<div align="center">(c)      <strong>Professional Claim Reserve Amount</strong></div>

Professionals shall reasonably estimate their unpaid Professional Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than five days before the Effective Date; *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional's final request for payment in the Chapter 11 Cases.  If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

<div align="center">(d)      <strong>Post-Confirmation Date Fees and Expenses</strong></div>

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors or Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors or Reorganized Debtors. Upon the Effective Date, any requirement that Professionals comply with Sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

<div align="center"><strong>4.      Payment of Restructuring Expenses</strong></div>

Prior to or on the Effective Date, the Debtors shall promptly pay in Cash in full any and all accrued but unpaid reasonable Noteholder Group's Fees and Expenses for which the Debtors have received invoices or estimates prior to the Effective Date (in each case whether accrued prepetition or postpetition and to the extent not otherwise paid during the Chapter 11 Cases) without application by any such parties to the Bankruptcy Court, and without notice and a hearing, pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise.  Following the Effective Date, the Reorganized Debtors shall pay the Noteholder Group's Fees and Expenses in the ordinary course of business for all reasonable and documented fees incurred in connection with the Chapter 11 Cases, the Plan and the Restructuring Transactions, including the implementation and consummation thereof, without further Bankruptcy Court order.

<div align="center"><strong>5.      Priority Tax Claims</strong></div>

Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtors (with the consent of the Noteholder Group) agree to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in Section 1129(a)(9)(C) of the Bankruptcy Code.

<div align="center"><strong>6.      Statutory Fees</strong></div>

All fees payable pursuant to section 1930(a) of the chapter 123 of title 28 of the United States Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Reorganized Debtors (or the Disbursing Agent on behalf of each of the Reorganized Debtors) for each quarter (including any fraction thereof) until the earlier of entry of a final decree closing such Chapter 11 Cases or an order of dismissal or conversion, whichever comes first.

**B.** **Classification and Treatment of Claims and Interests**

**1.** **Classification of Claims and Interests**

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation, and distribution pursuant thereto and pursuant to Sections 1122 and 1123(a) of the Bankruptcy Code. The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in a particular Class for purposes of distribution only to the extent that any such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date. In accordance with Section 1123(a)(1) of the Bankruptcy Code and as described in **Article II** of the Plan, the Debtors have not classified Administrative Expense Claims (including DIP Claims and Professional Claims) and Priority Tax Claims.

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | Revolving ABL Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 4 | Notes Claims | Impaired | Entitled to Vote |
| Class 5 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 6 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 7 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 8 | Existing ICD Subsidiary Equity Interest | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

**2.** **Treatment of Claims and Interests**

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Reorganized Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

(a) **Class 1 – Other Secured Claims**

(i) *Classification*: Class 1 consists of all Other Secured Claims.

(ii) *Treatment*: Subject to **Article VIII** of the Plan, except to the extent that a Holder of an Allowed Other Secured Claim against any of the Debtors has agreed to less favorable treatment of such Claim, on, or as soon as reasonably practicable after, the later of (i) the Effective Date if such Other Secured Claim is an Allowed Other Secured Claim as of the Effective Date or (ii) the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor, in each case, with the consent of the Noteholder Group:

1) payment in full in Cash of its Allowed Other Secured Claim;

2) Reinstatement of its Allowed Other Secured Claim; or

3) such other treatment that renders its Allowed Other Secured Claim Unimpaired in accordance with Section 1124 of the Bankruptcy Code;

*provided*, *however*, that Other Secured Claims arising out of obligations incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with the terms and conditions of any agreements relating thereto without further notice to or order of the Bankruptcy Court.

(iii) *Voting*: Class 1 is Unimpaired under the Plan. Holders of Claims in Class 1 are conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

(b) **Class 2 – Other Priority Claims**

(i) *Classification*: Class 2 consists of all Other Priority Claims.

(ii) *Treatment*: Subject to **Article VIII** of the Plan, except to the extent that a Holder of an Allowed Other Priority Claim against any of the Debtors has agreed to less favorable treatment of such Claim, on, or as soon as reasonably practicable after, the later of (i) the Effective Date if such Other Priority Claim is an Allowed Other Priority Claim as of the Effective Date or (ii) the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive, at the option of the applicable Debtor, in each case, with the consent of the Noteholder Group:

*a.* payment in full in Cash of its Allowed Other Priority Claim;

*b.* Reinstatement of its Allowed Other Priority Claim; or

*c.* such other treatment that renders its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code;

*provided*, *however*, that Other Priority Claims arising out of obligations incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with the terms and conditions of any agreements relating thereto without further notice to or order of the Bankruptcy Court.

(iii) *Voting*: Class 2 is Unimpaired under the Plan. Holders of Claims in Class 2 are conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

(c) **Class 3 – Revolving ABL Claims**

(i) *Classification*: Class 3 consists of all Revolving ABL Claims.

(ii) *Allowance*: On the Effective Date, the Revolving ABL Claims, and all Liens securing such Revolving ABL Claims shall continue in full force and effect on and after the Effective Date, as amended and restated by and in accordance with the Exit ABL Facility Agreement and the Exit ABL Facility Documents, and nothing in the Plan shall or shall be construed to release, discharge, relieve, limit or impair in any way the rights of any Holder of a Revolving ABL Claim or any Lien securing any such claim, all of which shall be

26

amended and restated by the Exit ABL Facility, without offset, recoupment, reductions, or deductions of any kind, plus any accrued and unpaid interest payable on such amounts through the date that each Holder of an Allowed Revolving ABL Claim receives the treatment provided under the Plan.

*(iii) Treatment*:  Upon the closing of the DIP Facility pursuant to the terms of the DIP Documents, each Holder of an Allowed Revolving ABL Claim shall have received payment in full in Cash or such other treatment that renders its Revolving ABL Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

*(iv) Voting*:  Class 3 is Unimpaired under the Plan.  Holders of Claims in Class 3 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

(d)       **Class 4 – Notes Claims**

*(i) Classification*:  Class 4 consists of all Notes Claims.

*(ii) Allowance*:   On the Effective Date, the Notes Claims shall be Allowed without offset, recoupment, reductions, or deductions of any kind in the amount of $206,774,306, plus any accrued and unpaid interest payable on such amounts through the date that each Holder of an Allowed Notes Claim receives the treatment provided under the Plan.

(iii) *Treatment*:  On the Effective Date, (a) the Liens securing the Notes Claims shall continue in full force and effect on and after the Effective Date, as amended and restated by and in accordance with the Exit Term Loan Facility Loan Agreement and the Exit Term Loan Facility Documents, and nothing in the Plan shall or shall be construed to release, discharge, relieve, limit or impair in any way the rights of any Holder of a Notes Claim or any Lien securing any such claim, all of which shall be amended and restated by the Exit Term Loan Facility, without offset, recoupment, reductions, or deductions of any kind and (b) each Holder of an Allowed Notes Claim shall receive its Pro Rata share of (a) 100% of the New Common Stock, subject to dilution on account of any equity issued pursuant to the Management Incentive Plan and (b) on account of the Additional Notes, solely $7.5 million, plus the amount of accrued and unpaid interest on the Additional Notes, in principal amount of the loans under the Exit Term Loan Facility.

(iv) *Voting*:  Class 4 is Impaired under the Plan.  Holders of Claims in Class 4 are entitled to vote to accept or reject the Plan.

(e)       **Class 5 – General Unsecured Claims**

(i) *Classification*:  Class 5 consists of all General Unsecured Claims against the Debtors.

(ii) *Treatment*:  The legal, equitable, and contractual rights of the Holders of General Unsecured Claims are unaltered by the Plan.  On or as soon as practicable after the earliest to occur of the Effective Date and the date such Claim becomes due in the ordinary course of business, each Holder of an Allowed General Unsecured Claim shall receive payment in full in Cash on account of its Allowed General Unsecured Claim or such other treatment as

would render such Claim Unimpaired (in each case except to the extent that a holder of a General Unsecured Claim agrees to less favorable treatment with the prior written consent of the Noteholder Group).

(iii) *Voting*: Class 5 is Unimpaired under the Plan. Holders of Claims in Class 5 are conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

(f)       **Class 6 – Intercompany Claims**

(i) *Classification*: Class 6 consists of all Intercompany Claims.

(ii) *Treatment*: On the Effective Date, each Intercompany Claim shall be, at the option of the applicable Debtor with the prior written consent of the Noteholder Group, either:

1)   Reinstated on the Effective Date; or

2)   canceled, released, and extinguished, and will be of no further force or effect without any distribution.

(iii) *Voting*: Pursuant to Sections 1126(f) and 1126(g) of the Bankruptcy Code, Holders of Intercompany Claims against the Debtors are not entitled to vote to accept or reject the Plan.

(g)       **Class 7 – Existing Equity Interests**

(i) *Classification*: Class 8 consists of all Existing Equity Interests.

(ii) *Treatment*: On the Effective Date, each Existing Equity Interest shall be canceled, released, and extinguished, and will be of no further force or effect.

(iii) *Voting*: Class 8 is Impaired under the Plan. Holders of Existing Equity Interests in Class 8 are conclusively presumed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

(h)       **Class 8 – Existing ICD Subsidiary Equity Interests**

(iv) *Classification*: Class 9 consists of all Existing ICD Subsidiary Equity Interests.

(v) *Treatment*: On the Effective Date, each Existing ICD Subsidiary Equity Interest shall be Reinstated.

(vi) *Voting*: Pursuant to Sections 1126(f) and 1126(g) of the Bankruptcy Code, Holders of Existing ICD Subsidiary Equity Interests are not entitled to vote to accept or reject the Plan.

3.       **Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan shall affect or limit the Debtors' or the Reorganized Debtors' rights and defenses (whether legal or equitable) regarding any Unimpaired or Reinstated Claim,

including, without limitation, all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired or Reinstated Claim.

### 4.     Elimination of Vacant Classes

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to Section 1129(a)(8) of the Bankruptcy Code.

### 5.     Controversy Concerning Impairment

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### 6.     Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests (as applicable) and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Allowed Interest (as applicable) in accordance with any contractual, legal, or equitable subordination relating thereto.

### 7.     Discharge of Claims

Pursuant to section 1141(c) of the Bankruptcy Code, all Claims and Interests that are not expressly provided for and preserved herein (or in any contract, instrument, release or other agreement or document created pursuant to the Plan) shall be discharged and extinguished upon the Effective Date, and the Debtors and all property dealt with herein shall be free and clear of all such Claims and Interests, including, without limitation, liens, security interests and any and all other encumbrances.

### C.     Acceptance or Rejection of the Plan

### 1.     Presumed Acceptance by Non-Voting Classes

Classes 1, 2, 3, 5, and 6 (in the event Unimpaired), and 8 are Unimpaired under the Plan.  Therefore, the Holders of Claims or Interests in such Classes are deemed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

### 2.     Voting Class

Class 4 is Impaired under the Plan.  The Holders of Claims in such Class are entitled to vote to accept or reject the Plan.

### 3.     Acceptance by Impaired Class

Pursuant to Section 1126(c) of the Bankruptcy Code and except as otherwise provided in Section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

### 4. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Section III.B of the Plan. The Debtors reserve the right, with the consent of the Noteholder Group, to modify the Plan in accordance with **Article XI** of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules. If a controversy arises as to whether any Claims or Interests, or any class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### D. Means for Implementation of the Plan

### 1. No Substantive Consolidation

The Plan is being proposed as a joint prepackaged plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan or reorganization of each Debtor. The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan; *provided* that the Reorganized Debtors may consolidate Allowed Claims on a per Class basis for voting purposes.

### 2. General Settlement of Claims and Interests

As discussed in detail in this Disclosure Statement and as otherwise provided in the Plan, pursuant to Section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, including (1) any challenge to the amount, validity, perfection, enforceability, priority or extent of the DIP Claims, Revolving ABL Claims, or the Notes Claims, and (2) any claim to avoid, subordinate, or disallow any DIP Claims, Revolving ABL Claims, or Notes Claims, whether under any provision of chapter 5 of the Bankruptcy Code, on any equitable theory (including equitable subordination, equitable disallowance, or unjust enrichment) or otherwise. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under Section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates. Subject to **Article VI** of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

### 3. Restructuring Transactions

On or before the Effective Date, the applicable Debtors or the Reorganized Debtors shall, subject to the consent of the Noteholder Group, enter into and shall take any actions as may be necessary or appropriate to effect the Restructuring Transactions. The actions to implement the Restructuring Transactions may include, among other things: (1) the execution and delivery of appropriate agreements or other documents that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (4) all other actions that the applicable Entities determine to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan. The Confirmation Order shall, and shall be deemed to, pursuant to Sections 363 and 1123 of the Bankruptcy Code, authorize and approve, among other things, the Restructuring Transactions and all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan.

4.        **Reorganized Debtors**

On the Effective Date, the New Board shall be established, and the Reorganized Debtors shall adopt their New Organizational Documents, which shall be consistent with the Plan.  The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan.  Cash payments to be made pursuant to the Plan will be made by the Debtors or Reorganized Debtors, as applicable.  The Debtors and Reorganized Debtors, as applicable, will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Debtors or Reorganized Debtors, as applicable, to satisfy their obligations under the Plan.  Except as set forth in the Plan, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in the Definitive Documentation, shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing as the boards of directors or members of the applicable Reorganized Debtors deem appropriate.

5.        **Sources for Plan Distributions**

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under the Plan with: (1) Cash on hand, including Cash from operations and (2) proceeds from the Exit Facilities.

(a)        **Exit Facilities**

On the Effective Date, the Reorganized Debtors shall enter into the Exit Facilities the terms of which will be set forth in the Exit Facilities Documents and acceptable to the Noteholder Group.

In accordance with the terms and conditions set forth in the Exit Facilities Documents, and to the extent applicable, Confirmation of the Plan shall be deemed (a) an approval of the Exit Term Loan Facility and Exit ABL Facility (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid (at any time) by the Debtors or the Reorganized Debtors, as applicable, in connection therewith and subject to all conditions set forth therein), to the extent not approved by the Bankruptcy Court previously, and (b) an authorization for the Debtors or the Reorganized Debtors, as applicable, to, without further notice to or order of the Bankruptcy Court, (i) execute and deliver those documents necessary or appropriate to obtain the Exit Facilities, including the Exit Term Loan Facility Documents and Exit ABL Facility Documents and (ii) act or take action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or the Reorganized Debtors, as applicable, may deem to be necessary to consummate the Exit Facilities.

On the Effective Date, the Exit Facilities Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the Exit Facilities Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law.  On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facilities Documents (1) shall be deemed to be granted, (2) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facilities Documents, (3) shall be deemed automatically perfected on the Effective Date (without any further action being required by the Debtors, the Reorganized Debtors, the applicable Exit Facility Agent, or any of the applicable Exit Facility Lenders), having the priority set forth in the Exit Facilities Documents and subject only to such Liens and security interests as may be permitted under the Exit Facilities Documents, and (4) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the Entities granted such Liens and security interests are authorized to

make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

6.      **New Common Stock**

The issuance of the New Common Stock, including options or other equity awards reserved for the Management Incentive Plan by the Reorganized Debtors, shall be authorized without any further action by the Holders of Claims or Interests.  The Reorganized Debtors shall be authorized to issue a certain number of shares of New Common Stock issued under the Plan and pursuant to their New Organizational Documents.  On the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall issue all Securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan.

All of the shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  Each distribution and issuance referred to herein shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

Reorganized ICD intends to exist and operate as a private company after the Effective Date.  As promptly as reasonably practicable following the Effective Date, Reorganized ICD expects to take all necessary steps to terminate the registration of all Securities under the Exchange Act and Securities Act, including to de-register its Existing Equity Interests, and to terminate its reporting obligations under sections 12, 13, and 15(d) of the Exchange Act, including by (1) filing, or causing any applicable national securities exchange to file, a Form 25 with the SEC under the Exchange Act, and (2) filing a Form 15 with the SEC under the Exchange Act.

7.      **Corporate Existence**

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other New Organizational Documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).  After the Effective Date, the respective certificate of incorporation and bylaws (or other New Organizational Documents) of one or more of the Reorganized Debtors may be amended or modified without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  After the Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

8.      **Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in, or entered into in connection with or pursuant to, the Plan or Plan Supplement,  pursuant to sections 1123(a)(5), 1123(b)(3), 1141(b) and (c) and other applicable provisions of the Bankruptcy Code, on or after the Effective Date, all property and assets of each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances subject to Liens that survive the occurrence of the Effective Date (including, without limitation, Liens

that secure the Exit Facilities and all other obligations of the Reorganized Debtors under the Exit Facilities Documents).  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than restrictions expressly imposed by the Plan or the Confirmation Order.

<p style="text-align:center">9.   <strong>Cancellation of Existing Securities and Agreements</strong></p>

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, certificates, credit agreements, indentures, and other similar documents evidencing Claims or Interests, shall be cancelled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect.  Holders of or parties to such canceled instruments, Securities, and other documentation will have no rights arising from or relating to such instruments, Securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to the Plan.  Notwithstanding the occurrence of the Confirmation Date, Effective Date, or anything to the contrary herein, but subject to any applicable provisions of **Article VI** of the Plan, the DIP Term Sheet or the DIP Facility Documents, as applicable, and the Indenture shall continue in effect solely to the extent necessary to: (1) permit Holders of Claims under the DIP Facility and the Indenture to receive their respective Plan Distributions, as applicable; (2) permit the Reorganized Debtors, the DIP Lenders, and the Indenture Trustee to make or assist in making, as applicable, Plan Distributions on account of the DIP Facility, and the Indenture and the Revolving ABL Credit Agreement, as applicable, and deduct therefrom such reasonable compensation, fees, and expenses (a) due to the DIP Lenders, the Indenture Trustee, and Revolving ABL Agent, as applicable, or (b) incurred by the DIP Lenders and the Indenture Trustee in making such Plan Distributions; and (3) permit the DIP Lenders, the Indenture Trustee, and the Revolving ABL Agent to seek compensation and/or reimbursement of fees and expenses in accordance with the terms of the Plan.  Except as provided in the Plan (including **Article VI** of the Plan), on the Effective Date, the DIP Lenders and the Indenture Trustee, and their respective agents, successors, and assigns shall be automatically and fully discharged of all of their duties and obligations associated with the DIP Facility and the Indenture, as applicable.  The commitments and obligations (if any) of the DIP Lenders or the Noteholders to extend any further or future credit or financial accommodations to any of the Debtors, any of their respective subsidiaries, or any of their respective successors or assigns under the DIP Facility and the Indenture, as applicable, shall fully terminate and be of no further force or effect on the Effective Date.

<p style="text-align:center">10.   <strong>Corporate Action</strong></p>

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including:  (1) adoption or assumption, as applicable, of the Assumed Employee Plans; (2) selection of the directors and officers for the New Board; (3) the issuance and distribution of the New Common Stock; (4) implementation of the Restructuring Transactions; (5) entry into the Exit Facilities Documents, as applicable; (6) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (7) adoption of the New Organizational Documents; (8) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (9) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Reorganized Debtor, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the holders of Securities, members, directors, or officers of the Debtors or the Reorganized Debtors, as applicable, unless otherwise required by applicable law.  On or prior to the Effective Date, as applicable, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated under the Plan (or necessary or desirable to effect the Restructuring Transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Common Stock, the New Organizational Documents, the Exit Facilities Documents, and any and all other agreements, documents, Securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by **Section IV.I** of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law, in each case in accordance with applicable law.

<p style="text-align:center">33</p>

11.     **New Organizational Documents**

On or immediately prior to the Effective Date, the New Organizational Documents shall be automatically adopted by the applicable Reorganized Debtors.  To the extent required under the Plan or applicable non-bankruptcy law, each of the Reorganized Debtors will file its New Organizational Documents, as applicable, with the applicable Secretaries of State and/or other applicable authorities in its respective state or country of organization if and to the extent required in accordance with the applicable laws of the respective state or country of organization.  The New Organizational Documents will prohibit the issuance of non-voting equity Securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code.  For the avoidance of doubt, the New Organizational Documents shall be consistent with the Plan and in form and substance reasonably acceptable to the Debtors and the Noteholder Group.  After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents, and the Reorganized Debtors may file such amended certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of the respective states, provinces, or countries of incorporation and the New Organizational Documents, in each case in accordance with applicable law.

12.     **Indemnification Provisions in Organizational Documents**

As of the Effective Date, the New Organizational Documents of each Reorganized Debtor shall, to the fullest extent permitted by applicable law, provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to, current and former managers, directors, officers, employees, or agents at least to the same extent as the certificate of incorporation, bylaws, or similar organizational document of each of the respective Debtors on the Petition Date, against any claims or causes of action whether direct or derivative, liquidated or unliquidated, fixed, or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted.

13.     **Directors and Officers of the Reorganized Debtors**

As of the Effective Date, the term of the current members of the board of directors of ICD shall expire, and all of the directors for the initial term of the New Board shall be selected by the Noteholder Group and shall include the Chief Executive Officer of Reorganized ICD.  For the avoidance of doubt, the New Board shall be appointed in compliance with Section 1129(a)(5) of the Bankruptcy Code.  To the extent known, the identity of the members of the New Board will be disclosed in the Plan Supplement or prior to the Confirmation Hearing, consistent with Section 1129(a)(5) of the Bankruptcy Code.

Each director and officer of the Reorganized Debtors shall serve from and after the Effective Date pursuant to the terms of the applicable New Organizational Documents and other constituent documents.  In subsequent terms, the directors of the Reorganized Debtors shall be selected in accordance with the New Organizational Documents.

14.     **Effectuating Documents; Further Transactions**

On and after the Effective Date, the Reorganized Debtors, and their respective officers, directors, members, or managers (as applicable), are authorized to and may issue, execute, deliver, File, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

15.     **Section 1146 Exemption**

To the fullest extent permitted by Section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under or in connection with the Plan, including pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors; (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of

additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant of collateral as security for the Reorganized Debtors' obligations under and in connection with the Exit Facilities; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of Section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 16.      Director and Officer Liability Insurance

The Reorganized Debtors shall obtain new director and officer liability insurance policies to cover the New Board effective as of the Effective Date.

In addition, after the Effective Date, for a period of at least six (6) years, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any "tail" D&O Liability Insurance Policies covering the Debtors' current boards of directors in effect on or after the Petition Date, with respect to conduct occurring prior thereto, and, subject to the terms of the applicable D&O Liability Insurance Policies, all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors and officers remain in such positions after the Effective Date.

### 17.      Management Incentive Program

On the Effective Date or as soon as practicable thereafter, the New Board shall adopt and implement the Management Incentive Plan pursuant to, and consistent with, the terms set forth in the Plan. Solely to the extent required under Section 1129(a)(5) of the Bankruptcy Code, the Management Incentive Plan shall be disclosed in the Plan Supplement. The New Board shall determine the timing and specific allocation of New Common Stock in Reorganized ICD.

### 18.      Employee and Retiree Benefits

Unless otherwise provided in the Plan, all employee wages, compensation, and benefit programs in place as of the Effective Date with the Debtors shall be assumed by the Reorganized Debtors and shall remain in place as of the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

### 19.      Preservation of Causes of Action

In accordance with Section 1123(b) of the Bankruptcy Code, but subject to **Article VIII** of the Plan, each Reorganized Debtor, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Retained Causes of Action Schedule, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than (i) the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in **Article VIII** of the Plan, and (ii) any preference actions under Section 547(b) of the Bankruptcy

Code, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or this Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including __Article VIII__ of the Plan. Unless otherwise agreed upon in writing by the parties to the applicable Cause of Action, all objections to the Retained Causes of Action Schedule must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date. Any such objection that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Reorganized Debtor, without the need for any objection or responsive pleading by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.** The Reorganized Debtors may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court. If there is any dispute regarding the inclusion of any Cause of Action on the Retained Causes of Action Schedule that remains unresolved by the Debtors or Reorganized Debtors, as applicable, and the objection party for thirty (30) days, such objection shall be resolved by the Bankruptcy Court. Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan (including in **__Article VIII__** of the Plan) or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including **__Article VIII__** of the Plan. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, File, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

### E.     Treatment of Executory Contracts and Unexpired Leases

#### 1.     Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided in **__Section V.I.1__** of the Plan and elsewhere in the Plan, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor in accordance with the provisions and requirements of Sections 365 and 1123 of the Bankruptcy Code, other than those that: (1) are identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (2) previously expired or terminated pursuant to their own terms; (3) have been previously assumed or rejected by the Debtors pursuant to a Final Order; (4) are the subject of a motion to reject that is pending on the Effective Date; or (5) have an ordered or requested effective date of rejection that is after the Effective Date.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan or the Rejected Executory Contracts and Unexpired Leases Schedule, pursuant to Sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise specifically set forth in the Plan, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Final Order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any Final

Order authorizing and providing for its assumption. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contracts and Unexpired Leases Schedule at any time up to thirty (30) days after the Effective Date, so long as such allocation, amendment, modification, or supplement is acceptable to the Noteholder Group.

### 2. Indemnification Obligations

On the Effective Date, all Indemnification Provisions shall be deemed and treated as Executory Contracts that are and shall be assumed by the Debtors (and assigned to the applicable Reorganized Debtors, if necessary) on terms no less favorable to the applicable counterparty pursuant to Section 365(a) and Section 1123 of the Bankruptcy Code as to which no proof of Claim, request for administrative expense, or cure claim need be Filed, and all Claims arising from the Indemnification Provisions shall survive the Effective Date and be Unimpaired. Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' assumption of each of the Indemnification Provisions. Confirmation and Consummation of the Plan shall not impair or otherwise modify any available defenses of the Reorganized Debtors or other applicable parties under the Indemnification Provisions. For the avoidance of doubt, the Indemnification Provisions shall continue to apply with respect to actions, or failures to act, that occurred on or prior to the Effective Date, subject to the terms and conditions of the Indemnification Provisions.

### 3. Claims Based on Rejection of Executory Contracts or Unexpired Leases

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Rejection Damages Claims, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date. **Any Rejection Damages Claims not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Rejection Damage Claim shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary.** All Allowed Rejection Damages Claims shall be classified as General Unsecured Claims and shall be treated in accordance with **Section III.B.5** of the Plan.

### 4. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

The Debtors or the Reorganized Debtors, as applicable, shall pay Cures, if any, on the Effective Date or as soon as reasonably practicable thereafter. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date. Any such request that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure; provided that nothing herein shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to File such request for payment of such Cure. The Reorganized Debtors also may settle any Cure without any further notice to or

action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan, must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing for which such objection is timely filed. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is any dispute regarding any Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of further performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure pursuant to **Section V.D** of the Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to this Section V.D, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court**.

### 5. Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

### 6. Insurance Policies

Notwithstanding anything to the contrary in the Definitive Documentation, the Plan Supplement, any other document related to any of the foregoing, or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction or release or requires a party to opt out of any releases): on and after the Effective Date (i) each of the Debtors' Insurance Contracts shall be treated as Executory Contracts under the Plan and the Debtors and Reorganized Debtors jointly and severally shall be deemed to have assumed the Insurance Contracts pursuant to sections 105 and 365 of the Bankruptcy Code; (ii) nothing shall alter, amend or otherwise modify the terms and conditions of the Insurance Contracts except that, on and after the Effective Date, the Reorganized Debtors shall become and remain jointly and severally liable in full for all of their and the Debtors' obligations under the Insurance Contracts, regardless of whether such obligations arise before or after the Effective Date, without the requirement or need for any Insurer to file a Proof of Claim or an Administrative Expense Claim, or to object to any Cure; and (iii) the automatic stay of Bankruptcy Code section 362(a) and the injunction set forth in **Section VIII.F** of the Plan, if and to the extent applicable, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit:  (a) claimants with valid workers' compensation claims or with valid direct action claims against an Insurer under applicable non-bankruptcy law to proceed with their claims; (b) Insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court, (1) workers' compensation claims, (2) claims where a claimant asserts a direct claim against any Insurer under applicable non-bankruptcy law, or an order has been entered by this Bankruptcy Court granting a claimant relief from the automatic stay or the injunction set forth in **Section VIII.F** of the Plan to proceed with its claim, and (3) all costs in relation to each of the foregoing; and (c) the Insurers to cancel any Insurance Contracts, and

take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the Insurance Contracts.

### 7. Reservation of Rights

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

### 8. Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to Section 365(d)(4) of the Bankruptcy Code.

### 9. Employee Compensation and Benefits

#### (a) Assumed Employee Plans

All officers of ICD immediately prior to the Effective Date shall be retained in their existing positions upon the Effective Date.  All employment agreements and severance policies, including all employment, compensation and benefit plans, policies, and programs of the Debtors applicable to any of their officers, employees and retirees, including without limitation, all workers' compensation programs, savings plans, retirement plans, SERP plans, healthcare plans, disability plans, severance benefit plans, incentive plans, change-in-control plans, life and accidental death and dismemberment insurance plans (collectively, the "**Assumed Employee Plans**"), shall, subject to the provisos below, be maintained and assumed by the Debtors (and assigned to the Reorganized Debtors, if necessary) pursuant to Section 365(a) of the Bankruptcy Code, either by separate motion filed with the Bankruptcy Court or pursuant to the terms of the Plan and the Confirmation Order; *provided* that (a) the Debtors acknowledge and agree that the Restructuring Transaction shall not constitute a change in control or term of similar meaning pursuant to any of the Assumed Employee Plans, and the Confirmation Order shall contain a finding and such other provisions acceptable to the Noteholder Group confirming the same, and (b) each "Executive" employment agreement shall only be maintained and assumed by the Debtors (and assigned to the Reorganized Debtors, if necessary) and considered an Assumed Employee Plan if the employee party to such agreement, on or prior to the Effective Date, (i) confirms that the Restructuring Transactions do not constitute a change in control and (ii) waives any right to resign with "good reason" solely as a result of the Restructuring Transactions and/or the transactions contemplated thereby or hereby. All claims arising from the Assumed Employee Plans shall otherwise be Unimpaired by the Plan.  For the avoidance of doubt, the Debtors shall pay in full any and all amounts due and owing under the Debtors' 2024 Incentive Compensation Policy in the ordinary course.

#### (b) Workers' Compensation Programs

As of the Effective Date, except as set forth in the Plan Supplement, the Debtors and the Reorganized Debtors shall continue to honor their obligations under: (a) all applicable workers' compensation laws in all applicable states; and (b) the Workers' Compensation Programs.  All Proofs of Claims on account of Workers' Compensation Programs shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to the Workers' Compensation Programs; *provided further* that nothing herein shall be deemed to impose any obligations on the Debtors or the Insurers in addition to what is provided for under the terms of the Workers' Compensation Programs and applicable state law.

###### 10. Contracts and Leases Entered Into after the Petition Date

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors in the ordinary course of their business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

#### F. Provisions Governing Distributions

##### 1. Distributions on Account of Claims Allowed as of the Effective Date

Except as otherwise provided the Plan, in a Final Order, or as otherwise agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of the applicable Allowed Claim on the first Distribution Date, the Reorganized Debtors shall make initial distributions under the Plan on account of Claims Allowed as of the Effective Date, subject to the Reorganized Debtors' right to object to Claims; *provided* that (1) Allowed Administrative Expense Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice; (2) Allowed Professional Claims shall be paid in accordance with **Section II.C** of the Plan; (3) Allowed Priority Tax Claims shall be paid in accordance with **Section II.E** of the Plan, and (4) Allowed General Unsecured Claims against Debtors shall be paid in accordance with **Section III.B.5** of the Plan. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

##### 2. Disbursing Agent

All distributions under the Plan shall be made by the Disbursing Agent. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Additionally, in the event that the Disbursing Agent is so ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

##### 3. Rights and Powers of Disbursing Agent

###### (a) Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

###### (b) Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, to the extent the Disbursing Agent is an Entity other than the Reorganized Debtors, the amount of any reasonable fees and expenses incurred by such Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by such Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

### 4. Delivery of Distributions and Undeliverable or Unclaimed Distributions

#### (a) Record Date for Distribution

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date. If a Claim, other than one based on a publicly traded Security, is transferred twenty (20) or fewer days before the Distribution Record Date, the Disbursing Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

#### (b) Delivery of Distributions in General

Except as otherwise provided in the Plan, the Disbursing Agent shall make distributions to Holders of Allowed Claims and Allowed Interests (as applicable) as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided*, *however*, that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors.

#### (c) Delivery of Distributions on DIP Claims, Revolving ABL Claims, and Notes Claims

As soon as practicable following compliance with the requirements set forth in **Article VI** of the Plan, the DIP Lenders, as applicable, the Revolving ABL Agent, and the Indenture Trustee shall arrange to deliver or direct the delivery of such distributions to or on behalf of the Holders of Allowed DIP Claims, Allowed Revolving ABL Claims, and Allowed Notes Claims, respectively, in accordance with the terms of the DIP Facility, Revolving ABL Credit Agreement, the Indenture, and the Plan. Notwithstanding anything in the Plan to the contrary, and without limiting the exculpation and release provisions of the Plan, the DIP Lenders, Revolving ABL Agent, and Indenture Trustee shall not have any liability to any Entity with respect to distributions made or directed to be made by the DIP Lenders, Revolving ABL Agent, Indenture Trustee, or Disbursing Agent.

#### (d) Minimum Distributions

No fractional shares of New Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional amounts. When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the actual distribution of shares of New Common Stock shall be rounded as follows: (a) fractions of one-half (1/2) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (1/2) shall be rounded to the next lower whole number with no further payment therefor. The total number of authorized shares of New Common Stock to be distributed to Holders of Allowed Claims hereunder shall be adjusted as necessary to account for the foregoing rounding.

#### (e) Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder of Allowed Claims is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided*, *however*, that such distributions shall be deemed unclaimed property under Section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder of Claims to such property or Interest in property shall be discharged and forever barred.

(f)        **Surrender of Canceled Instruments or Securities**

On the Effective Date or as soon as reasonably practicable thereafter, each Holder of a certificate or instrument evidencing a Claim or an Interest shall be deemed to have surrendered such certificate or instrument to the Disbursing Agent.  Such surrendered certificate or instrument shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the Holder of a Claim or Interest or a trustee or agent under such documents, which shall continue in effect for purposes of allowing Holders to receive distributions under the Plan and maintaining priority of payment, and to preserve any applicable charging liens and reimbursement and/or indemnification rights, in each case as set forth in the applicable certificates or instruments.  Notwithstanding anything to the contrary in the Plan, this paragraph shall not apply to certificates or instruments evidencing Claims that are Unimpaired under the Plan.

### 5.        Manner of Payment

All distributions of the New Common Stock or Cash to the Holders of the applicable Allowed Claims under the Plan shall be made by the Disbursing Agent on behalf of the Debtors or Reorganized Debtors, as applicable.

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

### 6.        Exemption from Registration Requirements

Pursuant to Section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the New Common Stock, as contemplated by **Section III.B** of the Plan, shall be exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of Securities.  In addition, under Section 1145 of the Bankruptcy Code, such New Common Stock will be freely tradable in the U.S. by the recipients thereof, subject to the provisions of (i) Section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in Section 2(a)(11) of the Securities Act; (ii) compliance with applicable securities laws and any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; and (iii) any restrictions in the Reorganized Debtors' New Organizational Documents.

### 7.        Compliance with Tax Requirements

In connection with the Plan, to the extent applicable, the Debtors, Reorganized Debtors, Disbursing Agent, and any applicable withholding agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Debtors and Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

### 8.        Allocations

Plan Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

9.        **No Postpetition Interest on Claims**

Unless otherwise specifically provided for in the Plan, the Confirmation Order, the Final DIP Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on such Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period form the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes and Allowed Claim.

10.        **Foreign Currency Exchange Rate**

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal*, National Edition, on the Effective Date.

11.        **Setoffs and Recoupment**

Except as expressly provided in the Plan, each Reorganized Debtor may, pursuant to Section 553 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Reorganized Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Reorganized Debtor(s) and the Holder of the Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided*, *however*, that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable Holder. In no event shall any Holder of a Claim be entitled to recoup such Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with **Section XII.G** of the Plan on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

12.        **Claims Paid or Payable by Third Parties**

(a)        **Claims Paid by Third Parties**

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

(b)        **Claims Payable by Third Parties**

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Contracts until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Contract. To the extent that one or more of the Debtors' Insurers agrees to pay in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then

43

immediately upon such Insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)        **Applicability of Insurance Policies**

Except as otherwise provided in the Plan, payments to Holders of Claims covered by Insurance Contracts shall be in accordance with the provisions of the applicable Insurance Contract and the Plan. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including Insurers under any Insurance Contract, nor shall anything contained therein constitute or be deemed a waiver by such Insurers of any defenses, including coverage defenses, held by such Insurers.

### G.        Procedures for Resolving Contingent, Unliquidated, and Disputed Claims

#### 1.        Disputed Claims Process

Notwithstanding section 502(a) of the Bankruptcy Code, and in light of the Unimpaired status of all Allowed General Unsecured Claims under the Plan, except as required by the Plan, Holders of Claims need not File Proofs of Claim, and the Reorganized Debtors and the Holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Chapter 11 Cases had not been commenced except that (unless expressly waived pursuant to the Plan) the Allowed amount of such Claims shall be subject to the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code, to the extent applicable. All Proofs of Claim filed in these Chapter 11 Cases shall be considered objected to and Disputed without further action by the Debtors. Upon the Effective Date, all Proofs of Claim filed against the Debtors, regardless of the time of filing, and including Proofs of Claim filed after the Effective Date, shall be deemed withdrawn and expunged, other than Rejection Damages Claims and as provided below. Notwithstanding anything in the Plan to the contrary, disputes regarding the amount of any Cure pursuant to section 365 of the Bankruptcy Code and Claims that the Debtors seek to have determined by the Bankruptcy Court, shall in all cases be determined by the Bankruptcy Court.

For the avoidance of doubt, there is no requirement to File a Proof of Claim or Proof of Interest (or move the Bankruptcy Court for allowance) to be an Allowed Claim or Allowed Interest, as applicable, under the Plan. Notwithstanding the foregoing, Entities must File Proofs of Claim for Rejection Damages Claims as set forth in **Section VI.C** of the Plan and Cure objections as set forth in **Section VI.D** of the Plan to the extent such Entity disputes the amount of the Cure paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty. **Except as otherwise provided herein, all Proofs of Claim filed after the Effective Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

#### 2.        Allowance of Claims

Except as otherwise set forth in the Plan, after the Effective Date, the Reorganized Debtors shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Effective Date, including the Causes of Action retained pursuant to **Section IV.S** of the Plan.  Except as specifically provided in the Plan or an order entered by the Bankruptcy Court in the Chapter 11 Cases, no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed in accordance with the Plan.

#### 3.        Claims Administration Responsibilities

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority: (1) to File, withdraw, or litigate to judgment, objections to Claims; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

Any objections to Claims and Interests other than General Unsecured Claims shall be served and filed on or before the 180th day after the Effective Date or by such later date as ordered by the Bankruptcy Court. All Claims and Interests other than General Unsecured Claims not objected to by the end of such 180-day period shall be deemed Allowed unless such period is extended upon approval of the Bankruptcy Court.

Any objections to Rejection Damages Claims shall be served and Filed on or before the 180th day after the Effective Date or by such later date as ordered by the Bankruptcy Court. All Rejection Damages Claims not objected to by the end of such 180-day period shall be deemed Allowed unless such period is extended upon approval of the Bankruptcy Court.

Notwithstanding the foregoing, the Debtors and Reorganized Debtors shall be entitled to dispute and/or otherwise object to any General Unsecured Claim in accordance with applicable nonbankruptcy law. If the Debtors, or Reorganized Debtors dispute any General Unsecured Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced. In any action or proceeding to determine the existence, validity, or amount of any General Unsecured Claim, any and all claims or defenses that could have been asserted by the applicable Debtor(s) or the Entity holding such General Unsecured Claim are preserved as if the Chapter 11 Cases had not been commenced.

### 4.      Adjustment to Claims without Objection

Any duplicate Claim or any Claim that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 5.      Disallowance of Claims or Interests

All Claims of any Entity from which property is sought by the Debtors under Sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under Sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be Disallowed pursuant to Section 502(d) of the Bankruptcy Code if: (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

### 6.      No Distributions Pending Allowance

Notwithstanding any other provision of the Plan, if any portion of a Claim is a Disputed Claim, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim; *provided* that if only the Allowed amount of an otherwise valid Claim is Disputed, such Claim shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

### 7.      Distributions after Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim the distribution to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim.

### H.      Settlement, Release, Injunction, and Related Provisions

#### 1.      Discharge of Claims and Termination of Interests

Pursuant to Section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan (including with respect to Reinstated Claims), the Confirmation Order or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in Sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to Section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to Section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has accepted the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

#### 2.      Release of Liens

**Except as otherwise provided in the Plan (including <u>Section IV.E</u> of the Plan), the Confirmation Order, or in any contract, instrument, or other agreement or document created pursuant to the Plan (including, for the avoidance of doubt, the Exit Facilities Documents), on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for (i) with respect to any Lien securing any Allowed Revolving ABL Claims or Notes Claims, in each case, that are amended and restated under the Exit Facilities, and (ii) Allowed Other Secured Claims, that the Debtors elect to Reinstate in accordance with the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and Filing or recording of such releases.  The presentation or Filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

**To the extent that any Holder of a Secured Claim (other than a Holder of any Allowed Revolving ABL Claims (with respect to such Allowed Revolving ABL Claims) and a Holder of Notes Claims (with respect to such Notes Claims)) that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps reasonably requested by the Debtors, the Reorganized Debtors, Revolving ABL Agent or Exit Facility Agents, if any, that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.**

Notwithstanding any of the foregoing and anything in the Revolving ABL Documents or the Note Documents to the contrary, in accordance with the terms of the Plan, the security interests and Liens of the Revolving ABL Agent in respect of the Revolving ABL Credit Facility and the Indenture Trustee in respect of the 2026 Convertible Notes shall not be released or discharged and shall remain in place, including as to the time of perfection, and (a) the security interests and Liens of the Revolving ABL Agent securing the obligations under the Revolving ABL Facility shall be shall be assigned to the Exit ABL Facility Agent to secure the obligations under the Exit ABL Facility for the benefit of the secured parties under the Exit ABL Facility, and (b) the security interests and Liens of the Indenture Trustee securing the obligations under the 2026 Convertible Notes shall be assigned to the Exit Term Loan Agent to secure the obligations under the Exit Term Loan Facility for the benefit of the secured parties under the Exit Term Loan Facility, in each case, pursuant to the terms set forth in the Confirmation Order.

3.     Releases by the Debtors

Effective as of the Effective Date, pursuant to Section 1123(b) of the Bankruptcy Code, for good and valuable consideration (including, without limitation, the service of the Released Parties to facilitate the expeditious reorganization of the Debtors, the implementation of the restructuring contemplated by the Plan, and the waiver of certain Claims of certain of the Released Parties against the Debtors) the adequacy of which is hereby confirmed, to the fullest extent allowed by applicable law, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, their Estates, and the Reorganized Debtors, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all claims and Causes of Action, and liabilities whatsoever, including any derivative claims, asserted by or assertable on behalf of any of the Debtors, their Estates, or the Reorganized Debtors, as applicable, whether known or unknown, foreseen or unforeseen, matured or unmatured, suspected or unsuspected, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, in law (or any applicable rule, statute, regulation, treaty, right, duty or requirement), equity, contract, tort, violations of federal or state securities laws, or otherwise, that the Debtors, their Estates, or the Reorganized Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to, the Debtor-Related Matters. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any obligations arising pursuant to or after the Effective Date of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (b) any Causes of Action included in the Retained Causes of Action Schedule, or (c) actual fraud, willful misconduct, or gross negligence as determined by a Final Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan and, further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the claims or Causes of Action released by the Debtor Release; (c) in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after reasonable investigation by the Debtors and after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, their Estates, or the Reorganized Debtors asserting any claim or Cause of Action released pursuant to the Debtor Release.

4.     Releases by the Releasing Parties (the "Third-Party Release")

Effective as of the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, to the fullest extent allowed by applicable law, each of the Releasing Parties shall be deemed to have to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and

discharged each of the Released Parties from any and all claims, Causes of Action, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, matured or unmatured, suspected or unsuspected, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, in law (or any applicable rule, statute, regulation, treaty, right, duty or requirement), equity, contract, tort, violations of federal or state securities laws, or otherwise, that such Releasing Party would have been legally entitled to assert in its own right (whether individually or collectively) or otherwise based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to, the Debtor-Related Matters.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any obligations arising pursuant to or after the Effective Date of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; (b) any Causes of Action included in the Retained Causes of Action Schedule, or (c) actual fraud, willful misconduct, or gross negligence as determined by a Final Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third Party Release is: (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the restructuring and implementing the Plan; (d) a good faith settlement and compromise of the claims or Causes of Action released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

5.    Exculpation

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, and except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party hereby is exculpated from any obligation, claim or Cause of Action related to, any act or omission in connection with, relating to, or arising out of the negotiation, solicitation, confirmation, execution, or implementation (to the extent on or prior to the Effective Date) of, as applicable, the Debtor-Related Matters except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted bad faith, fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of securities pursuant to the Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of securities hereunder. The exculpation hereunder will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.  Notwithstanding anything to the contrary in the foregoing, an Exculpated Party shall be entitled to exculpation solely for actions taken from the Petition Date through the Effective Date, and the exculpation set forth above does not exculpate any obligations arising pursuant to or after the Effective Date of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Solely with respect to the exculpation provisions, notwithstanding anything to the contrary in the Plan, each of the Section 1125(e) Parties shall not incur liability for any Cause of Action or Claim related to any act or omission in connection with, relating to, or arising out of, in whole or in part, (a) the solicitation of acceptance or rejection of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code or (b) the participation, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security, offered or sold under the Plan.

6.        **Injunction**

**Except as otherwise expressly provided in the Final DIP Order, the Plan, or the Confirmation Order or for obligations issued or required to be paid pursuant the Plan all Entities and persons are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any Claims or Interests; (b) enforcing, attaching, collecting, or recovering in any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any Claims or Interests; (c) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment, or other similar legal or equitable right of any kind, in each case in the foregoing classes (a) through (d) on account of or in connection with or with respect to any claim, demand, liability, obligation, debt, right, cause of action, equity interest, or remedy released or to be released, exculpated or to be exculpated, settled or to be settled or discharged or to be discharged pursuant to the Plan or the Confirmation order against any Person or Entity so released, discharged, or exculpated (or the property or estate of any Person or Entity so released, discharged, or exculpated) unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released, discharged, or settled pursuant to the Plan.  All injunctions or stays provided for in the Chapter 11 Cases under section 105 or section 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.**

**Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in <u>Section VIII.F</u> of the Plan.**

7.        **Gatekeeping Provision**

No party may commence, continue, amend, or otherwise pursue, join in, or otherwise support any other party commencing, continuing, amending, or pursuing, a Cause of Action of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, the Section 1125(e) Parties, or the Released Parties that relates to, or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of, a Cause of Action subject to <u>**Section VIII.C**</u> or <u>**Section VIII.E**</u> of the Plan without first (a) requesting a determination from the Bankruptcy Court, after notice and a hearing, that such Cause of Action represents a colorable claim against a Debtor, Reorganized Debtor, Exculpated Party, Section 1125(e) Party, or Released Party and is not a Claim that the Debtors released under the Plan, which request must attach the complaint or petition proposed to be filed by the requesting party, and (b) obtaining from the Bankruptcy Court specific authorization for such party to bring such Cause of Action against any such Debtor, Reorganized Debtor, Exculpated Party, Section 1125(e) Party, or Released Party; provided, however, that <u>**Section VIII.G**</u> of the Plan. shall not apply to claims covered by an Insurance Contract solely to the extent to allow Insurers to administer, handle, defend and/or pay claims covered by Insurance Contracts in accordance with and subject to the terms and conditions of such Insurance Contracts and/or applicable non-bankruptcy law, provided that the automatic stay of section 362(a) of the Bankruptcy Code and/or the injunctions set forth in <u>**Section VIII.F**</u> of the Plan, each if and to the extent applicable, have been lifted with respect to such claims.  For the avoidance of doubt, any party that obtains such determination and authorization and subsequently wishes to amend the authorized complaint or petition to add any Causes of Action not explicitly included in the authorized complaint or petition must obtain authorization from the Bankruptcy Court before filing any such amendment in the court where such complaint or petition is pending.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a Cause of Action is colorable and, only to the extend legally permissible, will have jurisdiction to adjudicate the underlying colorable Cause of Action.

8.        **Protections against Discriminatory Treatment**

Consistent with Section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

9.        **Waiver of Statutory Limitation on Releases**

Each of the Releasing Parties in each of the releases contained above expressly acknowledges that although ordinarily a general release may not extend to Claims which the Releasing Party does not know or suspect to exist in its favor, which if known by it may have materially affected its settlement with the party released, they have carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses or claims.  Without limiting the generality of the foregoing, each Releasing Party expressly waives any and all rights conferred upon it by any statute or rule of law which provides that a release does not extend to claims which the claimant does not know or suspect to exist in its favor at the time of providing the release, which if known by it may have materially affected its settlement with the released party.  The releases contained in the Plan are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, foreseen or unforeseen.

10.       **Reimbursement or Contribution**

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to Section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding Section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

11.       **Integral Part of Plan**

Each of the provisions set forth in the Plan with respect to the settlement, release, discharge, exculpation, injunction, indemnification and insurance of, for or with respect to Claims and/or Causes of Action are an integral part of the Plan and essential to its implementation.  Accordingly, each Entity that is a beneficiary of such provision shall have the right to independently seek to enforce such provision and such provision may not be amended, modified, or waived after the Effective Date without the prior written consent of such beneficiary.

I.        **Conditions Precedent to Confirmation and Consummation of the Plan**

1.        **Condition Precedent to Confirmation**

It shall be a condition to Confirmation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of **Article X.C** of the Plan:

(a)     The Plan and the Definitive Documentation shall be in form and substance consistent in all material respects with the Plan and otherwise acceptable to the Debtors and the Noteholder Group;

(b)     The Plan Supplement shall have been Filed; and

(c)     The Confirmation Order have been entered by the Bankruptcy Court which shall be in form and substance acceptable to the Noteholder Group.

## 2.     Conditions Precedent to the Effective Date

The following shall be conditions to the Effective Date (the "**Conditions Precedent**"):

a.     the Bankruptcy Court shall have entered the Confirmation Order, which shall be in form and substance acceptable to the Debtors and the Noteholder Group, shall be a Final Order, and shall:

1.     authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

2.     decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;

3.     authorize the Debtors, as applicable/necessary, to: (A) implement the Restructuring Transactions; (B) distribute the New Common Stock pursuant to the exemption from registration under the Securities Act provided by Section 1145 of the Bankruptcy Code or other exemption from such registration or pursuant to one or more registration statements; (C) make all distributions and issuances as required under the Plan, including Cash and the New Common Stock; and (D) enter into any agreements, transactions, and sales of property as set forth in the Plan and Plan Supplement, including the Exit Facilities Documents and the Management Incentive Plan;

4.     authorize the implementation of the Plan in accordance with its terms;

5.     provide that, pursuant to Section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax;

b.     the Bankruptcy Court shall have entered the Final DIP Order in form and substance consistent in all material respects with the DIP Term Sheet, and such Final DIP Order shall remain in full force and effect, and no Event of Default (as defined in the Final DIP Order) shall have occurred or be continuing thereunder;

c.     the Debtors shall have obtained all authorizations, consents, governmental approvals and consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

d.     the Plan, this Disclosure Statement, and the other Definitive Documentation, and all other documents contained in any supplement to the Plan, including any exhibits, schedules, amendments, modifications, or supplements thereto or other documents contained therein, shall have been executed or Filed, as applicable, in form and substance consistent in all material respects with the Plan, shall be in form and substance acceptable to the Debtors and the Noteholder Group, and shall be in full force and effect;

e. the Exit Facilities shall be in full force and effect and be consummated concurrently with the Effective Date (with all conditions precedent (other than any conditions related to the Effective Date) to the effectiveness of the Exit Facilities having been satisfied or waived in accordance with the terms thereof, including, but not limited to, that all documents related to the Exit Facilities shall have been duly executed and delivered by all the relevant parties thereto);

f. to the extent invoiced, all Noteholder Group's Fees and Expenses shall have been paid in full in Cash;

g. the Debtors shall have implemented the Restructuring Transactions and all transactions contemplated by the Plan, in a manner consistent in all respects the Plan, pursuant to documentation acceptable to the Debtors and the Noteholder Group; and

h. the Plan shall not have been materially amended, altered, or modified from the Plan confirmed by the Confirmation Order, unless such material amendment, alteration, or modification has been made in accordance with **Section X.A** of the Plan and is otherwise reasonably acceptable to the Debtors and Noteholder Group.

### 3. Waiver of Conditions

The conditions to Confirmation and consummation set forth in **Article VII** of the Plan may be waived by the Debtors only with the prior written consent of the Noteholder Group (email shall suffice), without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

### 4. Effect of Failure of Conditions

If Consummation does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan, this Disclosure Statement shall: (1) constitute a waiver or release of any Claims by the Debtors, or Claims against, or Interests in, the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity.

### 5. Substantial Consummation

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

### J. Modification, Revocation, or Withdrawal of Plan

### 1. Modification and Amendments

Except as otherwise specifically provided in the Plan, with the consent of the Noteholder Group, and solely with respect to any provisions pertaining to, the Revolving ABL Agent or adversely affecting the Revolving ABL Agent or the Revolving ABL Lenders, the consent of the Revolving ABL Agent, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to those restrictions on modifications set forth in the Plan and the requirements of section 1127 of the Bankruptcy Code, Rule 3019 of the Federal Rules of Bankruptcy Procedure, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or, to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, this Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

2.      **Effect of Confirmation on Modifications**

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to Section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

3.      **Revocation or Withdrawal of Plan**

With the consent of the Noteholder Group, the Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

**K.      Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to Sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

a.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

b.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

c.      resolve any matters related to: (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cures pursuant to Section 365 of the Bankruptcy Code; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (iii) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to **Article V** of the Plan, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (iv) any dispute regarding whether a contract or lease is or was executory or expired;

d.      ensure that distributions to Holders of Allowed Claims and Allowed Interests (as applicable) are accomplished pursuant to the provisions of the Plan;

e.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

f.      adjudicate, decide, or resolve any and all matters related to Section 1141 of the Bankruptcy Code;

g.      enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or

documents created in connection with the Plan or this Disclosure Statement, except to the extent that the Definitive Documentation provide for exclusive jurisdiction and venue in another forum;

h.   enter and enforce any order for the sale of property pursuant to Sections 363, 1123, or 1146(a) of the Bankruptcy Code;

i.   resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

j.   issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

k.   resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in **Article VIII** of the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

l.   resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to **Section VI.L** of the Plan;

m.   enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

n.   determine any other matters that may arise in connection with or relate to the Plan, this Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan, the Plan Supplement, or this Disclosure Statement;

o.   enter an order concluding or closing the Chapter 11 Cases;

p.   adjudicate any and all disputes arising from or relating to distributions under the Plan;

q.   consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

r.   determine requests for the payment of Claims and Interests entitled to priority pursuant to Section 507 of the Bankruptcy Code;

s.   hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan, except to the extent that any Definitive Documentation provide for exclusive jurisdiction and venue in another forum;

t.   hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code;

u.   hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under **Article VIII** of the Plan;

v.   enforce all orders previously entered by the Bankruptcy Court; and

w.   hear any other matter not inconsistent with the Bankruptcy Code.

As of the Effective Date, notwithstanding anything in **Article XI** of the Plan to the contrary, the New Organizational Documents and the Exit Facilities, as applicable, and any documents related thereto shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain jurisdiction with respect thereto.

### L.    Miscellaneous Provisions

#### 1.    Immediate Binding Effect

Subject to **Section IX.A** of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including, for the avoidance of doubt, the documents and instruments contained in the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

#### 2.    Additional Documents

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

#### 3.    Dissolution of Committee and Cessation of Fee and Expense Payment

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.  The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Effective Date.

#### 4.    Reservation of Rights

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, this Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

#### 5.    Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

#### 6.    Notices

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| Debtors | Counsel to the Debtors |
|---|---|
| Independence Contract Drilling, Inc.<br>20475 State Highway 249, Suite 300<br>Houston, Texas 77070<br>Attention: Philip Choyce | Sidley Austin LLP<br>1000 Louisiana, Suite 5900<br>Houston, Texas 77002<br>Attention: Duston K. McFaul and Maegan Quejada<br><br>*And*<br><br>Sidley Austin LLP<br>787 Seventh Avenue<br>New York, New York 10019<br>Attention: Michael A. Sabino |
| **United States Trustee** | **Counsel to the Noteholder Group** |
| Office of The United States Trustee<br>515 Rusk Street, Suite 3516<br>Houston, Texas 77002 | Latham and Watkins LLP<br>1271 Avenue of the Americas<br>New York, New York 10020<br>Attention: David Hammerman, Adam Goldberg and Jonathan Weichselbaum<br><br>*And*<br><br>Hunton Andrew Kurth LLP<br>600 Travis Street, Suite 4200<br>Houston, Texas  77002<br>Attention: Tad Davidson and Ashley Harper |

After the Effective Date, the Reorganized Debtors have the authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

### 7. Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to Sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

### 8. Entire Agreement

Except as otherwise indicated, and without limiting the effectiveness of the Plan (including, for the avoidance of doubt, the documents and instruments in the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

### 9. Exhibits and Annexes

All exhibits, annexes, and documents attached to the Plan or included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits, annexes, and documents are Filed, copies of such exhibits, annexes, and documents shall be available upon written request to the Debtors' counsel at the

address above.  To the extent any exhibit, annex, or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court or otherwise specifically provided for in such exhibit, annex, or document, the non-exhibit, non-annex, or non-document portion of the Plan shall control.

### 10.     Nonseverability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' or Reorganized Debtors' consent, as applicable; *provided* that any such deletion or modification must be acceptable to the Noteholder Group; and (3) nonseverable and mutually dependent.

### 11.     Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Released Parties will be deemed to have solicited votes on the Plan in good faith and in compliance with Section 1125(g) of the Bankruptcy Code and any applicable non-bankruptcy law, and pursuant to Section 1125(e) of the Bankruptcy Code, the Released Parties and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code, in the offer, issuance, sale, and purchase of securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

### 12.     Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Texas, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; *provided*, *however*, that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in Texas shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or the Reorganized Debtors, as applicable.

### 13.     Closing of Chapter 11 Cases

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

### 14.     Waiver or Estoppel

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, this Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

## VIII.    LIQUIDATION ANALYSIS, VALUATION, AND FINANCIAL PROJECTIONS

### A.    Liquidation Analysis

The Debtors believe that the Plan provides a greater recovery for Holders of Allowed Claims, and no less recovery for Holders of Interests, than would be achieved in a liquidation under chapter 7 of the Bankruptcy Code. This belief is based on a number of considerations, including (a) liquidation values of the Debtors' assets already being significantly lower than the Debtors' secured debt; (b) the likely erosion in value of the Debtors' assets in a chapter 7 case; (c) the additional Administrative Expense Claim and Professional Claims generated by conversion to a chapter 7 case and any related costs; (d) the absence of a robust market in which the Debtors' assets could be marketed and sold pursuant to a liquidation sale; and (e) the additional Claims that would arise by reason of the breach or rejection in a chapter 7 case of obligations under leases and executory contracts that would otherwise be assumed under the Plan.

The Debtors, with the assistance of Riveron, have prepared the Liquidation Analysis, which is attached hereto as **Exhibit B**, to assist Holders of Claims and Interests in evaluating the Plan.  The Liquidation Analysis compares the projected recoveries that would result for the liquidation of the Debtors in a hypothetical case under chapter 7 of the Bankruptcy Code with the estimated distributions to Holders of Allowed Claims and Interests under the Plan.  The Liquidation Analysis is based on the value of the Debtors' assets and liabilities as of a certain date and incorporates various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation as of a certain date. Further, the Liquidation Analysis is subject to potentially material changes, including with respect to economic and business conditions and legal rulings.  Therefore, the actual liquidation value of the Debtors could vary materially from the estimate provided in the Liquidation Analysis.

### B.    Valuation Analysis

Piper Sandler, at the request of the Debtors, has performed an analysis, which is attached hereto as **Exhibit D**, of the estimated implied value of Reorganized ICD and its subsidiaries on a going-concern basis as of an assumed Effective Date of January 1, 2025 (the "**Valuation Analysis**").  The Valuation Analysis, including the procedures followed, assumptions made, qualifications, and limitations on review undertaken and described therein, should be read in conjunction with **Section XII** of this Disclosure Statement, entitled "Risk Factors."  The Valuation Analysis is based on data and information as of the date of this Disclosure Statement.  Piper Sandler makes no representations as to changes to such data and information that may have occurred since the date of the Valuation Analysis.

### C.    Financial Projections

As further discussed in **Section X** of this Disclosure Statement, the Debtors believe the Plan meets the feasibility requirements set forth in Section 1129(a)(11) of the Bankruptcy Code, as Confirmation is not likely to be followed by a liquidation or the need for further financial reorganization of the Reorganized Debtors or any successor to the Debtors under the Plan.  In connection with the Solicitation and seeking Confirmation of the Plan, and for purposes of determining whether the Plan satisfies the feasibility standards, the Debtors' management has developed the Financial Projections attached hereto as **Exhibit C**.

Creditors and other interested parties should see **Section XII** of this Disclosure Statement, entitled "Risk Factors," for a discussion of certain factors that may affect the future performance of the Reorganized Debtors.

### Note about Forward-Looking Statements

Various statements contained in this Disclosure Statement, including those that express a belief, expectation or intention, as well as those that are not statements of historical fact, may constitute "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  These forward-looking statements may include projections and estimates concerning the timing and success of specific projects and the Debtors' future revenues, expenses, income, financial liquidity and covenant compliance, and capital spending.  The Debtors' forward-looking statements are generally accompanied by words such as "estimate," "project," "predict," "believe," "expect," "anticipate," "potential," "plan," "goal," "will" or other words that convey the uncertainty of future events

or outcomes. The Debtors have based these forward-looking statements on the Debtors' current expectations and assumptions about future events. While the Debtors' management considers these expectations and assumptions to be reasonable, they are inherently subject to significant business, economic, competitive, regulatory and other risks, contingencies and uncertainties, most of which are difficult to predict and many of which are beyond the Debtors' control. These and other important factors may cause the Debtors' actual results, performance or achievements to differ materially from any future results, performance or achievements expressed or implied by these forward-looking statements, and other unknown factors could impact the Debtors' restructuring plans or cause the actual results of the Debtors to be materially different from any future results expressed or implied by such forward-looking statements. There can be no assurance that the Restructuring described in this Disclosure Statement will be consummated. The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- The Chapter 11 Cases, including the Debtors' ability to obtain Confirmation or an alternative restructuring transaction;
- The Debtors' ability to obtain the approval of the Bankruptcy Court with respect to motions or other requests made to the Bankruptcy Court, including maintaining strategic control as debtor in possession;
- The effects of these Chapter 11 Cases on the Debtors and on the interests of the various constituents, including holders of the Debtors' common stock and indebtedness;
- The length of time that the Debtors will operate under Chapter 11 protection and the continued availability of capital during the pendency of the proceedings;
- Any future effects as a result of the pendency of or emergence from the Chapter 11 Cases or ability to emerge from Chapter 11;
- The adequacy and availability of capital resources, credit, and liquidity, including, but not limited to, debt refinancing or extensions, exchanges or repurchases of debt, issuances of debt or equity securities, access to additional borrowing capacity and the Debtors' ability to generate sufficient cash flow from operations to fund the Debtors' capital expenditures and meeting working capital needs;
- A decline in or substantial volatility of crude oil and natural gas commodity prices;
- A decrease in domestic spending by the oil and natural gas exploration and production industry;
- Fluctuation of the Debtors' operating results and volatility of the Debtors' industry;
- Inability to maintain or increase pricing of the Debtors' contract drilling services, or early termination of any term contract for which early termination compensation is not paid;
- The Debtors' backlog of term contracts declining rapidly;
- The loss of any of the Debtors' customers, customer consolidations, financial distress or

- management changes of potential customers or failure to obtain contract renewals and additional customer contracts for the Debtors' drilling services;
- Overcapacity and competition in the Debtors' industry
- An increase in interest rates and deterioration in the credit markets;
- Unanticipated costs, delays and other difficulties in executing the Debtors' long-term growth strategy;
- The loss of key management personnel;
- New technology that may cause the Debtors' drilling methods or equipment to become less competitive;
- Labor costs or shortages of skilled workers;
- The loss of or interruption in operations of one or more key vendors;
- The effect of operating hazards and severe weather on the Debtors' rigs, facilities, business, operations and financial results, and limitations on the Debtors' insurance coverage;
- Increased regulation of drilling in unconventional formations;
- Risks related to the ongoing conflict between Russia and Ukraine and conflict in Gaza, including the effects of related sanctions and supply chain disruptions or general effects on the global economy;
- Risks associated with a global pandemic that would cause a reduction in economic activity or reduction in oil and natural gas demand or prices;
- The incurrence of significant costs and liabilities in the future resulting from the Debtors' failure to comply with new or existing environmental regulations or an accidental release of hazardous substances into the environment; and
- The potential failure by us to establish and maintain effective internal control over financial reporting and cybersecurity risks.

The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement and the Plan.

**Creditors and other interested parties should read <u>Section XII</u> of this Disclosure Statement, entitled "Risk Factors," for a discussion of certain factors that may affect the ability of the Debtors to reorganize and the future financial performance of the Reorganized Debtors.**

### D. Other Available Information

ICD files with the SEC its Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and all required amendments to those reports, proxy statements, and registration statements. The SEC maintains an internet site at www.sec.gov that contains reports, proxy and information statements, and other information regarding issuers, including ICD, that file electronically with the SEC.

All of ICD's reports and materials filed with the SEC are available free of charge through its website (https://www.sec.gov/edgar/search/) as soon as reasonably practicable after ICD electronically files such material with the SEC.

ICD's consolidated financial statements for the year ended December 31, 2023, together with other financial information for prior reporting periods, are included in its Form 10-K for the fiscal year ended December 31, 2023, filed with the SEC on February 28, 2024, and its Form 10-Q for the fiscal quarter ended June 30, 2024, filed with the SEC on August 7, 2024. Such information was prepared assuming that ICD will continue as a going concern and contemplates the realization of assets and the satisfaction of liabilities in the normal course of business.

## IX. CORPORATE GOVERNANCE

### A. New Organizational Documents

On or immediately prior to the Effective Date, the Debtors or the Reorganized Debtors will enact certain new corporate governance as will be set forth in the New Organizational Documents to be filed with the Plan Supplement. The New Organizational Documents will prohibit the issuance of non-voting equity securities to the extent required by Section 1123(a)(6) of the Bankruptcy Code.

### B. Directors and Officers of the Reorganized Debtors

The New Board shall have full power and authority to manage and control the business and affairs of the Company and its subsidiaries. The New Board will be selected by the Noteholder Group and shall include the chief executive officer of Reorganized ICD. The identities of the members of the New Board shall be Filed with the Plan Supplement.

## X. FEASIBILITY AND BEST INTEREST OF THE CREDITORS

### A. Feasibility of the Plan

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the chapter 11 plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of, the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan).

To determine whether the Plan meets this feasibility requirement, the Debtors have analyzed their ability to meet their respective obligations under the Plan and to continue operating as a going concern. As part of this analysis, the Debtors prepared the Financial Projections, as set forth in **<u>Exhibit C</u>** attached hereto. Based on such Financial Projections, the Debtors believe that they will be able to make all payments required under the Plan and, therefore, Confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization of the Reorganized Debtors.

B.       **Best Interests of Creditors Test**

Often called the "best interests" test, Section 1129(a)(7) of the Bankruptcy Code requires that a Bankruptcy Court find, as a condition to confirmation, that a chapter 11 plan of reorganization provides, with respect to each class of claims and interests, that each holder of a claim or an interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value that is not less than the amount that such holder would receive or retain if the debtor liquidated under chapter 7.

In order to satisfy the "best interests" test, the Debtors have attached hereto as **Exhibit B** the Liquidation Analysis.  The Liquidation Analysis demonstrates that the distributions to all Classes of Claims and Interests under the Plan is not less than the amount that Holders in such Classes are likely to receive if the Debtors were liquidated under chapter 7.

XI.      **CONFIRMATION PROCEDURES**

A.       **Combined Hearing**

Section 1129(a) of the Bankruptcy Code requires a bankruptcy court, after notice, to hold a hearing on confirmation of a chapter 11 plan.  The Bankruptcy Code further provides that any party in interest may object to the confirmation of a chapter 11 plan.

The Debtors will request that the Bankruptcy Court schedule the Combined Hearing for January 9, 2025, at the United States Bankruptcy Court for the Southern District of Texas.  The Combined Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Combined Hearing or at any subsequent adjourned Combined Hearing.

The Debtors will request that the Bankruptcy Court direct that objections, if any, to confirmation of the Plan be served and filed so that they are received on or before January 3, 2025 at 4:00 p.m. (prevailing Central Time).  **THE BANKRUPTCY COURT MAY NOT CONSIDER OBJECTIONS TO CONFIRMATION OF THE PLAN IF ANY SUCH OBJECTIONS HAVE NOT BEEN TIMELY SERVED AND FILED IN COMPLIANCE WITH THE ORDER APPROVING THE DISCLOSURE STATEMENT.**

B.       **Statutory Requirements for Confirmation of the Plan**

Among the requirements for the confirmation of a chapter 11 plan of reorganization are that such plan (i) is accepted by all impaired classes of claims and interests, or if rejected by an impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class; (ii) is feasible; and (iii) is in the "best interests" of holders of claims and interests that are impaired under the plan.

In these Chapter 11 Cases, at the Combined Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of Section 1129 of the Bankruptcy Code.  The Debtors believe that: (i) the Plan satisfies all of the necessary statutory requirements of chapter 11, (ii) they have complied or will have complied with all of the necessary requirements of chapter 11, and (iii) the Plan has been proposed in good faith.

1.       **Acceptance by Impaired Classes**

The Bankruptcy Code requires that, as a condition to confirmation, except as described in **Section XI.B.2** of this Disclosure Statement, each class of claims or interests that is impaired under a chapter 11 plan of reorganization, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.[8]

---

[8] As described in Section 1124 of the Bankruptcy Code, a class is "impaired" unless the plan: (a) leaves unaltered the holder for certain damages or losses, as applicable, and does not otherwise the legal, equitable, and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest or (b) cures any default,

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims or interests as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims or interests in that class, counting only those claims or interests that actually voted to accept or to reject the plan.

Thus, the Voting Class described herein will have voted to accept the Plan only if two-thirds in amount and a majority in number of Holders that actually vote on the Plan vote to accept.

### 2.    Confirmation Without Acceptance by All Impaired Classes

Bankruptcy Code Section 1129(b) allows a bankruptcy court to confirm a plan, even if an impaired class has not accepted it, provided that the plan has been accepted by at least one impaired class.  The Plan provides that Class 8 is deemed to reject the Plan, and the Debtors cannot guarantee that the Voting Class will accept the Plan.  The Debtors intend to seek confirmation of the Plan pursuant to Bankruptcy Code Section 1129(b).  Bankruptcy Code Section 1129(b) states that, notwithstanding an impaired class's failure to accept a plan of reorganization, the plan may still be confirmed, so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.  The test does not require that the treatment be the same or equivalent, but that treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class.  As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that pursuant to Section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of allowed Claims in that Class.  The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan, any Exhibit thereto and any Plan Supplement, including to amend or modify it to satisfy Bankruptcy Code Section 1129(b), if necessary.

## XII.    RISK FACTORS

The following provides a summary of various important considerations and risk factors associated with the Plan; however, it is not exhaustive.  There are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project and the Debtors undertake no obligation to update any such statement.

---

reinstates the original terms of such obligation, compensate equitable or contractual rights to which such claim or interest entitles the holder of such claim or interest.

### A.     Bankruptcy-Specific Considerations

#### 1.     General

While the Debtors believe that the Chapter 11 Cases will be of short duration and will not be materially disruptive to their business, the Debtors cannot be certain that this will be the case.  Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that one or more of the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed.  Even if confirmed on a timely basis, bankruptcy proceedings to confirm the Plan could have an adverse effect on the Debtors' business.  Among other things, it is possible that bankruptcy proceedings could adversely affect the Debtors' relationships with their ICD customers and employees.  The proceedings will also involve additional expense and may divert some of the attention of the Debtors' management away from business operations.

#### 2.     Objections to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class.  Nevertheless, there can be no assurance that parties in interest will not object to the classification of Claims and Interests under the Plan, or that the Bankruptcy Court will approve such classification.

#### 3.     Non-Confirmation or Delay of Confirmation of the Plan

In the event that votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan.  The Debtors can give no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims and Allowed Interests as those proposed in the Plan.

Alternatively, the Debtors may nevertheless seek Confirmation of the Plan notwithstanding the dissent of certain Classes of Claims or Interests.  Here, Class 7 under the Plan – Existing Equity Interests – is not receiving a distribution under the Plan and therefore deemed to reject.  Further, it is possible that Class 4 may vote to reject the Plan.  Nevertheless, the Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code if the Bankruptcy Court determines that the Plan satisfies Section 1129(b) of the Bankruptcy Code.  To confirm a plan over the objection of a dissenting class, the Bankruptcy Court also must find that at least one Impaired Class (which cannot be an "insider" class) has accepted the Plan.

Even if the requisite acceptances of a proposed plan are received, the Bankruptcy Court is not obligated to confirm the Plan as proposed.  A dissenting Holder of a Claim or Interest against the Debtors could challenge the balloting procedures as not being in compliance with the Solicitation Procedures Order and the Bankruptcy Code, which could mean that the results of the balloting may be invalid.  If the Bankruptcy Court determined that the balloting procedures were appropriate and the results were valid, the Bankruptcy Court could still decline to confirm the Plan, if the Bankruptcy Court found that any of the statutory requirements for confirmation had not been met.

For the Debtors to emerge successfully from the Chapter 11 Cases as viable entities, the Debtors, like any other chapter 11 debtor, must obtain approval from their creditors and confirmation of the Plan by the Bankruptcy Court, and then successfully implement the Plan.  The foregoing process requires the Debtors to (i) meet certain statutory requirements with respect to the adequacy of this Disclosure Statement, (ii) solicit and obtain creditor acceptances of the Plan, and (iii) fulfill other statutory conditions with respect to the confirmation of the Plan.

Although the Debtors believe that the Plan satisfies all of the requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  The Debtors also understand that parties in interest may object to Confirmation.  Moreover, there can be no assurance that

modifications to the Plan will not be required for Confirmation, or that such modifications would not necessitate the re-solicitation of votes to accept the Plan, as modified. If the Plan is not confirmed by the Bankruptcy Court, (a) the Debtors may not be able to reorganize their business; (b) the distributions that Holders of Claims and Interests ultimately would receive, if any, with respect to their Claims or Interests is uncertain; and (c) there is no assurance that the Debtors will be able to successfully develop, prosecute, confirm, and consummate an alternative plan that will be acceptable to the Bankruptcy Court and the Holders of Claims and Interests. It is also possible that third parties may seek and obtain approval from the Bankruptcy Court to terminate or shorten the exclusivity period during which only the Debtors may propose and seek to confirm a plan of reorganization.

### 4. Non-Consensual Confirmation

In the event that any impaired class of claims or equity interests does not accept or is deemed not to accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. These requirements must be satisfied with respect to Class 7, and any Voting Class that votes to reject the Plan (if any). The Debtors believe that the Plan satisfies these requirements.

### 5. Non-Occurrence of the Effective Date

As more fully set forth in **Article IX** of the Plan, the Effective Date is subject to a number of conditions precedent. If such conditions precedent are not met or waived, the Effective Date will not take place.

### 6. Conversion to Chapter 7

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of Holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. *See* **Section VIII.A** of this Disclosure Statement, as well as the Liquidation Analysis attached hereto as **Exhibit B**, for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and Interests.

### 7. Impact of Chapter 11 Cases on the Debtors

The Plan affects both the Debtors' capital structure and the ownership, structure and operation of their business and reflects assumptions and analyses based on the Debtors' experience and perception of historical trends, current conditions, and expected future developments, as well as other factors that the Debtors consider appropriate under the circumstances. Whether actual future results and developments will be consistent with the Debtors' expectations and assumptions depends on a number of factors, including, but not limited to, the Debtors' (i) ability to obtain adequate liquidity and financing sources; (ii) ability to maintain customers' confidence in the Debtors' viability as a continuing entity and to attract and retain sufficient business from them; and (iii) ability to retain Debtors' employees, as well as the overall strength and stability of general economic conditions of the oil and gas industry. The failure of any of these factors could materially adversely affect the successful reorganization of the Debtors' business.

In addition, the Plan relies upon Financial Projections, including with respect to revenues, EBITDA, debt service, and cash flow. Financial forecasts are necessarily speculative, and it is likely that one or more of the assumptions and estimates that are the basis of these financial forecasts will not be accurate. Consequently, there can be no assurance that the results or developments contemplated by any plan of reorganization implemented will occur or, even if they do occur, that they will have the anticipated effects on the Debtors and their subsidiaries or their business or operations. The failure of any such results or developments to materialize as anticipated could materially adversely affect the successful execution of the Plan.

Finally, the pursuit of these Chapter 11 Cases has consumed and will continue to consume a substantial portion of the time and attention of management, which may have an adverse effect on the Debtors' business and results of operations. The Debtors may also face increased levels of employee attrition.

### 8.  Inability to Assume Executory Contracts

An executory contract is a contract on which performance remains due to some extent by both parties to the contract. The Plan provides for the assumption of all Executory Contracts and Unexpired Leases that are not specifically rejected as set forth in the Plan. The Debtors intend to preserve as much of the benefit of their existing Executory Contracts and Unexpired Leases as possible. However, with respect to some limited classes of Executory Contracts, including licenses with respect to patents or trademarks, the Debtors may need to obtain the consent of the counterparty to maintain the benefit of the contract. There is no guarantee that such consent either would be forthcoming or that conditions would not be attached to any such consent that makes assuming the contracts unattractive. The Debtors then would be required to either forego the benefits offered by such contracts or to find alternative arrangements to replace them.

### 9.  Adverse Effect on Debtors' Tax Attributes

Under federal income tax law, a corporation is generally permitted to offset its taxable income net operating losses (the "**NOLs**") carried forward from prior years. The Debtors estimate that, as of December 31, 2023, they had available approximately $448.6 million of federal NOLs.

The Debtors' ability to use NOLs and other tax attributes to offset future taxable income is subject to certain requirements and restrictions. If the Debtors experience an "ownership change" as defined in Section 382 of the Internal Revenue Code of 1986, as amended (the "**IRC**"), then their ability to use the Pre-Change Losses (as defined below), including any "net unrealized built-in loss," may be substantially limited, which could have a negative impact on the Debtors' financial position and results of operations. The Debtors currently expect that consummation of the Restructuring will result in an "ownership change" and that their NOLs and other tax attributes will be reduced in connection with the Restructuring, and any remaining NOLs and other tax attributes (including any "net unrealized built-in loss") may be subject to limitations going forward.

Holders of Allowed Claims should carefully review **Section XIV** of this Disclosure Statement, including to determine how the tax implications of the Plan and these Chapter 11 Cases may further affect the Reorganized Debtors.

### 10.  Votes and Recoveries Subject to Contingencies

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Voting Class to accept or reject the Plan or require any sort of revote by the Voting Class.

The estimated Claims and creditor recoveries that will be forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

### 11.  Ability to Discharge or Satisfy Prepetition Claims

The Debtors may be subject to Claims in various legal proceedings and may become subject to other legal proceedings in the future. Although any such Claims will generally be stayed while the Chapter 11 Cases are pending, the Debtors may not be successful in ultimately discharging or satisfying such Claims. The ultimate outcome of each

of these matters, including the Debtors' ability to have these matters satisfied and discharged in the bankruptcy proceeding, cannot presently be determined, nor can the liability that may potentially result from a negative outcome be reasonably estimated presently for every case. The liability the Debtors may ultimately incur with respect to any one of these matters in the event of a negative outcome may be in excess of amounts currently accrued with respect to such matters and, as a result, these matters may potentially be material to the Debtors' business, financial condition, and/or results of operations.

### 12. Failure to Obtain Approval of Releases, Injunctions, and Exculpation

**Article VIII** of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases of claims and causes of action that may otherwise be asserted against the Debtors, Reorganized Debtors, or other Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. Any party in interest, including the UST, could object to the Plan on the grounds that the third-party release contained in **Section VIII.D** of the Plan is not given consensually or in a permissible nonconsensual manner. In response to such an objection, the Bankruptcy Court could determine that the third party release is not valid under the Bankruptcy Code. If the Bankruptcy Court makes such a determination, the Plan could not be confirmed without modifying the Plan to alter or remove the third-party release, in which case the Released Parties may withdraw their support for the Plan. This could result in substantial delay in Confirmation of the Plan or the Plan not being confirmed at all.

### 13. Plan Based on Assumptions

The Plan affects both the Debtors' capital structure and the ownership, structure, and operation of its business and reflects assumptions and analyses based on the Debtors' experience and perception of historical trends, current conditions, and expected future developments, as well as other factors that the Debtors consider appropriate under the circumstances. Whether actual future results and developments will be consistent with the Debtors' expectations and assumptions depends on a number of factors, including but not limited to the Debtors' (i) ability to obtain adequate liquidity and financing sources; (ii) ability to maintain customers' confidence in the Debtors' viability as a continuing entity and to attract and retain sufficient business from them; and (iii) ability to retain Debtors' employees, as well as the overall strength and stability of general economic conditions of the oil and gas industry.

The failure of any of these factors could materially adversely affect the successful reorganization of the Debtors' business.

In addition, the Plan relies upon the Financial Projections, including with respect to revenues, EBITDA, debt service, and cash flow. Financial forecasts are necessarily speculative, and it is likely that one or more of the assumptions and estimates that are the basis of these financial forecasts will not be accurate. Consequently, there can be no assurance that the results or developments contemplated by any plan of reorganization implemented will occur or, even if they do occur, that they will have the anticipated effects on the Debtors and their subsidiaries or their business or operations. The failure of any such results or developments to materialize as anticipated could materially adversely affect the successful implementation of the Plan.

### B. Risks Related to the Debtors' Business Operations and Financial Condition

### 1. Volatility of Oil and Natural Gas Prices

As a provider of land-based contract drilling services, the Debtors' business depends on the level of exploration and production activity by oil and natural gas companies operating in the United States, and in particular, the regions where the Debtors actively market their contract drilling services. The oil and natural gas exploration and production industry is a historically cyclical industry characterized by significant changes in the levels of exploration and development activities. Oil and natural gas prices and market expectations of potential changes in those prices significantly affect the levels of those activities. Worldwide political, regulatory, economic, and military events as well as natural disasters have contributed to oil and natural gas price volatility and are likely to continue to do so in the future. Any prolonged reduction in the overall level of exploration and development activities in the United States and the regions where the Debtors market their contract drilling services, whether resulting from changes in oil and

natural gas prices, an increase in the use of alternative forms of energy and reduction in demand for oil and natural gas, or otherwise, could materially and adversely affect the Debtors' business, results of operations and financial condition.

Depending on the market prices of oil and natural gas, oil and natural gas exploration and production companies may cancel or curtail their drilling programs and may lower production spending on existing wells, thereby reducing demand for the Debtors' services. Many factors beyond the Debtors' control affect oil and natural gas prices, including, but not limited to:

- the cost of exploring for, producing and delivering oil and natural gas;
- the discovery and development rate of new oil and natural gas reserves, especially shale and other unconventional natural gas resources for which the Debtors market their rigs;
- the rate of decline of existing and new oil and natural gas reserves;
- available pipeline and other oil and natural gas transportation capacity;
- the levels of oil and natural gas storage;
- the ability of oil and natural gas exploration and production companies to raise capital;
- economic conditions in the United States and elsewhere;
- actions by the Organization of Petroleum Exporting Countries ("**OPEC**") and other oil producing nations, such as Russia, relating to oil price and production levels, including announcements of potential changes to such levels;
- political instability in the Middle East, Russia and other major oil and natural gas producing regions;
- governmental regulations, sanctions and trade restrictions, both domestic and foreign;
- domestic and foreign tax policy;
- the availability of and constraints in pipeline, storage and other transportation capacity in the basins in which the Debtors operate, including, for example, takeaway constraints experienced in the Permian Basin;
- weather conditions in the United States;
- the pace adopted by foreign governments for the exploration, development and production of their national reserves;
- the price of foreign imports of oil and natural gas;
- the strength or weakness of the United States dollar;
- the overall supply and demand for oil and natural gas; and
- the development of alternate energy sources and the long-term effects of worldwide energy conservation measures.

In addition, if oil and natural gas prices decline, companies that planned to finance exploration, development or production projects through the capital markets may be forced to curtail, reduce, postpone or delay drilling activities even further, and also may experience an inability to pay suppliers. Adverse conditions in the global economic environment could also impact the Debtors' vendors' and suppliers' ability to meet obligations to provide materials and services in general. If any of the foregoing were to occur, or if current depressed market conditions continue for a prolonged period of time, it could have a material adverse effect on the Debtors' business and financial results and their ability to timely and successfully implement their growth strategy.

### 2.      Operating Hazards

The Debtors' operations are subject to the many hazards inherent in the drilling and well services industries, including the risks of personal injury and loss of life, blowouts, cratering, fires and explosions, loss of well control, collapse of the borehole, damaged or lost drilling equipment, and damage or loss from extreme weather and natural disasters.

Any of these hazards can result in substantial liabilities or losses from, among other things, suspension of operations, damage to, or destruction of, the Debtors' property and equipment and that of others, damage to producing or potentially productive oil and natural gas formations through which the Debtors drill, and environmental damage.

Although, the Debtors seek to protect themselves from some but not all operating hazards through insurance coverage, some risks are either not insurable or insurance is available only at rates that the Debtors consider uneconomical. Depending on competitive conditions and other factors, the Debtors attempt to obtain contractual protection against uninsured operating risks from their customers. However, customers who provide contractual indemnification protection may not in all cases maintain adequate insurance or otherwise have the financial resources necessary to support their indemnification obligations. The Debtors' insurance or indemnification arrangements may not adequately protect them against liability or loss from all the hazards of their operations. The Debtors do not carry loss of business insurance for a rig being out of service.

The Debtors maintain insurance against some, but not all, of the potential risks affecting their operations and only in coverage amounts and deductible levels that they believe to be economical. Their insurance coverage includes deductibles which must be met prior to recovery. Additionally, their insurance is subject to exclusions and limitations, and there is no assurance that such coverage will adequately protect the Debtors against liability from all potential consequences and damages. The occurrence of a significant event that the Debtors have not fully insured or indemnified against or the failure of a customer to meet its indemnification obligations could materially and adversely affect the Debtors' results of operations and financial condition. Furthermore, the Debtors may be unable to maintain adequate insurance in the future at rates they consider reasonable. Incurring a liability for which they are not fully insured or indemnified could have a material adverse effect on the Debtors' financial condition and results of operations.

### 3. Substantial Leverage; Ability to Service Debt

According to the terms and conditions of the Plan, upon the Effective Date, the Reorganized Debtors will have outstanding net indebtedness of approximately $40 million under the Exit Facilities.

The Reorganized Debtors' ability to service their debt obligations will depend, among other things, upon their future operating performance. These factors depend partly on economic, financial, competitive, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may not be able to generate sufficient Cash from operations to meet their debt service obligations as well as fund necessary capital expenditures and investments in sales and marketing. In addition, if the Reorganized Debtors need to refinance their debt, obtain additional financing or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

Any default under the Exit Facilities Documents could adversely affect their growth, financial condition, results of operations, the value of their equity and ability to make payments on such debt. The Reorganized Debtors may incur significant additional debt in the future. If current debt amounts increase, the related risks that the Reorganized Debtors now face will intensify.

### 4. Restrictive Covenants in Exit Facilities Documents

The Exit Facilities Documents may contain a number of significant covenants that could adversely affect the Reorganized Debtors' ability to operate their business, as well as significantly affect their liquidity, and therefore could adversely affect the Reorganized Debtors' results of operations. These covenants may restrict (subject to certain exceptions) the Reorganized Debtors' ability to incur additional indebtedness; grant liens; consummate mergers, acquisitions consolidations, liquidations and dissolutions; sell assets; pay dividends and make other payments in respect of capital stock; make capital expenditures; make investments, loans and advances; make payments and modifications to subordinated and other material debt instruments; enter into transactions with Affiliates; consummate sale-leaseback transactions; change their fiscal year; and enter into hedging arrangements (except as otherwise expressly permitted). In addition, the Reorganized Debtors may be required to maintain a minimum fixed charge coverage ratio, interest coverage ratio, maximum leverage ratio and/or comply with other financial covenants.

The breach of any covenants or obligations in the Exit Facilities Documents not otherwise waived or amended, could result in a default of such documents and could trigger acceleration of certain obligations thereunder. Any default of the Exit Facilities Documents could adversely affect the Reorganized Debtors' growth, financial condition, results of operations, and ability to make payments on debt.

5.        **Effect of Uncertainty on Employees and Contract Counterparties**

Uncertainty about the effects of the Plan on employees may have an adverse effect on the Debtors. These uncertainties may impair the Debtors' ability to retain and motivate their personnel and could cause users and others that deal with the Debtors to defer entering into contracts with the Debtors or making other decisions concerning the Debtors or seek to change existing business relationships with the Debtors.

6.        **Loss of ICD Executive Officers**

The Debtors' business depend upon the efforts, abilities and expertise of the Debtors' executive officers. The Debtors are implementing a multifaceted strategy to mitigate the risk and cost of losing such executive officers. To the extent certain executive officers cease employment with the Debtors and the Debtors are unable to mitigate the resulting costs, the Debtors' business could be impacted.

7.        **Adverse Impact of Prepetition and Postpetition Litigation**

In the future, the Reorganized Debtors may become party to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' business and financial stability, however, could be material.

8.        **Inability to Obtain Capital**

The contract drilling industry is capital intensive. The Debtors' cash flow from operations and the continued availability of credit are subject to a number of variables, including general economic conditions, conditions in the oil and natural gas market, and more specifically, rig utilization rates, operating margins and ability to control costs and obtain contracts in a competitive industry. The Debtors' cash flow from operations and present borrowing capacity may not be sufficient to fund their anticipated capital expenditures and working capital requirements. They may from time to time seek additional financing, either in the form of bank borrowings, sales of debt or equity securities or otherwise. To the extent the Debtors' capital resources and cash flow from operations are at any time insufficient to fund the Debtors' activities or repay their indebtedness as it becomes due, they will need to raise additional funds through public or private financing or additional borrowings. The Debtors may not be able to obtain any such capital resources in the amount or at the time when needed. Any new sources of debt capital would require substantially higher interest requirements, and any new sources of equity capital could be substantially dilutive to existing shareholders. Any limitations on the Debtors' access to capital or increase in the cost of that capital could significantly impair their operational strategies. The Debtors' ability to maintain their targeted credit profile could affect their cost of capital as well as their ability to execute their growth strategy. In addition, a variety of factors beyond their control could impact the availability or cost of capital, including domestic or international economic conditions, increases in key benchmark interest rates and/or credit spreads, the adoption of new or amended banking or capital market laws or regulations, the re-pricing of market risks and volatility in capital and financial markets. If the Debtors are at any time not able to obtain the necessary capital resources, their financial condition and results of operations could be materially adversely affected.

9.        **Shortages of Equipment or Supplies**

Increased or decreased demand among drilling contractors and the Debtors' customers for consumable supplies, including fuel, water and ancillary rig equipment, such as pumps, valves, drill pipe and engines, may lead to delays in obtaining these materials and the Debtors' inability to operate their rigs in an efficient manner. They have periodically experienced increased lead times in purchasing ancillary equipment for the Debtors' drilling rigs. To the extent there are significant delays in being able to purchase important components for the Debtors' rigs, certain of the rigs may not be available for operation or may not be able to operate as efficiently as expected, which could adversely affect the results of operations and financial condition.

In addition, the Debtors' customers typically purchase the fuel and water for their operations, including fuel that runs the Debtors' drilling rigs, and thus bear the financial impact of increased prices. However, prolonged shortages in the availability of fuel or water to conduct drilling and completion activities could result in the suspension of the Debtors' contracts or reduce demand for the Debtors' contract drilling services and have a material adverse effect on their financial condition and results of operations.

The Debtor's contract drilling operations depend upon the availability of various rig equipment, including drillers cabins, top drives, mud pumps, engines and drill pipe, as well as replacement parts, related rig equipment and fuel. Some of these have been in short supply from time to time. In addition, key rig components critical to the operation, construction or upgrade of the Debtors' rigs are either purchased from or fabricated by a limited number of vendors, including vendors that may compete against the Debtors from time to time. For many of these products and services, there are only a limited number of vendors and suppliers available.

The Debtors do not currently have any long-term supply contracts with any of their suppliers or subcontractors and may be at a competitive disadvantage compared to their larger competitors when purchasing from these suppliers and subcontractors. Shortages could occur in these essential components due to an interruption of supply or increased demands in the industry. If the Debtors are unable to procure certain of such rig components or services from their subcontractors they would be required to reduce or delay the Debtors' rig construction and other operations, which could have a material adverse effect on their business, results of operations, financial condition and growth strategy.

### 10.      Uncertainty Related to Customers

The Debtors' customer base consists of E&P companies that drill oil and natural gas wells in the United States in the regions where they market the Debtors' rigs. As of December 31, 2023, the Debtors had rigs operating or earning revenues from twelve (12) different customers, including one customer who had contracted four (4) rigs, or twenty-five percent (25%), of the Debtors' contracted rigs and one (1) customer who had contracted two (2) rigs, or thirteen percent (13%), of the Debtors' contracted rigs. It is likely that the Debtors will continue to derive a significant portion of the Debtors' revenue from a relatively small number of customers in the future. If a customer decided not to continue to use the Debtors' services or to terminate an existing contract, or if there is a change of management or ownership of a customer or a material adverse change in the financial condition of one of the Debtors' customers, and they are not able to timely recontract such rigs, it could have a material adverse effect on the Debtors' revenues, cash flows, and financial condition.

### 11.      Inability to Compete Effectively

The oil and natural gas industry is intensely competitive, and the Debtors compete with other companies that have greater resources than them. The Debtors compete with large national and multi-national companies that have longer operating histories, greater financial, technical and other resources and greater name recognition than they do. Many of their larger competitors are able to offer ancillary products and services with their contract drilling services, and recently, some of their larger competitors have begun integrating and offering contract drilling services in connection with directional drilling and other services that the Debtors do not offer. In this regard, large, diversified oilfield service companies have begun to market bundled services, including contract drilling services, in the United States. If any of these combined offerings gain acceptance within the United States market, it could place the Debtors at a competitive disadvantage that has an adverse impact on their future results of operations and profitability.

Furthermore, the drilling industry is subject to the introduction of new drilling and completion methods and equipment using new technologies, some of which may be subject to patent protection. Changes in technology or improvements in competitors' equipment could make the Debtors' equipment less competitive or require significant capital investments to build and maintain a competitive advantage. Further, the Debtors may face competitive pressure to design, implement or acquire certain new technologies at a substantial cost. Some of the Debtors' competitors have greater financial, technical and personnel resources that may allow them to implement new technologies before the Debtors can. If the Debtors are unable to implement new and emerging technologies on a timely basis or at an acceptable cost, their business, results of operations, financial condition and growth strategy may be adversely affected.

12.      **Financial Projections**

The Financial Projections set forth in **Exhibit C** to this Disclosure Statement represent the Debtors' management's best estimate of the Debtors' future financial performance based on currently known facts and assumptions about the Debtors' future operations as well as the U.S. and world economy in general and the industry segments in which the Debtors operate in particular.  The Debtors' actual financial results may differ significantly from the Financial Projections.  If the Debtors do not achieve their projected financial results, the value of the New Common Stock may be negatively affected and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date.  Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

13.      **Variance between Historical Performance and Future Performance of Reorganized Debtors**

As a result of the Plan and the transactions contemplated thereby, the financial conditions and results of the operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

C.      **Risks Related to the New Common Stock**

1.      **Significant Holders**

As set forth in the Plan, after the Effective Date, the Noteholder Group will hold approximately 100% of the New Common Stock (subject to dilution, as set forth in the Plan).  As a result, and pursuant to the terms of the New Stockholders' Agreement, the Noteholder Group will have significant voting power, and may exercise any voting power in their own interests and not necessarily in the interests of other stakeholders of Reorganized ICD.  This concentration of ownership could also facilitate or hinder a negotiated change of control of the Reorganized Debtors and, consequently, have an impact upon the value of the New Common Stock.

2.      **Lack of Public Market or Valuation Analysis for Plan Securities**

It is anticipated that there will be no active trading market for the New Common Stock.  The New Common Stock will be subject to restrictions on transfer.  Accordingly, there can be no assurance that any market will develop or as to the liquidity of any market that may develop for any such securities.  Furthermore, the lack of liquidity may adversely affect the price at which New Common Stock may be sold, if at all.

The liquidity of any market for the New Common Stock will depend on a number of factors, including, without limitation:

- the number of holders of the New Common Stock;
- the Reorganized Debtors' operating performance and financial condition;
- the market for similar securities; and
- the interest of securities dealers in making a market in the New Common Stock.

The Valuation Analysis, attached hereto as **Exhibit D**, are based on the Financial Projections and is not intended to represent the trading values of New Common Stock in public or private markets.

3.      **Restrictions on Transfer**

The offer, issuance, and distribution of the New Common Stock pursuant to or in connection with the Plan will be exempt from registration under the Securities Act pursuant to any available exemption, including, but not limited to, Section 3(a)(9) of the Securities Act and Section 1145 of the Bankruptcy Code.  Accordingly, recipients will be able to resell the New Common Stock without registration under the Securities Act or other federal securities laws, unless the recipient is an "underwriter" with respect to such securities, within the meaning of Section 1145(b) of the Bankruptcy Code.  The Holders of Notes Claims who receive securities issued under or in connection with the

Plan who are deemed to be "underwriters" as defined in Section 1145(b) of the Bankruptcy Code will be restricted in their ability to transfer or sell their securities.  In addition, securities issued under the Plan to affiliates of the Reorganized Debtors will be subject to restrictions on resale.  These persons will be permitted to transfer or sell such securities only pursuant to the provisions of Rule 144 or Rule 144A under the Securities Act, if available, or another available exemption from the registration requirements of the Securities Act.  Parties that believe that they may be statutory underwriters as defined in Section 1145(b) of the Bankruptcy Code are advised to consult with their own counsel as to the availability and requirements of the non-exclusive exemptions provided by Rule 144 and Rule 144A.

As the New Common Stock may be held by fewer than 300 holders, the Debtors anticipate that they may be able to suspend their reporting obligations under the Exchange Act.  As a result, the Reorganized Debtors may not be obligated to file periodic or other reports with the SEC following any such suspension.  The New Organizational Documents or Stockholders' Agreement of Reorganized ICD may include restrictions on transfer of the New Common Stock intended to ensure that the New Common Stock does not become held by such number of persons as would require any Reorganized Debtors to continue or resume filing periodic or other reports pursuant to the Exchange Act. These restrictions may adversely impact the value of the shares of New Common Stock and make it more difficult for such shareholders to dispose of their shares, or to realize value on the shares and warrants, at a time when they may wish to do so.

See **Section XIII** of this Disclosure Statement, entitled "Certain Securities Law Matters" for additional information regarding restrictions on resale of the New Common Stock.

### 4. Potential for Dilution

The Debtors cannot predict the effect of future sales of shares or the availability of shares for future sales, on the market price of or the liquidity of the market for the shares.  Sales of substantial amounts of shares, or the perception that such sales could occur, could adversely affect the prevailing market price of the shares.  Such sales, or the possibility of such sales, could also make it difficult for the Debtors to sell equity securities in the future at a time and at a price that the Debtors deem appropriate.

In the future, Reorganized ICD may grant equity securities to its officers, directors and employees under the Management Incentive Plan that Reorganized ICD intends to adopt to be effective following the Effective Date. Furthermore, Reorganized ICD may issue equity securities in connection with future investments, acquisitions or capital raising transactions.  Such grants or issuances could constitute a substantial portion of the then-outstanding common stock, which may result in substantial dilution in ownership to holders of New Common Stock.

### 5. Adverse Effects on Value of New Common Stock

The value of New Common Stock may be adversely affected by a number of factors, including many of the risks described in this Disclosure Statement.  If, for example, the Reorganized ICD fails to comply with the covenants in the Exit Facilities Documents resulting in an event of default thereunder, certain of the Reorganized ICD's outstanding indebtedness could be accelerated, which could have a material adverse effect on the value of the New Common Stock.

### D. Additional Risks, Uncertainties, and Other Factors

*See* "Risk Factors" in ICD's Annual Report on Form 10-K for the year ended December 31, 2023 for a further description of additional risk factors that could have a significant impact on the Company's operating performance, and see ICD's other filings with the SEC on Form 10-Q and Form 8-K for additional disclosures regarding additional risks and forward-looking statements.

## XIII.   CERTAIN SECURITIES LAW MATTERS

### A.      Plan Securities

The Debtors believe that the securities offered and distributed under the Plan constitute "securities," as defined in Section 2(a)(1) of the Securities Act, Section 101 of the Bankruptcy Code and all applicable state Blue Sky Laws.  The Debtors further believe that the offer and sale of such securities are, and subsequent transfers of such securities by the holders thereof that are not "underwriters," as defined in Section 2(a)(11) of the Securities Act and in the Bankruptcy Code, will be exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code and applicable state Blue Sky Laws.

### B.      Issuance and Resale of Plan Securities under the Plan

#### 1.      Exemptions from Registration Requirements of the Securities Act and State Blue Sky Laws

The Debtors believe that, subject to certain exceptions described below, various provisions of the Securities Act, the Bankruptcy Code, and Blue Sky Laws exempt from federal and state securities registration requirements (a) the offer and the sale of securities pursuant to the Plan and (b) subsequent transfers of such securities.

The Debtors have not filed a registration statement under the Securities Act or any other federal or state securities laws with respect to the new securities that may be deemed to be offered by virtue of the Solicitation.  The Debtors are relying on exemptions from the registration requirements of the Securities Act, including, without limitations, Section 3(a)(9) thereof, to exempt the offer of the securities that may be deemed to be made pursuant to the solicitation of votes on the Plan.  Section 3(a)(9) of the Securities Act provides that the registration requirements of the Securities Act will not apply to "any security exchanged by the issuer with its existing security holders exclusively where no commission or other remuneration is paid or given directly or indirectly for soliciting such exchange."  Importantly, an exchange of debt is a separate offer from the exchange of claims for an enhanced litigation interest.

The Debtors are also relying on Section 18(b)(4)(C) of the Securities Act to exempt from Blue Sky Law requirements the offer of the securities that may be deemed to be made pursuant to the solicitation of votes on the Plan.  Section 18(b)(4)(C) provides, among other things, that state securities laws will not apply to securities that are exempt from federal registration under Section 3(a)(9) of the Securities Act.  The Debtors do not have any contract, arrangement, or understanding relating to, and will not, directly or indirectly, pay any commission or other remuneration to any broker, dealer, salesperson, agent, or any other person for soliciting votes to accept or reject the Plan.  The Debtors have received assurances that no person will provide any information to Holders of Allowed Claims relating to the solicitation of votes on the Plan other than to refer the holders of 2026 Convertible Notes to the information contained in this Disclosure Statement.  In addition, no broker, dealer, salesperson, agent, or any other person, is engaged or authorized to express any statement, opinion, recommendation, or judgment with respect to the relative merits and risks of the Plan.

Section 1145(a)(1) of the Bankruptcy Code exempts the offer or sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws if three principal requirements are satisfied: (a) the securities must be issued "under a plan" of reorganization by the debtor or its successor under a plan or by an affiliate participating in a joint plan of reorganization with the debtor; (b) the recipients of the securities must hold a claim against, an interest in, or a claim for administrative expenses in the case concerning the debtor or such affiliate; and (c) the securities must be issued in exchange for the recipient's claim against or interest in the debtor, or such affiliate, or "principally" in such exchange and "partly" for cash or property.  In reliance upon these exemptions and the exemption set forth in the preceding paragraph, including the exemptions provided by Sections 3(a)(9) and 18(b)(4)(C) of the Securities Act, the Debtors believe that the anticipated offer and sale of securities under the Plan will be exempt from registration under the Securities Act and Blue Sky Laws.

To the extent that the issuance of securities pursuant to the Plan is covered by Section 1145 of the Bankruptcy Code, such securities may be resold without registration under the Securities Act or other federal securities laws,

unless the holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in Section 2(a)(11) of the Securities Act and in the Bankruptcy Code.  In addition, securities governed by Section 1145 of the Bankruptcy Code generally may be able to be resold without registration under applicable Blue Sky Laws pursuant to various exemptions provided by the respective Blue Sky Laws of the various states; however, the availability of such exemptions cannot be known unless individual state Blue Sky Laws are examined.  Therefore, recipients of such securities are advised to consult with their own legal advisors as to the availability of any such exemption from registration under applicable Blue Sky Laws in any given instance and as to any applicable requirements or conditions to such availability.

Recipients of the securities pursuant to the Plan are advised to consult with their own legal advisors as to the applicability of Section 1145 of the Bankruptcy Code and the availability of any exemption from registration under the Securities Act and Blue Sky Laws.

### 2.        Resales of Plan Securities; Definition of Underwriter

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (1) with a view to distribution of such securities and (2) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of Section 2(a)(11) of the Securities Act.  In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an "underwriter" within the meaning of Section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an "underwriter" under Section 1145(b)(1)(D) of the Bankruptcy Code, by reference to Section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  The reference to "issuer," as used in the definition of "underwriter" contained in Section 2(a)(11) of the Securities Act, is intended to cover "controlling persons" of the issuer of the securities.  "Control," as defined in Rule 405 under the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.  Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling Person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities.  In addition, the legislative history of Section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of securities of a reorganized debtor may be presumed to be a "controlling Person" and, therefore, an underwriter.

Resales of securities of the Plans by Entities deemed to be "underwriters" (which definition includes "controlling Persons") are not exempted by Section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Under certain circumstances, holders of securities who are deemed to be "underwriters" may be entitled to resell their securities pursuant to the non-exclusive safe harbor resale provisions of Rule 144 and Rule 144A of the Securities Act.

Generally, Rule 144 provides that if certain conditions are met, specified persons who resell restricted securities will not be deemed to be "underwriters" as defined in Section 2(a)(11) of the Securities Act.  Rule 144 provides that:

(i)        a non-affiliate who has not been an affiliate during the preceding three months may resell restricted securities after a six-month holding period if at the time of the sale there is current public information regarding the issuer and after a one year holding period regardless of whether there is current public information regarding the issuer at the time of the sale; and

(ii)      an affiliate may sell restricted securities after a six month holding period if the issuer of the securities is, and has been for a period of at least ninety (90) days immediately before the sale, subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act and after a one-year holding period if the issuer of the securities is or has not been subject to such requirements, provided that in each case the affiliate otherwise complies with the volume, current public information, manner of sale and notice requirements of Rule 144.

Rule 144A provides a non-exclusive safe harbor exemption from the registration requirements of the Securities Act for resales to certain "qualified institutional buyers" of securities that are "restricted securities" within the meaning of the Securities Act, irrespective of whether the seller of such securities purchased its securities with a view towards reselling such securities, if certain other conditions are met (e.g., the availability of information required by paragraph 4(d) of Rule 144A and certain notice provisions).  Under Rule 144A, a "qualified institutional buyer" is defined to include, among other persons "dealers" registered as such pursuant to Section 15 of the Exchange Act, and entities that purchase securities for their own account or for the account of another qualified institutional buyer and that, in the aggregate, own and invest on a discretionary basis at least $100 million in the securities of unaffiliated issuers.

Whether any particular Person would be deemed to be an "underwriter" (including whether such Person is a "controlling Person") with respect to the securities contemplated herein and in the Plan would depend upon various facts and circumstances applicable to that Person.  Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to such securities and, in turn, whether any Person may freely resell such securities.  The Debtors recommend that potential recipients of securities under the Plan consult their own counsel concerning their ability to trade such securities without compliance with the registration requirements of applicable federal and state securities laws.

### 3. Resale of Other Securities Exempt from Registration Requirements Pursuant to Section 4(a)(2) of the Securities Act

The Section 4(a)(2) Securities will be offered, issued, and distributed without registration under the Securities Act and applicable Blue Sky Laws and in reliance upon the exemption set forth in Section 4(a)(2) of the Securities Act and Regulation D.  This offer, issuance, and distribution will not be exempt under Section 1145 of the Bankruptcy Code.  Therefore, such Section 4(a)(2) Securities will be considered "restricted securities" as defined by Rule 144 of the Securities Act and may not be resold absent an effective registration statement, or pursuant to an applicable exemption from registration, under the Securities Act and pursuant to applicable Blue Sky Laws as described in the previous four paragraphs.

## XIV.   CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.   Introduction

The following discussion is a summary of certain U.S. federal income tax consequences of the Consummation of the Plan to the Debtors and to certain Holders of Claims.  Except as otherwise described herein, the following summary does not address the U.S. federal income tax consequences to Holders of Claims or Interests not entitled to vote to accept or reject the Plan.  This summary is based on the IRC, the U.S. Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "**IRS**"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.  Legislative, judicial, or administrative changes or interpretations hereafter enacted could alter or modify the analysis and conclusions set forth below.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below.  The discussion below is not binding upon the IRS or any court.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.  This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain Holders in light of their individual circumstances.  This discussion does not address tax issues with respect to Holders subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial

institutions, tax-exempt organizations, small business investment companies, persons who are related to the Debtors within the meaning of the IRC, persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, and regulated investment companies and those holding, or who will hold, Claims, debt of Reorganized ICD, or shares of New Common Stock, as part of a hedge, straddle, conversion, or other integrated transaction). No aspect of state, local, estate, gift, or non-U.S. taxation is addressed. Furthermore, this summary assumes that a Holder of a Claim holds its Claim as a "capital asset" (within the meaning of Section 1221 of the IRC). Except as stated otherwise, this summary also assumes that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

### B.     Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors

#### 1.     Cancellation of Debt and Reduction of Tax Attributes

Absent an exception, a debtor will recognize cancellation of debt income ("**COD Income**") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of Cash paid, (y) the issue price of any new indebtedness issued, and (z) the fair market value of any new consideration (including equity) given, in each case, in satisfaction of such indebtedness at the time of the exchange.

A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a bankruptcy court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that case. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income. In general, tax attributes will be reduced in the following order:  (a) NOLs; (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets; (e) passive activity loss and credit carryovers; and (f) foreign tax credits. A debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to Section 108(b)(5) of the IRC. Absent such election, a debtor's tax basis in its assets cannot be reduced below the total amount of its liabilities outstanding immediately after the discharge. In the context of a group of corporations filing a consolidated federal income tax return, special rules apply to determine how the tax attributes of the group are reduced.

Because the Plan provides that Holders of Notes Claims will receive shares of New Common Stock and Exit Facility Term Loans, the amount of COD Income recognized by the Debtors, and accordingly the amount of tax attributes of the Debtors required to be reduced, will depend in part on the fair market value of the New Common Stock and the issue price of the Exit Facility Term Loans at the time of the Consummation of the Plan. This value and issue price cannot be known with certainty until after the Effective Date. However, as a result of the Consummation of the Plan, the Debtors currently expect that their federal NOLs (estimated to be approximately $440.5 million as of December 31, 2023) may be reduced.

#### 2.     Limitation of Tax Attributes

As noted above, the Debtors currently expect that their federal NOLs may be reduced as a result of the bankruptcy exception to inclusion of COD Income in gross income. In addition to NOLs, the Debtors have significant tax basis in assets and a carryover of disallowed interest expense. The amount of tax attributes that will be available to the Reorganized Debtors at emergence is based on a number of factors and is impossible to calculate at this time. Some of the factors that will impact the amount of available tax attributes include: (a) the amount of tax losses incurred by the Debtors in 2024 and later; (b) the fair market value of the shares of New Common Stock; (c) the issue price of the Exit Facility Term Loans; and (d) the amount of COD Income incurred by the Debtors in connection with Consummation of the Plan. Following Consummation of the Plan, the Debtors anticipate that any remaining tax attributes, including a carryover of disallowed interest expense, allocable to periods before the Effective Date ("**Pre-**

**Change Losses**") may be subject to limitation under Section 382 of the IRC by reason of the transactions pursuant to the Plan.

Under Section 382 of the IRC, if a corporation undergoes an "ownership change," the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally is subject to an annual limitation. The Debtors anticipate that the issuance of the shares of New Common Stock pursuant to the Plan will result in an "ownership change" of the Reorganized Debtors for these purposes, and that the Debtors' use of their Pre-Change Losses will be subject to limitation unless an exception to the general rules of Section 382 of the IRC applies. This limitation is independent of, and in addition to, the reduction of tax attributes described in the preceding section resulting from the exclusion of COD Income.

For this purpose, if a corporation has a "net unrealized built-in loss" (generally, an aggregate amount of tax basis in excess of fair market value) at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization and depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change. The Debtors currently anticipate that they may have a net unrealized built-in loss as of the Effective Date.

(a)  **General Section 382 Annual Limitation**

This discussion refers to the limitation determined under Section 382 of the IRC in the case of an ownership change as the "**Section 382 Limitation**." In general, the annual Section 382 Limitation on the use of Pre-Change Losses in any "post-change year" is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (b) the "long term tax exempt rate" (which is currently 3.31 percent for November 2024). The Section 382 Limitation may be increased during the five-year period following the ownership change to the extent that the Debtors have a "net unrealized built-in gain" rather than a net unrealized built-in loss as of the Effective Date. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. However, if a corporation that has undergone an ownership change does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the Section 382 Limitation is generally reduced to zero, thereby precluding any utilization of the corporation's Pre-Change Losses (absent any increases due to net unrealized built-in gain discussed above). As discussed below, however, special rules may apply in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding.

(b)  **Special Bankruptcy Exceptions**

An exception to the foregoing annual limitation rules generally applies when shareholders and/or so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their claims or interests, at least 50 percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "**382(l)(5) Exception**"). Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, the debtor's NOL carryforwards are required to be reduced by the amount of any interest deductions claimed during any taxable year ending during the three-year period preceding the taxable year that includes the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the debtor undergoes another ownership change within two years after the Effective Date, then the debtor's Pre-Change Losses effectively are eliminated in their entirety.

A "qualified creditor" is any creditor who has held the debt of a debtor for at least eighteen months prior to the petition date or who has held "ordinary course indebtedness" that has been owned at all times by such creditor. A creditor who does not become a direct or indirect five-percent shareholder of a reorganized debtor may generally be treated by the debtor as having always held any debt owned immediately before the ownership change.

Where the 382($l$)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382($l$)(5) Exception), a second special rule will generally apply (the "**382($l$)(6) Exception**").  When the 382($l$)(6) Exception applies, a debtor corporation that undergoes an ownership change generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditors' claims in the bankruptcy.  This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined before the events giving rise to the change.  The 382($l$)(6) Exception also differs from the 382($l$)(5) Exception in that the debtor corporation is not required to reduce its NOL carryforwards by interest deductions by the amount of interest deductions claimed within the prior three-year period as described above, and the debtor may undergo a change of ownership within two years without triggering the elimination of its Pre-Change Losses.  An election to apply the 382($l$)(6) Exception rather than the 382($l$)(5) Exception must be made on the tax return for the year in which the Effective Date occurred.

The Debtors have not yet determined whether or not the 382($l$)(5) Exception will apply.  Even if the 382($l$)(5) Exception applies, the Reorganized Debtors may elect out of the 382($l$)(5) Exception, particularly if it appears likely that another ownership change would be expected to occur within two years after emergence.  If the 382($l$)(5) Exception is unavailable or the Debtors elect out, the 382($l$)(6) Exception would apply.  The Reorganized Debtors will evaluate the known circumstances at the time, and assuming the 382($l$)(5) Exception is available, decide which exception to apply after consultation with and subject to the approval by the Noteholders.  In either case, the Debtors expect that their use of Pre-Change Losses (if any) after the Effective Date will be subject to limitation based on the rules discussed above.  Regardless of whether the Reorganized Debtors take advantage of the 382($l$)(6) Exception or the 382($l$)(5) Exception, the Reorganized Debtors' use of their Pre-Change Losses after the Effective Date may be adversely affected if an "ownership change" within the meaning of Section 382 of the IRC were to occur after the Effective Date.

### C.    Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Claims

The U.S. federal income tax consequences of the Plan to Holders of Claims, including the character and amount of income, gain or loss recognized as a consequence of the Plan, will depend upon, among other things, (a) the manner in which a Holder acquired a Claim; (b) the length of time the Claim has been held; (c) whether the Claim is a capital asset in the hands of the Holder; (d) the method of tax accounting of the Holder; and (e) with respect to any Claim, (i) whether the Claim was acquired at a discount, (ii) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years, (iii) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim, and (iv) whether the Claim is an installment obligation for U.S. federal income tax purposes.

EACH HOLDER OF A CLAIM OR INTEREST AFFECTED BY THE PLAN IS STRONGLY URGED TO CONSULT ITS OWN TAX ADVISORS REGARDING THE SPECIFIC TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.

### 1.    General

A Holder of a Claim may recognize ordinary income or loss with respect to any portion of its Claim attributable to accrued but unpaid interest.  A Holder who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Plan, will be treated as having received interest income to the extent that any consideration received is characterized for U.S. federal income tax purposes as a payment of interest, regardless of whether such Holder realizes an overall gain or loss as a result of surrendering its Claim.  In general, a Holder that previously included in its income accrued but unpaid interest attributable to its Claim will recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such Holder realizes an overall gain or loss as a result of the distribution it may receive under the Plan on account of its Claim.  Although the manner in which consideration is to be allocated between accrued interest and principal for these purposes is unclear under present law, the Debtors intend to allocate for U.S. federal income tax purposes the consideration paid pursuant to the Plan with respect to a Claim first to the principal amount of such Claim as determined for U.S. federal income tax purposes and then to accrued interest, if any, with respect to such Claim.  Accordingly, in cases where a Holder receives consideration in an amount that is less than the principal amount of its Claim, the Debtors intend to allocate the full amount of consideration transferred to such Holder to the

78

principal amount of such obligation and to take the position that no amount of the consideration to be received by such Holder is attributable to accrued interest.  There is no assurance that such allocation will be respected by the IRS for U.S. federal income tax purposes.

Subject to the foregoing rules relating to accrued interest, gain or loss recognized for U.S. federal income tax purposes as a result of the Consummation of the Plan by Holders of Claims that hold their Claims as capital assets generally will be treated as a gain or loss from the sale or exchange of such capital asset.  Capital gain or loss will be long-term if the Claim was held by the Holder for more than one year and otherwise will be short-term.  Any capital losses realized generally may be used by a corporate Holder only to offset capital gains, and by an individual Holder only to the extent of capital gains plus $3,000 of other income.

### 2.        Market Discount

The market discount provisions of the IRC may apply to holders of certain Claims.  In general, a debt obligation that is acquired by a holder in the secondary market is a "market discount bond" as to that holder if its stated redemption price at maturity (or, in the case of a debt obligation having original issue discount, its adjusted issue price) exceeds, by more than a statutory de minimis amount, such holder's tax basis in the debt obligation immediately after its acquisition (any such excess, "**market discount**").  In general, a market discount obligation is treated as having accrued market discount as of any date equal to the total market discount multiplied by a fraction, the numerator of which is the number of days the holder has owned the market discount obligation and the denominator of which is the total number of days that remained until maturity at the time the holder acquired the market discount obligation.  If a Holder has Claims with accrued market discount and such Holder recognizes gain upon the exchange of its Claims for property pursuant to the Plan, such Holder may be required to include as ordinary income the amount of such accrued market discount to the extent of such recognized gain, unless such Holder elected to include the market discount in income as it accrued.  Holders who have Claims with accrued market discount should consult their tax advisors as to the application of the market discount rules to them in view of their particular circumstances.  In particular, Holders of Claims that are "securities" for U.S. federal income tax purposes and that are exchanged for shares of New Common Stock should consult their tax advisors regarding recognition of ordinary income upon a subsequent disposition of such shares of New Common Stock.[9]

### 3.        Definition of "Security"

The term "security" is not defined in the IRC or in the Treasury Regulations.  Whether an instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all of the facts and circumstances.  Certain authorities have held that one factor to be considered is the length of the initial term of the debt instrument.  These authorities have indicated that an initial term of less than five years is evidence that the instrument is generally not a security, whereas an initial term of ten years or more is evidence that it is a security.  Treatment of an instrument with an initial term between five and ten years is generally unsettled.  Numerous factors other than the term of an instrument could be taken into account in determining whether a debt instrument is a security, including, but not limited to, whether repayment is secured, the level of creditworthiness of the obligor, whether the instrument is subordinated, whether the holders have the right to vote or otherwise participate in the management of the obligor, whether the instrument is convertible into an equity interest, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or are accrued.

### 4.        Consequences to Holders of Notes Claims

As more fully described in the Plan, a Holder of an Allowed Notes Claim will receive its Pro Rata share of (i) the New Common Stock and (ii) on account of the Additional Notes, solely the Exit Facility Term Loans.  The tax consequences to a Holder of an Allowed Notes Claim therefore depend, in part, upon whether the 2026 Convertible Notes surrendered, and the consideration received therefor constitute stock or "securities" for U.S. federal income tax purposes.  Holders are encouraged to consult with their tax advisors in connection with the determination of whether

---

[9] *See* "Definition of 'Security'" below.

their Notes or the consideration received in exchange for their Notes are "securities" for U.S. federal income tax purposes.

<div align="center">(a)    <b>Receipt of New Common Stock</b></div>

If a Holder's 2026 Convertible Notes constitute "securities", the Holder's exchange of such 2026 Convertible Notes for shares of New Common Stock will be treated as a recapitalization for U.S. federal income tax purposes. A Holder who realizes gain or loss will not be permitted to recognize such gain or loss, except to the extent of any portion of such Holder's recovery attributable to accrued but unpaid interest, such portion would be treated as interest income to the Holder, and conversely such Holder may be permitted to recognize a loss to the extent it had taken accrued interest into income but receives no payment. A Holder's tax basis in its 2026 Convertible Notes will be allocated between the shares of New Common Stock received based on their relative fair market values on the Effective Date, except that such Holder's tax basis in any shares of New Common Stock attributable to accrued interest, if any shall be equal to the fair market value of such New Common Stock. Any accrued market discount on the 2026 Convertible Notes that has not previously been included in income will likely carry over to the New Common Stock received and generally should be recognized as ordinary income when the New Common Stock is subsequently sold or disposed of in a taxable transaction, to the extent of any gain recognized upon such sale or disposition. A Holder's holding period in the shares of New Common Stock will generally be measured from the date on which it acquired the 2026 Convertible Notes, except that the holding period for any shares of New Common Stock attributable to accrued interest, if any, shall begin on the day after the Effective Date.

If a Holder's 2026 Convertible Notes do not constitute "securities", the Holder's exchange of such 2026 Convertible Notes for shares of New Common Stock will be a taxable transaction, and the Holder will be required to recognize gain or loss equal to the full amount of gain or loss realized on the exchange. For this purpose, each Holder of 2026 Convertible Notes will realize gain or loss in an amount equal to the difference between (a) the fair market value of shares of New Common Stock received, and (b) the adjusted tax basis in its 2026 Convertible Notes, determined immediately prior to the Effective Date. A Holder's tax basis in the shares of New Common Stock should equal their fair market value on the Effective Date. A Holder's holding period for the shares of New Common Stock should begin on the day following the Effective Date.

<div align="center">(b)    <b>Receipt of Exit Facility Term Loans</b></div>

Consummation of the Plan may result in a "significant modification" of the Additional Notes as of the Effective Date for U.S. federal income tax purposes. Generally, a modification of a debt instrument will be treated as resulting in a "deemed exchange" for U.S. federal income tax purposes of an old debt instrument for a new debt instrument if the modification is "significant." The applicable Treasury Regulations provide that a modification of a debt instrument generally is a "significant modification" for U.S. federal income tax purposes, if, based on all the facts and circumstances and considering certain modifications of the debt instrument collectively, the degree to which the legal rights and obligations are altered is "economically significant." If there is a "significant modification," there would be a deemed taxable exchange of the Additional Notes for the Exit Facility Term Loans unless the Additional Notes and the Exit Facility Term Loans are both treated as securities. Whether the exchange of Additional Notes for Exit Facility Term Loans pursuant to the Plan will constitute a "significant modification" is uncertain as of the date of this Disclosure Statement because the terms of the Exit Facility Term Loan Facility Documents have not been determined. Reorganized ICD will provide its determination of whether such exchange constitutes a "significant modification" to holders of Allowed Notes Claims promptly following the Effective Date (but in no event later than thirty days following the Effective Date).

It is uncertain whether the Additional Notes or the Exit Facility Term Loans constitute securities for U.S. federal income tax purposes. If the Additional Notes and the Exit Facility Term Loans constitute securities, a Holder's receipt of such Exit Facility Term Loans in exchange for its Additional Notes pursuant to the Plan will qualify for reorganization exchange treatment. Under this treatment, a Holder of such Additional Notes who realizes gain or loss will not be permitted to recognize such gain or loss, except to the extent any portion of such Holder's recovery would be allocable to accrued but unpaid interest, such portion would be treated as interest income to the Holder, and conversely such Holder may be permitted to recognize a loss to the extent it had taken accrued interest into income but receives no payment. The Holder's tax basis in such Exit Facility Term Loan will be equal to the adjusted tax basis of the Additional Notes exchanged therefor, except that such Holder's basis in any Exit Facility Term Loan attributable

<div align="center">80</div>

to accrued interest, if any shall be equal to the fair market value of such Exit Facility Term Loan. A Holder's holding period such Exit Facility Term Loan received will generally be measured from the date on which it acquired the Additional Notes, except that the holding period for any Exit Facility Term Loan attributable to accrued interest, if any, shall begin on the day after the Effective Date.

If either of the Additional Notes or the Exit Facility Term Loans does not constitute a security, the receipt of the Exit Facility Term Loans in exchange for such Holder's Claim in the Additional Notes will be treated as a taxable exchange for U.S. federal income tax purposes. The Holder will be required to recognize gain or loss on the exchange equal to the difference between (x) the issue price of such Exit Facility Term Loans received (excluding any portion attributable to accrued but unpaid interest) and (y) the Holder's adjusted basis in the Additional Notes. To the extent that the Holder's share of such Exit Facility Term Loans received is treated as attributable to accrued but unpaid interest on the Additional Notes, the Holder will be required to include such amount as ordinary income. The Holder's tax basis in such Exit Facility Term Loans received in exchange for its Additional Notes will equal the fair market value of the Exit Facility Term Loans. The Holder's holding period in such Exit Facility Term Loans will commence on the day after the Effective Date.

Holders of Additional Notes are urged to consult their tax advisors regarding the proper characterization of the exchange and the resulting U.S. federal income tax consequences to them.

### 5. Bad Debt and/or Worthless Securities Deduction

A Holder who receives an amount in respect of a Claim less than the Holder's tax basis in the claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under Section 166(a) of the IRC or a worthless securities deduction under Section 165(g) of the IRC.  The rules governing the character, timing and amount of bad debt or worthless securities deductions place considerable emphasis on the facts and circumstances of the Holder, the obligor and the instrument with respect to which a deduction is claimed.  Holders of Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

### 6. Consequences to Holders that are Non-United States Persons

Holders of Claims that are not "United States persons" within the meaning of Section 7701(a)(30) of the IRC ("**Non-U.S. Holders**") generally will not be subject to U.S. federal income tax with respect to property (including cash) received in exchange for such Claims, unless (a) such Holder is engaged in a trade or business in the United States to which income, gain or loss from the exchange is "effectively connected" for U.S. federal income tax purposes, (b) if such Holder is an individual, such Holder is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met, or (c) such Claim constitutes a United States real property interest ("**USRPI**"), as described below.  A Non-U.S. Holder described in (a) above will generally be subject to U.S. federal income tax on the exchange in the same manner as if such Non-U.S. Holder were a United States person as described herein.  In the case of a Non-U.S. Holder that is a foreign corporation, any gain recognized on the exchange may also be subject to an additional branch profits tax at a rate of 30 percent (or a lower applicable income tax treaty rate).  A Non-U.S. Holder described in (b) above will generally be subject to U.S. federal income tax at a rate of 30 percent (or a lower applicable income tax treaty rate) on any gain recognized on the exchange, which may be offset by certain U.S.-source capital losses.  A Non-U.S. Holder exchanging a USRPI generally will be subject to U.S. federal income tax on a taxable disposition of that USRPI in the same manner as Non-U.S. Holders described in (a) (except that branch profits tax would not apply).

A Claim will constitute a USRPI if (a) ICD is or has been a United States real property holding corporation ("**USRPHC**") for U.S. federal income tax purposes at any time within the shorter of the five-year period ending on the date of such exchange or the period that the exchanging Non-U.S. Holder held such Claim and (b) the Claim includes a right to acquire, by purchase, conversion or otherwise, an equity interest in ICD, and one of the exceptions below does not apply.  Generally, a corporation is a USRPHC if the fair market value of its U.S. real property interests equals or exceeds 50 percent of the sum of the fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business.  The Debtors believe that ICD currently is not, and expect that it will not become in the foreseeable future, a USRPHC for U.S. federal income tax purposes, however no assurances can be made that ICD will not become a USRPHC in the future.

Non-U.S. Holders of 2026 Convertible Notes are encouraged to consult with their tax advisors on the tax consequences of the exchange, including the certification and filing requirements that may be necessary to meet these exceptions.

### 7.  Consequences to U.S. Holders of Ownership and Dispositions of Exit Facility Term Loans

#### (a)  Payments of Interest

Stated interest on the Exit Facility Term Loans generally will be taxable to a U.S. Holder as ordinary income at the time such interest is received or accrued, in accordance with such U.S. Holder's method of tax accounting for U.S. federal income tax purposes.

#### (b)  Sale or Other Taxable Disposition

A U.S. Holder will recognize gain or loss on the sale, exchange, redemption, retirement or other taxable disposition of the Exit Facility Term Loans. The amount of such gain or loss will generally equal the difference between the amount received for the Exit Facility Term Loans in cash or other property valued at fair market value (less amounts attributable to any accrued but unpaid interest, which will be taxable as ordinary income (as described above under "— Payments of Interest") to the extent not previously included in income) and the U.S. Holder's adjusted tax basis in the Exit Facility Term Loans.  Any such gain or loss generally will be capital gain or loss, and will be long-term capital gain or loss if the U.S. Holder has held the Exit Facility Term Loans for more than one year at the time of sale or other taxable disposition. Long-term capital gains recognized by certain non-corporate U.S. Holders, including individuals, generally will be taxable at a reduced rate. The deductibility of capital losses is subject to limitations.

### 8.  Consequences to Non-U.S. Holders of Ownership and Dispositions of Exit Facility Term Loans

#### (a)  Payments of Interest

Subject to the discussions below concerning backup withholding and Foreign Account Tax Compliance Act ("**FATCA**") withholding (as described below), interest paid on the Exit Facility Term Loans to a Non-U.S. Holder that is not effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States generally will not be subject to U.S. federal income tax and will be exempt from withholding of U.S. federal income tax under the "portfolio interest" exemption if the Non-U.S. Holder properly certifies as to its foreign status, as described below, and:

- the Non-U.S. Holder does not, actually or constructively, own 10% or more of the total combined voting power of all classes of stock of Reorganized ICD entitled to vote;

- the Non-U.S. Holder is not a controlled foreign corporation related, actually or constructively, to Reorganized ICD; and

- the Non-U.S. Holder is not a bank whose receipt of interest on the Exit Facility Term Loans is in connection with an extension of credit made pursuant to a loan agreement entered into in the ordinary course of its trade or business.

The portfolio interest exemption generally applies only if the Non-U.S. Holder also appropriately certifies as to its foreign status. A Non-U.S. Holder can generally meet the certification requirement by providing a properly executed IRS Form W-8BEN or IRS Form W-8BEN-E (or other applicable or successor form) to the applicable withholding agent. If a Non-U.S. Holder holds the Exit Facility Term Loans through a financial institution or other agent acting on its behalf, such Non-U.S. Holder may be required to provide appropriate certifications to the agent. Such Non-U.S. Holder's agent will then generally be required to provide appropriate certifications to the applicable withholding agent, either directly or through other intermediaries. Special rules apply to foreign partnerships, estates

and trusts, and in certain circumstances certifications as to the foreign status of partners, trust owners or beneficiaries may have to be provided to the applicable withholding agent. In addition, special rules apply to qualified intermediaries that enter into withholding agreements with the IRS.

If a Non-U.S. Holder does not satisfy the requirements above, payments of interest made to such Non-U.S. Holder will be subject to U.S. federal withholding tax at a rate of 30 percent, unless (i) the Non-U.S. Holder provides the applicable withholding agent with a properly executed IRS Form W-8BEN or IRS Form W-8BEN-E (or other applicable or successor form) claiming a reduced rate of withholding under the benefits of an applicable income tax treaty, or (ii) the payments of interest are effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States (and, if required by an applicable income tax treaty, are attributable to a permanent establishment or fixed base maintained by the Non-U.S. Holder in the United States) and the Non-U.S. Holder meets certain certification requirements.

The certifications described above must be provided to the applicable withholding agent prior to the payment of interest and must be updated periodically. Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for a reduced rate under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS. Non-U.S. Holders should consult their tax advisors regarding the U.S. federal income tax consequences of purchasing, owning and disposing of the Exit Facility Term Loans, including their entitlement to benefits under any applicable income tax treaty.

(b) **Sale or Other Taxable Disposition**

Subject to the discussion below concerning backup withholding, a Non-U.S. Holder will not be subject to U.S. federal income tax on any gain realized upon the sale, exchange, redemption, retirement or other taxable disposition of the Exit Facility Term Loans (except to the extent attributable to accrued but unpaid interest) unless:

- the gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States (and, if required by an applicable income tax treaty, the Non-U.S. Holder maintains a permanent establishment or a fixed base in the United States to which such gain is attributable); or

- the Non-U.S. Holder is an individual who has been present in the United States for 183 days or more during the taxable year of the disposition and certain other requirements are met.

Non-U.S. Holders should consult their tax advisors regarding the U.S. federal income tax consequences of receiving, owning and disposing of the Exit Facility Term Loans, including any applicable income tax treaties that may provide for different rules.

9. **Consequences to U.S. Holders of Ownership and Dispositions of New Common Stock**

(a) **Dividends on New Common Stock**

Any distributions made on account of the New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current and accumulated earnings and profits of Reorganized ICD as determined under U.S. federal income tax principles. "Qualified dividend income" received by an individual U.S. Holder is subject to preferential tax rates. To the extent that a U.S. Holder receives distributions that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares of the New Common Stock. Any such distributions in excess of the U.S. Holder's basis in its shares of the New Common Stock (determined on a share-by-share basis) generally will be treated as capital gain.

Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction so long as Reorganized ICD has sufficient earnings and profits and certain holding period requirements are satisfied. The length of time that a U.S. Holder has held its stock is reduced for any period during which such U.S. Holder's risk of loss with respect to the stock is diminished by reason

of the existence of certain options, contracts to sell, short sales, or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends-received deduction may be disallowed.

<p style="text-align:center">(b)      **Sale, Redemption, or Repurchase of New Common Stock**</p>

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the New Common Stock. Such capital gain generally will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder has held the New Common Stock for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations as described below.

Under the recapture rules of section 108(e)(7) of the IRC, a U.S. Holder may be required to treat gain recognized on the taxable disposition of the New Common Stock as ordinary income if such U.S. Holder took a bad debt deduction with respect to its Allowed Note Claims or recognized an ordinary loss on the exchange of its Allowed Notes Claims for New Common Stock.

**10.      Consequences to Non-U.S. Holders of Ownership and Dispositions of New Common Stock**

Distributions with respect to the New Common Stock will generally be treated as dividend income to the extent such distributions are paid from the current or accumulated earnings and profits of Reorganized ICD as determined for U.S. federal income tax purposes.  If a distribution exceeds the current and accumulated earnings and profits of Reorganized ICD, the excess will generally be treated first as a return of capital to the extent of the Non-U.S. Holder's adjusted tax basis in the New Common Stock (and will reduce the Non-U.S. Holder's basis in such New Common stock) and thereafter as capital gain from the sale or exchange of such New Common Stock, subject to the tax treatment described below.  Generally, the gross amount of dividends paid to Non-U.S. Holders will be subject to withholding of U.S. federal income tax at a rate of 30 percent or at a lower rate if an applicable income tax treaty so provides and Reorganized ICD (or its agent) has received proper certification as to the application of that treaty.

Dividends that are "effectively connected" with a Non-U.S. Holder's conduct of a trade or business within the United States (and, if required by an applicable income tax treaty, are attributable to a U.S. permanent establishment of the Non-U.S. Holder) are generally subject to U.S. federal income tax on a net basis at regular graduated rates, in the same manner as if the Non-U.S. Holder were a United States person, and are exempt from the 30 percent withholding tax described above, provided that certain certification requirements are satisfied. Any such effectively connected dividends received by a Non-U.S. Holder that is a corporation may also, under certain circumstances, be subject to an additional "branch profits tax" at a rate of 30 percent or such lower rate as may be specified by an applicable income tax treaty.

To satisfy the IRS certification requirements in order to claim a reduction of withholding under an applicable income tax treaty , a Non-U.S. Holder will generally be required to provide a properly executed IRS Form W-8BEN or W-8BEN-E (if the holder is claiming the benefits of an income tax treaty) or IRS Form W-8ECI (for income effectively connected with the conduct of a trade or business in the United States) or other suitable form. A Non-U.S. Holder eligible for a reduced rate of withholding tax pursuant to an income tax treaty may obtain a refund of any excess amounts withheld by filing an appropriate claim for refund with the IRS. Non-U.S. Holders should consult their tax advisors regarding their entitlement to benefits under an applicable income tax treaty and the specific manner of claiming the benefits of the treaty.

Subject to the discussion below on FATCA withholding, a Non-U.S. Holder will generally not be subject to U.S. federal income or withholding tax with respect to gain realized on the sale, exchange, or other taxable disposition of the New Common Stock, unless:

- in the case of a Non-U.S. Holder that is a non-resident alien individual, such Non-U.S. Holder is present in the United States for 183 days or more in the taxable year of the sale, exchange, or other taxable disposition, and certain other conditions are met;

- the gain is "effectively connected" with such Non-U.S. Holder's conduct of a trade or business within the United States (and, if required by an applicable treaty, the gain is attributable to a U.S. permanent establishment of such Non-U.S. Holder); or

- Reorganized ICD is or has been a USRPHC for U.S. federal income tax purposes at any time within the shorter of the five-year period ending on the date of such sale, exchange, or other taxable disposition or the period that such Non-U.S. Holder held such New Common Stock and either (a) the New Common Stock was not treated as regularly traded on an established securities market in the calendar year in which the sale, exchange, or other taxable disposition occurs, or (b) such Non-U.S. Holder owns or owned (actually or constructively) more than five percent of the total fair market value of the New Common Stock at any time during the shorter of the two periods described above.

A Non-U.S. Holder described in the first bullet point above will generally be subject to U.S. federal income tax at a rate of 30 percent (unless otherwise provided by an applicable treaty) on any capital gain recognized on the disposition of the New Common Stock, which may be offset by certain U.S.-source capital losses.

A Non-U.S. Holder whose gain is described in the second bullet point above will generally be subject to U.S. federal income tax on the net gain from the disposition of the New Common Stock at regular graduated rates in the same manner as if such Non-U.S. Holder were a United States person. In the case of a Non-U.S. Holder that is a foreign corporation, such gain may also be subject to an additional branch profits tax rate of 30 percent (or a lower applicable treaty rate). The Debtors believe that ICD currently is not, and expect that it will not become in the foreseeable future, a USRPHC for U.S. federal income tax purposes, however no assurances can be made that ICD will not become a USRPHC in the future.

Non-U.S. Holders should consult their tax advisors with respect to the application of the foregoing rules to their ownership and disposition of the New Common stock

### 11.  Withholding and Reporting

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends. The Debtors will comply with all applicable reporting requirements of the IRC. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim. Additionally, backup withholding, currently at a rate of 24 percent, will generally apply to such payments if a Holder fails to provide an accurate taxpayer identification number or otherwise fails to comply with the applicable requirements of the backup withholding rules. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules will be allowed as a credit against such Holder's U.S. federal income tax liability and may entitle such Holder to a refund from the IRS, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

### 12.  FATCA

Pursuant to Sections 1471 through 1474 of the IRC, foreign financial institutions (which term includes most foreign hedge funds, private equity funds, mutual funds, and other investment vehicles) and certain other foreign entities who do not comply with certain information reporting rules with respect to their U.S. account holders investors or owners may be subject to a withholding tax on U.S.-source payments made to them. A foreign financial institution or such other foreign entity that does not comply with the FATCA reporting requirements generally will be subject to a 30 percent withholding tax with respect to any "withholdable payments." For this purpose, "withholdable payments" are any U.S.-source payments of fixed or determinable, annual, or periodical income (including interest paid on the Claims and distributions, if any on shares of New Common Stock). Under the Treasury Regulations, withholding

under FATCA will generally apply to payments of interest on the Claims and the Exit Facility and dividends on shares of New Common Stock.  Withholding with respect to the gross proceeds of a disposition of any stock, debt instrument, or other property that can produce U.S.-source dividends or interest has been eliminated under proposed Treasury Regulations, which can be relied on until final regulations become effective.  Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing FATCA may be subject to different rules.

Holders are urged to consult with their own tax advisors regarding the effect, if any, of the FATCA provisions to them based on their particular circumstance.

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY AND DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

### D.      Reservation of Rights

The foregoing discussion is subject to change (possibly substantially) based on, among other things, subsequent changes to the Plan and events that may subsequently occur that may impact the timeline for the transactions contemplated by the Plan.  The Debtors and the Debtors' advisors reserve the right to modify, revise, or supplement this discussion and other tax related sections of the Plan and Disclosure Statement in accordance with the terms of the Plan and the Bankruptcy Code.

*[Remainder of page intentionally left blank]*

## XV.   CONCLUSION AND RECOMMENDATION

In the opinion of each of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario.  In addition, any alternative to confirmation of the Plan could result in extensive delays and increased administrative expense.

Accordingly, the Debtors recommend all Holders of Claims entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they are received no later than 12:00 p.m. (prevailing Central Time) on December 4, 2024.

Dated:  December 2, 2024

Independence Contract Drilling, Inc.
(on behalf of itself and Sidewinder Drilling LLC)

*/s/ J. Anthony Gallegos, Jr.*
J. Anthony Gallegos, Jr.
Chief Executive Officer and Director
Independence Contract Drilling, Inc.